# EXHIBIT A

**CIVIL**

_____ Walla Walla _____ COUNTY SUPERIOR COURT

Case Information Cover Sheet (CICS)

**Case Number** _____  **Case Title** John Doe v. The Board of Trustees of Whitman College

**Attorney Name**  Lara Hruska _____  **Bar Membership Number**  46531

Please check one category that best describes this case for indexing purposes.  Accurate case indexing not only saves time in docketing new cases, but helps in forecasting needed judicial resources.  Cause of action definitions are listed on the back of this form.  Thank you for your cooperation.  *Form updated 6/27/2022*

| | | | | | |
|---|---|---|---|---|---|
| ☐ | ABJ | Abstract of Judgment | ☐ | PRG | Property Damage – Gangs |
| ☐ | ABL | Abusive Litigation | ☐ | PRP | Property Damages |
| ☐ | ALR | Administrative Law Review | ☐ | QTI | Quiet Title |
| ☐ | ALRJT | Administrative Law Review-Jury Trial  (L&I) | ☐ | RDR | Relief from Duty to Register |
| ☐ | BAT | Ballot Title | ☐ | RFR | Restoration of Firearm Rights |
| ☐ | CHN | Non-Confidential Change of Name | ☐ | SDR | School District-Required Action Plan |
| ☐ | CBC | Contractor Bond Complaint | ☐ | SER | Subdivision Election Process Law Review |
| ☐ | COL | Collection | ☐ | SPC | Seizure of Property-Commission of Crime |
| ☐ | CON | Condemnation | ☐ | SPR | Seizure of Property-Resulting from Crime |
| ☐ | COM | Commercial | ☐ | TAX | Employment Security Tax Warrant |
| ☐ | CPO | Civil Protection Orders | ☐ | TAX | L & I Tax Warrant |
| ☐ | CRP | Pet. for Cert. of Restoration of Opportunity | ☐ | TAX | Licensing Tax Warrant |
| ☐ | DOL | Appeal Licensing Revocation | ☐ | TAX | Revenue Tax Warrant |
| ☐ | ECP | Enforce Canadian DV Protection Order | ☐ | TMV | Tort – Motor Vehicle |
| ☐ | EOM | Emancipation of Minor | ☐ | TRJ | Transcript of Judgment |
| ☐ | FJU | Foreign Judgment | ☐ | TTO | Tort – Other |
| ☐ | FOR | Foreclosure | ☐ | TXF | Tax Foreclosure |
| ☐ | FPO | Foreign Protection Order | ☐ | UND | Unlawful Detainer – Commercial |
| ☐ | INJ | Injunction | ☐ | UND | Unlawful Detainer – Residential |
| ☐ | INT | Interpleader | ☐ | VEP | Voter Election Process Law Review |
| ☐ | LCA | Lower Court Appeal – Civil | ☐ | VVT | Victims of Motor Vehicle Theft-Civil Action |
| ☐ | LCI | Lower Court Appeal – Infractions | ☐ | WDE | Wrongful Death |
| ☐ | LUPA | Land Use Petition Act | ☐ | WHC | Writ of Habeas Corpus |
| ☐ | MAL | Other Malpractice | ☐ | WMW | Miscellaneous Writs |
| ☐ | MED | Medical Malpractice | ☐ | WRM | Writ of Mandamus |
| ☐ | MHA | Malicious Harassment | ☐ | WRR | Writ of Restitution |
| ☐ | MSC2 | Miscellaneous – Civil | ☐ | WRV | Writ of Review |
| ☐ | MST2 | Minor Settlement – Civil  (No Guardianship) | ☐ | XRP | Extreme Risk Protection Order |
| ☐ | PCC | Petition for Civil Commitment (Sexual Predator) | ☐ | XRU | Extreme Risk Protection Order Under 18 |
| ☐ | PFA | Property Fairness Act | | | |
| ☐ | PIN | Personal Injury | | | |
| ☐ | PRA | Public Records Act | | | |

**IF YOU CANNOT DETERMINE THE APPROPRIATE CATEGORY, PLEASE DESCRIBE THE CAUSE OF ACTION BELOW**
_____

*Please Note:  Public information in court files and pleadings may be posted on a public Web site.*

**APPEAL/REVIEW**

**Administrative Law Review**-Petition to the superior court for review of rulings made by state administrative agencies.

**Appeal of a Department of Licensing Revocation**-Appeal of a DOL revocation (RCW 46.20.308(9)).

**Lower Court Appeal-Civil**-An appeal for a civil case; excludes traffic infraction and criminal matters.

**Lower Court Appeal-Infractions**-An appeal for a traffic infraction matter.

**CONTRACT/COMMERCIAL**

**Breach of Contract**-Complaint involving monetary dispute where a breach of contract is involved.

**Contractor Bond Complaint**-Complaint for claim against a contractor or subcontractor bond.

**Commercial Contract**-Complaint involving monetary dispute where a contract is involved.

**Commercial Non-Contract**-Complaint involving monetary dispute where no contract is involved.

**Third Party Collection**-Complaint involving a third party over a monetary dispute where no contract is involved.

**PROTECTION ORDER**

**Civil Protection Orders –** Petition seeking protection from harmful or threatening behavior. (Chapt. 7.105 RCW) (eff. 7/1/2022).

**Enforce Canadian DV Protection Order –** Petition seeking order granting recognition and enforcement of Canadian DV PO. (Chapt. 26.55 RCW)

**Extreme Risk Protection Order**-Petition to restrict ownership, possession, custody or control of a firearm or concealed weapons permit.

**Extreme Risk Protection Order Under 18**-Petition to restrict access, possession, purchase, custody or control of a firearm by a minor.

**Foreign Protection Orders**-Any protection order of a court of the United States, or of any state, territory, or tribal land, which is entitled to full faith and credit in this state.

**JUDGMENT**

**Abstract Only**-A certified copy of a judgment docket from another superior court, an appellate court, or a federal district court.

**Foreign Judgment**-Any judgment, decree, or order of a court of the United States, or of any state or territory, which is entitled to full faith and credit in this state.

**Judgment, Another County**-A certified copy of a judgment docket from another superior court within the state.

**Judgment, Another State**-Any judgment, decree, or order from another state that is entitled to full faith and credit in this state.

**Tax Warrants** -A notice of assessment by a state agency creating a judgment/lien in the county in which it is filed.  (Four types available.)

**Transcript of Judgment**-A certified copy of a judgment from a court of limited jurisdiction to a superior court in the same county.

**OTHER COMPLAINT/PETITION**

**Abusive Litigation**- Request to restrict a current or former intimate partner party from filing abusive litigation for the purposes of harassing, intimidating, or maintaining contact with the other party

**Ballot Title**-Action for review of the ballot title (RCW 29A.36.090).

**Petition for Certificate of Restoration of Opportunity**-Request for order that is intended to facilitate obtaining housing and employment (RCW 9.97.020).

**Change of Name**-Petition for a change of name.  If change is confidential due to domestic violence/anti-harassment see case type 5 instead.

**Deposit of Surplus Funds**-Deposit of money or other item with the court.

**Emancipation of Minor**-Petition by a minor for a declaration of emancipation.

**Injunction**-Complaint/petition to require a person to do or refrain from doing a particular thing.

**Interpleader**-Petition for the deposit of disputed earnest money from real estate, insurance proceeds, and/or other transaction(s).

**Malicious Harassment**-Suit involving damages resulting from malicious harassment.

**Minor Settlements**-Petition for a court decision that an award to a minor is appropriate when no letters of guardianship are required (e.g., net settlement value $25,000 or less).

**Petition for Civil Commitment (Sexual Predator)**-Petition for the involuntary civil commitment of a person who 1) has been convicted of a sexually violent offense whose term of confinement is about to expire or has expired, 2) has been charged with a sexually violent offense and who has been determined to be incompetent to stand trial who is about to be released or has been released, or 3) has been found not guilty by reason of insanity of a sexually violent offense and who is about to be released or has been released, and it appears that the person may be a sexually violent predator.

**Property Damage-Gangs**-Complaint involving damage to property related to gang activity.

**Public Records Act**-Actions filed under RCW 42.56.

**Relief from Duty to Register**-Civil action requesting relief from duty to register as a sex offender. Petition can address the registration obligation that arises from multiple cases. RCW 9A.44.142, 9A.44.143.

**Restoration of Firearms Rights**-Petition seeking restoration of firearms rights under RCW 9.41.040 and 9.41.047. *(Eff. 9-2-2014)*

**School District-Required Action Plan**-Petition filed requesting court selection of a required action plan proposal relating to school academic performance.

**Seizure of Property from the Commission of a Crime**-Seizure of personal property that was employed in aiding, abetting, or commission of a crime, from a defendant after conviction.

**Seizure of Property Resulting from a Crime**-Seizure of tangible or intangible property that is the direct or indirect result of a crime, from a defendant following criminal conviction (e.g., remuneration for, or contract interest in, a depiction or account of a crime).

**Subdivision Election Process Review**-Petition seeking court acknowledgement of compliance (RCW 29A.92).

**Subpoenas**-Petition for a subpoena.

**Voter Election Law Review**-Action filed by voters requesting review of Voting Rights Act (RCW 29A.92).

**PROPERTY RIGHTS**

**Condemnation**-Complaint involving governmental taking of private property with payment, but not necessarily with consent.

**Foreclosure**-Complaint involving termination of ownership rights when mortgage or tax foreclosure is involved; ownership is not in question.

**Land Use Petition**-Petition for an expedited judicial review of a land use decision made by a local jurisdiction (RCW 36.70C.040).

**Property Fairness**-Complaint involving the regulation of private property or restraint of land use by a government entity brought forth by Title 64 RCW.

**Quiet Title**-Complaint involving the ownership, use, or disposition of land or real estate other than foreclosure.

**Unlawful Detainer**-Complaint involving the unjustifiable retention of lands or attachments to land, including water and mineral rights.

**TORT, MEDICAL MALPRACTICE**

**Hospital**-Complaint involving injury or death resulting from a hospital.

**Medical Doctor**-Complaint involving injury or death resulting from a medical doctor.

**Other Health Care Professional**-Complaint involving injury or death resulting from a health care professional other than a medical doctor.

**TORT, MOTOR VEHICLE**

**Death**-Complaint involving death resulting from an incident involving a motor vehicle.

**Non-Death Injuries** -Complaint involving non-death injuries resulting from an incident involving a motor vehicle.

**Property Damage Only**-Complaint involving only property damages resulting from an incident involving a motor vehicle.

**TORT, NON-MOTOR VEHICLE**

**Asbestos**-Complaint alleging injury resulting from asbestos exposure.

**Other Malpractice**-Complaint involving injury resulting from other than professional medical treatment.

**Personal Injury**-Complaint involving physical injury not resulting from professional medical treatment, and where a motor vehicle is not involved.

**Products Liability**-Complaint involving injury resulting from a commercial product.

**Property Damages**-Complaint involving damage to real or personal property excluding motor vehicles.

**Victims of Motor Vehicle Theft**-Complaint filed by a victim of car theft to recover damages. (RCW 9A.56.078).

**Wrongful Death**-Complaint involving death resulting from other than professional medical treatment.

**WRIT**

**Writ of Habeas Corpus**-Petition for a writ to bring a party before the court.

**Writ of Mandamus**-Petition for writ commanding performance of a particular act or duty.

**Writ of Restitution**-Petition for a writ restoring property or proceeds; not an unlawful detainer petition.

**Writ of Review**-Petition for review of the record or decision of a case pending in the lower court; does not include lower court appeals or administrative law reviews.

**Miscellaneous Writs**



FILED

APR 1 4 2023

KATHY MARTIN
WALLA WALLA COUNTY CLERK

**SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR WALLA WALLA COUNTY**

JOHN DOE,

      Plaintiff,

v.

THE BOARD OF TRUSTEES OF
WHITMAN COLLEGE, a non-profit
corporation,

      Defendant.

Case No. **23  2  0 0 2 2 8 , 36**

SUMMONS

TO THE DEFENDANT, THE BOARD OF TRUSTEES OF WHITMAN COLLEGE: A lawsuit has been started against you in the above-entitled court by the plaintiffs. Plaintiff's claims are stated in the written complaint, a copy of which is served upon you with this summons.

In order to defend against this lawsuit, you must respond to the complaint by stating your defense in writing, and by serving a copy upon the undersigned attorney for the plaintiff within twenty (20) days after the service of this summons, excluding the day of service, or a default judgment may be entered against you without notice. A default judgement is one where Plaintiff

SUMMONS - 1

Cedar Law PLLC
113 Cherry Street, PMB 96563
Seattle, Washington, 98104
(206) 607-8277
lara@cedarlawpllc.com

is entitled to what they ask for because you have not responded. If you serve a notice of appearance on the undersigned attorney, you are entitled to notice before a default judgment may be entered.

If you wish to seek the advice of an attorney in this matter, you should do so promptly so that your written response, if any, may be served on time.

This summons is issued pursuant to Rule 4 of the Superior Court Civil Rules of the State of Washington.

Dated this 11th day of April 2023.

CEDAR LAW PLLC

Lara Hruska, WSBA # 46531
113 Cherry St. PMB 96563
Seattle, WA 98104
206-607-8277
lara@cedarlawpllc.com
Attorney for Plaintiff

SUMMONS - 2



FILED

APR 1 4 2023

KATHY MARTIN
WALLA WALLA COUNTY CLERK

SUPERIOR COURT OF THE STATE OF WASHINGTON
AND FOR THE COUNTY OF WALLA WALLA

| | |
|---|---|
| JOHN DOE | Case No: |
| Plaintiff, | 23 2 00228 36 |
| vs. | |
| THE BOARD OF TRUSTEES OF WHITMAN COLLEGE, a non-profit corporation. | MOTION TO PROCEED UNDER A PSEUDONYM |
| Defendants | |

### I.    Relief Requested

Pursuant to LCR 7 and 10, GR 10 and 15, Plaintiff respectfully request that this Court enter an order allowing him to proceed in this action as John Doe.

### II.    Statement of Facts

The subject of this case and the complexity of the issues at hand are briefed in the Plaintiff's Complaint and his motion for a temporary restraining order, filed contemporaneously with this motion. Simply, Plaintiff was expelled from Whitman College after an improper, procedurally deficient, and biased Title IX investigation and hearing by Whitman. Plaintiff brings this action seeking injunctive relief and monetary damages for the unlawful conduct of Whitman.

MOTION TO PROCEED UNDER A PSEUDONYM - 1

**Cedar Law PLLC**
113 Cherry Street PMB 96563
Seattle, WA 98104
Phone (206) 607-8277 • Fax (206) 237-9101

### III.    Statement of Issues

Whether the *Ishikawa* factors are met and the name of John Doe may be redacted for compelling privacy and safety concerns.

### IV.    Evidence Relied Upon

The Plaintiff relies on the verified complaint, as well as the Declaration of John Doe, submitted in support of his motion for a temporary injunction.

### V.    Authority

Washington courts rely on GR 15 and the factors outlined in *Seattle Times v. Ishikawa*, 97 Wn.2d 30, 38-39, 640 P.2d 716, 720-21 (1982) to determine whether pseudonymous litigation is appropriate. *John Doe G v. Dep't of Corr.,* 190 Wn.2d 185, 198-99, 410 P.3d 1156, 1163 (2018). Under GR 15( c )(2), a court record may be redacted of names if a court "enters written findings that the specific sealing or redaction is justified by identified compelling privacy or safety concerns that outweigh the public interest in access to the court record." In *Ishikawa*, 97 Wn.2d at 38-39, the Supreme Court of Washington directed our courts to (1) identify the need to seal court records, (2) allow anyone present in the courtroom an opportunity to object, (3) determine whether the requested method is the least restrictive means of protecting the interests threatened, (4) weigh the competing interests and consider alternative methods, and (5) issue an order no broader than necessary. *See John Doe G, 190 Wn.2d* at 199 (citing *Ishikawa*). In this case, all five *Ishikawa* factors are present and the compelling privacy interests outweigh the public interests in publishing the Plaintiff's names.

The Plaintiff's interest in his privacy outweighs any public interest in his identity, according to the balance of equities set forth in GR 15(c)(2). In this case, a false allegation of sexual assault was made against John Doe and the Complainant has shown a substantial interest

MOTION TO PROCEED UNDER A PSEUDONYM - 2

**Cedar Law PLLC**
113 Cherry Street PMB 96563
Seattle, WA  98104
Phone (206) 607-8277 • Fax (206) 237-9101

in commenting on the case in social media. *Complaint,* ¶ 30. John Doe has never been charged with any crime. (*Complaint,* ¶ 35). The accusation that he was involved in a sexual assault is, by nature, a false accusation that is highly offensive to a reasonable person.

According to the first *Ishikawa* factor, the Plaintiff needs to proceed pseudonymously because the very privacy right that he seeks to protect in this action would be violated without such an order. *Ishikawa*, 97 Wn.2d at 37. If John Doe was required to identify himself as a person accused of sexual assault, this would defeat the purpose of this lawsuit - to prevent his name, identity, and reputation from being tarnished by connection to some unsubstantiated accusations involving sexual misconduct.

The second *Ishikawa* factor requires that anyone present in the courtroom be allowed an opportunity to object. *Ishikawa*, 97 Wn.2d at 38. This means that the proponent must state the grounds for the motion with reasonable specificity to provide potential objectors with sufficient information to be able to appreciate the damages which would result from free access to the records. *Id.* The privacy reason provided above, that identification of John Doe would connect him to a false accusation of sexual assault, an unsubstantiated crime, is sufficient specificity to provide potential objectors with notice of the potential harm at stake in this case.

The third *Ishikawa* factor asks the Court to determine whether the requested method is the least restrictive means of protecting the interests threatened. *Id.* The redaction of the name of John Doe in court papers is the least restrictive means of protecting his privacy interests. He does not seek an order sealing the record. He does not object to disclosure of their identities to Whitman College for the sole purposes of discovery, as Whitman is already aware of Doe's identity. But the public should not have a right to discover the identity of the Plaintiff.

MOTION TO PROCEED UNDER A PSEUDONYM - 3

The fourth *Ishikawa* factor requires the Court to weigh the competing interests and consider alternative methods. *Id.* John Doe was a college student at the time he was alleged to commit a sexual assault. He is not a public figure, and his private life has no bearing on any governmental operation. *See Tiberino v. Spokane Cty. Prosecutor*, 103 Wn. App. 680, 689, 13 P.3d 1104, 1109 (2000) (stating that the basic purpose and policy of the PRA, Chapter 42.56 RCW, was "to allow the public scrutiny of government, rather than to promote scrutiny of particular individuals who are unrelated to any governmental operation.") The public has no legitimate interest in the personal relationships of college students, including any role they played in sexual relations with the Complainant. Such "gossip and sensation" is not a public interest. *See Bellevue John Does 1-11*, 164 Wn.2d at 221. There is no alternative method of protecting the identity of the John Doe.

The fifth and final *Ishikawa* factor is that an order restricting access to public records cannot be broader than necessary. *Ishikawa,* 97 Wn.2d at 39. Plaintiff therefore requests that the Court's order be limited to allowing him to file pseudonymously to protect his identity and to keep his name from the media. For the purposes of discovery he does not object to disclosure of his identity, of which Whitman College is already aware.

\*\*\*

Although not Washington specific cases, these types of Title IX cases involving student discipline frequently utilizes pseudonyms - *see Unknown Party v. Arizona Board of Regents,* 2022 WL 3841065 (D.Ariz. August 30, 2022), *Doe v. Oregon, 2022 WL 2713886* (D. Oregon July 13, 2022), *Doe v. Regents of University of California,* 23 F.4th 930 (2022).

**VI. Conclusion**

MOTION TO PROCEED UNDER A PSEUDONYM - 4

**Cedar Law PLLC**
113 Cherry Street PMB 96563
Seattle, WA  98104
Phone (206) 607-8277 • Fax (206) 237-9101

1

2    For the foregoing reasons, the Plaintiff respectfully requests that the Court enter an order

3    permitting him to file his lawsuit under pseudonym to prevent associating John Doe with false and

highly offensive accusations.

4

5

6    Dated this 11th of April, 2023.

7

8    Lara Hruska, WSBA No. 46531
     Cedar Law PLLC
9    113 Cherry Street PMB 96563
     Seattle, WA  98104
10   lara@cedarlawpllc.com
     Phone (206) 607-8277
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   MOTION TO PROCEED UNDER A PSEUDONYM - 5

SUPERIOR COURT OF THE STATE OF WASHINGTON
IN THE COUNTY OF WALLA WALLA

| | |
|---|---|
| JOHN DOE<br><br>    Plaintiff,<br><br>vs.<br><br>THE BOARD OF TRUSTEES OF WHITMAN COLLEGE, a non-profit corporation. | Case No.: 23-2-00228-36<br><br><br>ORDER GRANTING MOTION TO PROCEED UNDER A PSEUDONYM |

   The Plaintiff's Motion to Proceed Under a Pseudonym came before the Court without oral argument. The Court has considered the following pleadings and evidence:

   1.  Plaintiff's Motion to Proceed Under a Pseudonym;

   The Court hereby finds that redaction is justified by identified and compelling privacy and safety concerns that outweigh the public interest in this record.

   Based on the pleadings, evidence, and record in this case, IT IS HEREBY ORDERED: the Plaintiff may proceed under a pseudonym.

   Dated this _____ of April, 2023.


_____
Judge/Court Commissioner

ORDER GRANTING MOTION TO PROCEED UNDER A
PSEUDONYM - 1

**Cedar Law PLLC**
113 Cherry Street, PMB 96563
Seattle, WA 98104-2205
lara@cedarlawpllc.com
Phone (206) 607-8277 • Fax (206) 237-9101

Presented by:


   s/Lara Hruska
LARA HRUSKA, WSBA #46531
Attorney for Plaintiff
Lara@CedarLawPLLC.com

**Cedar Law PLLC**
113 Cherry Street, PMB 96563
Seattle, WA 98104-2205
lara@cedarlawpllc.com
Phone (206) 607-8277 • Fax (206) 237-9101

FILED

APR 14 2023

KATHY MARTIN
WALLA WALLA COUNTY CLERK



**SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR WALLA WALLA COUNTY**

JOHN DOE,

      Plaintiff,

v.

THE BOARD OF TRUSTEES OF
WHITMAN COLLEGE, a non-profit
corporation,

      Defendant.

Case No. 23 2 00228 36

NOTE FOR HEARING

TO: The Clerk of the Court;

AND TO: Michael Porter and Andrea Barton, Attorneys for Defendant

DATE AND TIME OF HEARING: **Monday, April 24, 2023 @ 9:00 a.m.**

PLACE OF HEARING:    **Walla Walla County Superior Court
Via Webex**

CASE DESCRIPTION:   Civil

TYPE OF MOTION:    Motion for Temporary Restraining Order, and
Motion to Proceed Under a Pseudonym

Note for Hearing- 1

1    Dated this 11th day of April 2023.

2                                                    CEDAR LAW PLLC

3

4                                                    _____
                                                     Lara Hruska, WSBA # 46531
5                                                    Attorney for Plaintiff

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Note for Hearing- 2

FILED

APR 1 4 2023

KATHY MARTIN
WALLA WALLA COUNTY CLERK



1
2
3
4
5
6
7
8

SUPERIOR COURT OF THE STATE OF WASHINGTON
AND FOR THE COUNTY OF WALLA WALLA

9  JOHN DOE,                              Case No.:

10           Plaintiff,
                                          23 2 00228 36
11  vs.

12  THE BOARD OF TRUSTEES OF
13  WHITMAN COLLEGE, A non-profit
    corporation                           MOTION FOR TEMPORARY
14                                        RESTRAINING ORDER
             Defendant.
15

16                    **I. RELIEF REQUESTED**

17        Plaintiff seeks a temporary restraining order preventing Defendant Whitman College

18  ("Whitman"), from expelling him just seven weeks before his graduation based on a flawed

19  investigation and hearing pertaining to events from 2019, which denied him substantive rights

20  promised to him by Whitman and guaranteed under Title IX. Time is of the essence and

21  
22  irreparable harm may ensue if the TRO is not entered.

23                    **II. STATEMENT OF FACTS**

24

25

26
27  MOTION FOR TEMPORARY RESTRAINING ORDER
    - 1                                    Cedar Law PLLC
                                           113 Cherry Street
                                           PMB 96563
                                           Seattle, Washington 98104
                                           Phone (206) 607-8277 • Fax (206) 237-9101

Plaintiff John Doe ("Doe," he/him) and the Complainant from the underlying Title IX proceeding ("Complainant," femme nonbinary they/them) met during the first week of freshman year and were romantically and sexually involved between September 2019 to December 2019, until Doe broke up with the Complainant. *Complaint* ¶ 8. During that time, Doe and Complainant frequently engaged in consensual sexual activity. *Id*. In September 2021, someone anonymously contacted Doe's soccer coaches to report that he had abused his ex-girlfriend. *Complaint* ¶ 23. Complainant was Doe's only ex-girlfriend at Whitman and so he was perplexed at the allegation since there had been no abuse in their relationship. *Id.* ¶ 23. On October 2, 2021, Doe called Complainant to tell her about the surprising allegation and they assured him over the phone that he had never been abusive to them. *Id.* at ¶ 23. They later texted him to reiterate that he never abused them, providing:

> It's fucked up and idk how this is being fabricated and spread [.]
> And I do want to clarify that I haven't talked about our relationship
> to anyone at Whitman and when I did I never said you abused me
> or anything remotely like that [.] Whoever's doing this knows
> nothing about me or you [.]

*Id.* ¶ 24. Around this time, Complainant also called their former roommate (identified in the underlying Title IX investigation as Witness A) to express curiosity and annoyance that someone had filed a complaint with the soccer team on their behalf. *Id.* ¶ 25. They told Witness A that they never thought of their relationship with Doe as abusive or nonconsensual. *Id.* ¶25.

During what appears to have been a manic episode as a result of their unmedicated bipolar disorder, Complainant changed their mind as to the nature of their relationship with John Doe sometime later in October 2021 and alleged that John Doe had, in fact, abused them over the course of the relationship. *Id.* ¶ 26-29. On November 20, 2021, Complainant publicly posted on

MOTION FOR TEMPORARY RESTRAINING ORDER - 2

their Instagram story visible to hundreds of Whitman students a photo that Witness G had taken of Doe in Witness G's room with the caption:

> this man r@ped me until I developed stockholm syndrome - the
> sexual abuse continued throughout the relationship.

*Id.* ¶ 30. The response by Doe's classmates within the highly politicized climate on campus regarding sexual assault to this very public allegation by Complainant at Whitman was humiliating and intense. *Id.* ¶ 31. Doe was severely emotionally affected by these very public allegations. *Id.* Doe lost ten pounds and experienced intense back and shoulder pain from hours spent lying in bed because of depression. *Id.* He continued to experience significant anxiety including intermittent panic attacks. Ultimately, Doe was forced to change his living situation as a result of the allegations. *Id.*

After months of efforts by Doe and his attorneys to deescalate Complainant and work with her to resolve the conflict, Complainant filed a police report in April 2022 that was investigated and ultimately not pursued as credible by the Walla Walla Police Department. *Id.* ¶ 35. Still upset, Complainant – who had not attended school at Whitman for over a year – filed a Title IX complaint in May 2022. *Id.* ¶ 36. Notably, Complainant explained to a Witness in the proceedings that their intent for engaging in the Title IX process was simply to "to do my best to fuck with" [Doe's] future. *Id.* ¶ 38.

This kicked off a multi-month investigation, rife with bias and procedural errors as detailed in the complaint. *Id.* ¶ 37-62. For example, Doe was prohibited from raising Complainant's mental health history to the hearing panel and denied the opportunity for this procedural error to be considered on appeal, despite Complainant specifically raising mental

MOTION FOR TEMPORARY RESTRAINING ORDER - 3

**Cedar Law PLLC**
113 Cherry Street
PMB 96563
Seattle, Washington 98104
Phone (206) 607-8277 • Fax (206) 237-9101

health as an issue. *Id.* ¶ 59, 72. The Title IX Hearing Investigator permitted an unrelated witness, who had a one-time sexual encounter with Doe, to show a "pattern and practice" of abuse by the Complainant, but refused Doe's efforts to introduce a long-time partner as evidence of a "pattern of practice" of consent. *Id.* ¶ 37-40. Notably, the Whitman Hearing Panel went to great lengths to avoid exonerating Doe regarding his interactions with Witness C as consensual by referring to it in the double negative of "not unwelcome." *Id.* ¶ 65. This discriminatory bias was likewise rejected as an appealable issue by Whitman. *Id.* ¶ 72.

Not surprisingly, Whitman denied Doe's appeal and upheld its finding that he had engaged in "forcible rape." *Id.* ¶ 73. These findings were not based on an actual incident of nonconsensual sexual contact but because "Complainant said that [they] relented to [Doe's] frequent advances" since Doe asked if Complainant was ready to engage in sexual intercourse multiple times over the first few weeks of their relationship. *Id.* ¶ 64. The Hearing Panel concluded "[Doe's] verbal pressure constituted coercion as defined by Whitman College policy" and "consent is invalidated by the application of force, and [so] Respondent used coercive force to engage in sexual penetration of Complainant." *Id.*

As the sanction for Doe's offense of "forcible rape" Whitman recommended expulsion just seven weeks before Doe was set to graduate for the conclusory reason that forcible rape "relate[s] to some of the most egregious forms of conduct prohibited by Whitman College." *Declaration of John Doe* ("Doe Decl.) exhibit 3 at 13. In arriving at this performatively punitive result, the decision-makers did not take into account that the Complainant is no longer on campus or that Doe could complete his final seven weeks of college off-campus after years of work.

### III.    STATEMENT OF ISSUE

MOTION FOR TEMPORARY RESTRAINING ORDER
- 4

Whether Whitman College should be enjoined from expelling John Doe until a hearing on a motion for a preliminary injunction can be held.

## IV.    EVIDENCE RELIED UPON

The Plaintiffs rely on the allegations raised in the verified complaint, the Declaration of John Doe, and the other papers and pleadings filed in this action.

## V. NOTICE

Plaintiff gave notice via counsel to attorney for the Defendant in an email of his intent to seek a temporary restraining order enjoining Defendant from expelling him on March 27, 2023.

## VI. ARGUMENT AND AUTHORITY

### A.    Legal Standard.

The purpose of a temporary restraining order is to preserve the status quo until the trial court can conduct a full hearing on the merits. See *Ameriquest Mortg. Co. v. State Atty Gen.*, 148 Wn. App. 145, 157, 199 P.3d 468 (2009). "The 'status quo ante' means the 'last actual, peaceable, noncontested condition which preceded the pending controversy.'" *Id.* (quoting *Gen. Tel. Co. of the NW Inc. v. Wash. Utils. & Transp. Comm'n*, 104 Wn.2d 460, 466, 706 P.2d 625 (1985)). The requirements for the issuance of injunctive relief in Washington are well established. The movant must show a clear legal right to relief, a well- grounded fear of an immediate invasion of that right, and that the acts complained of will result in substantial harm. *Kucera v. Dep't of Transp.*, 140 Wn.2d 200, 209, 995 P.2d 63 (2000). The Court then considers the competing equities. *NW Gas Ass'n v. Wash. Util. & Transp. Comm'n*, 141 Wn. App. 98, 122, 168 P.3d 443 (2007).

RCW 7.40.020 mirrors the requirements discussed above, stating, "[w]hen it appears by the complaint that the plaintiff is entitled to the relief demanded and the relief, or any part thereof,

MOTION FOR TEMPORARY RESTRAINING ORDER
- 5

consists in restraining the commission or continuance of some act, the commission or continuance of which during the litigation would produce great injury to the plaintiff; or when during the litigation, it appears that the defendant is doing, or threatened, or is about to do, or is procuring, or is suffering some act to be done in violation of the plaintiff's rights respecting the subject of the action tending to render the judgment ineffectual; or where such relief, or any part thereof, consists in restraining proceedings upon any final order or judgment, an injunction may be granted to restrain such act or proceedings until the further order of the court[…].”

### B. The Plaintiff Has a Legal Right to Relief

To determine whether a party has a clear legal or equitable right to injunctive relief, the court examines “the likelihood that the moving party will prevail on the merits.” *Rabon v. City of Seattle*, 135 Wn. 2d 278, 285, 957 P.2d 621 (1998). Here, Plaintiff is likely to prevail on the merits of his claims for violations of Title IX, Breach of Contract between Plaintiff and Defendant, Breach of the Covenant of Good Faith and Fair Dealing, and violations of the Consumer Protection Act.

### 1. Title IX

The Plaintiff is likely to succeed on his claim that Whitman violated his rights under Title IX because the College discriminated against him during the Title IX hearing process on the basis of sex. The Ninth Circuit Court of Appeals has recognized a cause of action under Title IX when a college or university, who receives federal funds, imposes discipline where gender is a motivating factor in the discipline. *Schwake v. Arizona Board of Regents,* 967 F.3d 940, 947 (9th Cir. 2020). Although some circuit courts impose doctrinal tests in the context of this type of litigation, the Ninth Circuit adopted a “far simpler standard” for Title IX claims in this context –

MOTION FOR TEMPORARY RESTRAINING ORDER - 6

"whether the alleged facts, if true, raise a plausible inference that the university discriminated against the plaintiff on the basis of sex?" *Schwake,* 967 F.3d at 947 (cleaned up) (citing *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854–55 (7th Cir. 2019)). Sex discrimination need not be the only plausible explanation or even the most plausible explanation for a Title IX claim to proceed. See *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018).

Since *Schwake,* the Ninth Circuit has identified three broad categories of evidence that tend to support Title IX claims in this context – external pressure on the College regarding Title IX, internal patterns and practices of bias against male students, and allegations of specific instances of bias in the individual's case, including procedural irregularities. *See Doe v. Regents of University of California*, 23 F.4th 930, 936-940 (9th Cir. 2022).

Regarding external pressures on colleges and universities, courts have looked to government guidance surrounding Title IX, including the April 2011 "Dear Colleague" Letter from the Department of Education ("DOE") "directing schools to take 'immediate action' to eliminate sexual harassment," as well as statements made by executive branch officials regarding the consequences of violating Title IX. *Id.* Internal patterns involve the past and current practices of the college regarding Title IX investigations, including the disparity between how male and female respondents are treated during the Title IX process. However, specific statistical allegations are not necessary at an early stage, because "[i]t may be difficult for a plaintiff to know the full extent of alleged discrimination in decision making before discovery allows a plaintiff to unearth information controlled by the defendant." *Schwake,* 967 F.3d at 949. Internal pressures may also include articles printed in college newspapers regarding the Title IX process.

**Cedar Law PLLC**
113 Cherry Street
PMB 96563
Seattle, Washington 98104
Phone (206) 607-8277 • Fax (206) 237-9101

*Regents,* 23 F.4d at 938. Taken together, the external and internal pressures on the college are often referred to as "background indicia of sex discrimination." *Id.* at 939.

After considering the background indicia of sex discrimination, plaintiffs are required to "combine those allegations with facts particular to his case." *Id.* (citing *Schwake,* 967 F.3d at 949)(cleaned up). Courts, including the *Schwake* and *Regents* courts, look to whether the university's process included any procedural irregularities such as when "the university failed to consider the male accused's version of the alleged assault or to follow up with witnesses and evidence offered in his defense" (*Schwake,* 967 F.3d at 951), or when "the appeals board exclusively credited female testimony and rejected all male testimony." *Doe v. Baum*, 903 F.3d 575, 586 (Sixth Cir. 2018). As the court held in *Regents,* "at some point an accumulation of procedural irregularities all disfavoring a male respondent begins to look like a biased proceeding despite the Regents' protests otherwise." *Regents,* 23 F.4d at 941.

The facts surrounding the investigation and hearing, as alleged in the complaint, raise an inference that sex was a motivating factor in expelling Plaintiff. Regarding the background indicia of sex discrimination, the verified complaint alleges that the 2011 Dear Colleague Letter, although technically rescinded, still informs the college's practice in conducting Title IX hearings, especially considering statements made by Department of Education officials. *Complaint ¶* 77-83. The complaint also alleges that the college's Title IX process discriminates against male students because it repeatedly finds male students responsible for violating Title IX regardless of the level of evidence available. *Complaint ¶* 86-88. Conversely, female students at Whitman are rarely determined to have violated Title IX, both in terms of sheer number of female students

MOTION FOR TEMPORARY RESTRAINING ORDER - 8

subjected to the Title IX process, and those that do go through the process are very rarely found responsible. *Id.*

The College also faces pressure from its community to do more to punish students suspected of violating Title IX. *The Whitman Wire,* Whitman's on campus newspaper, has run eight articles regarding Title IX between the time of Plaintiff's enrollment at Whitman in September of 2019 and his hearing in February of 2023. *Complaint ¶* 90. None of the articles were supportive of the College's response to sexual assault on campus, with many of them challenging the College to do more. *Id.* Article headlines include "Let's Talk about Whitman's Treatment of Sexual Assault," "Whitman Didn't Count You in the Security Report? Me too," "Whitman College Blatantly Ignores Student Safety in Annual Security Report," "Title IX: Survivors Deserve Better," and "Beer Goggles, Munchies, and Title IX Violations. *Id.* The College also faced pressure directly from Complainant, who threatened to sue the College for their handling of Title IX issues. *Id. ¶* 92.  And in 2014, Whitman was the subject of an investigation by the Department of Education's Office for Civil Rights that garnered significant media attention. *Id. ¶* 93. Taken together, the pressure from the school community, as evidenced by the school newspaper and the Complainants threat to sue, highlights the pressure the College is under to overzealously prosecute Title IX violations.

Regarding Plaintiff's specific circumstance, the evidence shows that Whitman created an altogether unfair process that Plaintiff had to go through to defend his innocence. The complaint outlines multiple incidents of procedural irregularities, with just a few highlighted below. Put simply, Plaintiff, a male, was denied the same opportunity to present evidence that the complainant, who is femme/nonbinary, was afforded.

MOTION FOR TEMPORARY RESTRAINING ORDER - 9

**Cedar Law PLLC**
113 Cherry Street
PMB 96563
Seattle, Washington 98104
Phone (206) 607-8277 • Fax (206) 237-9101

The complaint highlights four procedural irregularities that tarnished the Title IX process, although Doe has identified far more than the four discussed in detail below. *See Id.* ¶ 50.  (1) The College's reliance on "pattern of conduct" evidence, without giving Doe an equal opportunity to present competing evidence, (*Id.* ¶ 37-40); (2) the prohibition on asking complainant about their mental health, despite them making their mental health a central component of their story, (*Id.* ¶ 59-61); (3) The College's reliance on "Witness G's" recanted statements, instead of her actual statements, (*Id.* ¶ 60, 69); and (4) accepting and adopting the investigator's conclusions, despite a clear policy against allowing the investigator to reach conclusions. *Id.* ¶ 69, 111. The decision to allow the investigator's conclusions to be included in the report is particularly egregious because the investigator and the hearing chair knew each other from a prior Title IX training. *Id.* ¶ 63. This relationship was not disclosed to the parties. *Id.*

As alleged in the complaint, one of the most glaring procedural irregularities is the College's one-sided use of evidence. As an example, the College only allowed the use of "pattern of conduct" evidence when it supported complainant's story but refused to include evidence that tended to support Plaintiff's story. *Id.* ¶ 37-40. As part of the report submitted to the hearing panel, the investigator included allegations by "Witness C" regarding her own relationship with Plaintiff.[1] *Doe Decl.* exhibit 1 at 35-38. Witness C's relationship with Plaintiff is wholly unrelated to the sexual relationship between Plaintiff and the Complainant. It was simply not relevant and

---

[1] Witness C's statements were not just relegated to passing references either. As discussed later, the investigator (improperly) drew direct connections between Complainant's story and Witness C's account, thus having a tangible impact on the decision maker's perception of the evidence.

MOTION FOR TEMPORARY RESTRAINING ORDER - 10

**Cedar Law PLLC**
113 Cherry Street
PMB 96563
Seattle, Washington 98104
Phone (206) 607-8277 • Fax (206) 237-9101

would have been excluded as improper character evidence under ER 404(b) in any courtroom in Washington.

However, recognizing that the hearing panel was not a courtroom, nor subject to evidence rules, Plaintiff provided to the Investigator an account by another third party (referred to in the documents as Witness G), which spoke clearly about her own consensual relationship with Plaintiff. *Doe Decl.* exhibit 2 at 24. Specifically, Witness G stated, "my numerous experiences of sex with [Plaintiff] during the time we lived together between August and December 2020 were ALWAYS consensual, and I never once felt unsafe, uncomfortable, or disrespected." *Id*. Witness G would go on to relay an experience she had telling Plaintiff to stop during sex due to pain caused by a medical condition – specifically, she stated "I asked to stop, and he immediately stopped. He asked if I was okay, I told him what was going on, and he completely respected it…" Id. None of this information regarding Plaintiff's consensual relationship with Witness G was included in the final report. *See Doe Decl.* exhibit 1 at 47-49 (the report's narrative of Witness G statements). Additionally, the report also failed to include relevant "pattern of conduct" evidence against the Complainant. This was not the first time Complainant has accused a male of sexually assaulting them, having done so in December of 2019 before backing down from their allegations. *Complaint* ¶ 9-10. However, this information was not included in the report.   Having made the decision to allow "pattern of conduct" evidence in the hearing, the College discriminated against Plaintiff by refusing to include exculpatory evidence offered in direct response to evidence offered by the College.

Another example of the use of one-sided evidence is the College's refusal to allow Plaintiff's advocate to question the complainant regarding her mental health. *Complaint* ¶ 59. As

MOTION FOR TEMPORARY RESTRAINING ORDER - 11

**Cedar Law PLLC**
113 Cherry Street
PMB 96563
Seattle, Washington 98104
Phone (206) 607-8277 • Fax (206) 237-9101

the complaint alleges, the complainant is diagnosed with bipolar disorder, and during the time the complainant initially made the allegations against Plaintiff, they were not taking their medications. *Id.* ¶ 59. This is directly relevant to their credibility, as Complainant, in other conversations, talks specifically about altering their perception of events, and alleged that Doe had given them "Stockholm Syndrome" as an excuse for why they continued to have sex with Doe for months. *Doe Decl.,* exhibit 2 at 23, and *Complaint* ¶ 61. Because their mental health could be a plausible explanation for their changing story about the nature of their consensual relationship with the Doe, Plaintiff should have been allowed to introduce evidence relevant to that.

Another, frankly bizarre, decision by the College was the choice to credit Witness G's recanted statements over her actual statements. Witness G originally spoke with the investigator in August of 2022 but after reviewing the transcript for a second time, Witness G was "unhappy with how it looked. [She] wanted to clarify some things but was unsure if it was too late to do so or not…" prompting her to speak with Plaintiff's advocate. *Doe Decl.* exhibit 4 at 14. The advocate "told [her] it was important for the investigator to hear the whole truth from [her] and it wasn't too late to reach out to the investigator to revise [her] statement, which was not accurate as written." *Doe Decl.* exhibit 4 at 14. In fact, Whitman policy specifically affords witnesses an opportunity to review and clarify their statements. *Doe Decl.* exhibit 6 at 30. The College effectively denied Witness G her right to do so. On September 29, 2022 Witness G emailed the investigator to "clarify" two statements and add one more. *Id.* The College's findings specifically state "the panel determined that Witness G's original statements were credible and relevant, and

MOTION FOR TEMPORARY RESTRAINING ORDER - 12

**Cedar Law PLLC**
113 Cherry Street
PMB 96563
Seattle, Washington 98104
Phone (206) 607-8277 • Fax (206) 237-9101

that Witness G's revised and retracted statement was not credible…" *Doe Decl.*, exhibit 3 at 12.[2] Relying on recanted statements that fit complainant's narrative, while discounting and refusing to accept the actual, corrected statements that conform to Plaintiff's story is fundamentally irrational and procedurally inappropriate.

Finally, the college violated its own policies by allowing the investigator to make "credibility considerations" that were nothing more than credibility determinations. Whitman's policy states "The investigator(s) gather, assess, and synthesize evidence, **but make no conclusions**, engage in no policy analysis, and render no recommendations as part of their report." *Doe Decl.* exhibit 6. In direct violation of the prohibition on making conclusions, the investigator concluded that "Information tending to support Complainant's allegations was offered by several witnesses who said they did not currently have an active friendship relationship with her: Witness A, Witness C, Witness D, Witness F," and "As detailed in Section VIII above, witnesses corroborated: (a) seeing a bruise or mark on Complainant's face or neck; (b) Complainant talking to them about a bruise or mark; and (c) Complainant telling them about nonconsensual activity with Respondent." *Doe Decl.* exhibit 1 at 68. The investigator's blanket statement that witnesses corroborated Complainant's allegations ignores the fact that each witness testified to different events occurring and often times contradicted each other. For example, Witness C never

---

[2] The Panel compounds their mistake by inaccurately stating the Respondent's advisor had a role in revising and retracting Witness G's statement. That is simply incorrect. Witness G specifically informed the hearing panel that Respondent's Advisor did not help write her September 29, 2022 statement and that, "It's entirely my own." *Doe Decl.* exhibit 4 at 6. As part of Plaintiff's appeal, Witness G submitted a sworn affidavit saying, "I confirm that everything I stated in my September 29, 2022 email, which included me recanting statements made during my interview, is true and correct."

MOTION FOR TEMPORARY RESTRAINING ORDER - 13

corroborated seeing a bruise on Complainants face, only her neck. *Doe Decl.,* exhibit 1 at 35. However, the Complainant does not remember ever having a bruise on her neck. *Id.* At 23. Notably, Doe putting his hands on Complainant's neck was described by Complainant as "the things that I like" and that they were okay with "a normal amount" of choking. *Id,* exhibit 2 at 7 and exhibit 3 at 5. Witness D only testified to seeing Respondent grabbing Complainant's arm at a party, which no other witnesses corroborated. *Complaint, ¶* 54. Furthermore, the Investigator failed to follow up with the only other witness to the event that Witness D named: Riley Kraft. *Id.* Witness F stated that Complainant told him that Doe hit them "all the time," yet Complainant specifically told the Investigator that Witness F's account was inaccurate. *Id.* at 55. Witness F even stated that he asked Complainant if they had a bruise, and recalls that they (Complainant) indicated there was never one. *Id.* Finally, other witnesses explicitly did not corroborate the allegations – including Witnesses A and G. *See Doe Decl.* exhibit 2 at 23-25 and *Doe Decl.* exhibit 4 at 12-14.

Further compounding this error is the fact that the investigation's "credibility consideration" section failed to address the two most glaring credibility issues for the complainant (1) that as recently as three days before making their allegations and throughout their relationship, they had repeatedly, and affirmatively stated Plaintiff had not abused them and that (2) even after making the allegations, Complainant's story varied wildly regarding which specific acts were or were not consensual. *Complaint* at ¶ 49. Both choosing to make credibility "considerations" and not including the most glaring issues, all to the benefit of complainant, was procedurally inappropriate. *Doe Decl.* exhibit 1 at 68.

MOTION FOR TEMPORARY RESTRAINING ORDER - 14

The procedural irregularities identified in the complaint and expanded on here were all to the benefit of the complainant and denied Plaintiff an opportunity to meaningfully respond to the evidence. Coupled with the background indicia of sex discrimination, Plaintiff is likely to show the decision to expel him was motivated by his sex. As such, he is likely to succeed on his Title IX claim.

### 2.  Breach of Contract

Washington courts have long recognized that "the relationship between a student and a university is primarily contractual in nature," "with the specific terms to be found in the university bulletin and other publications," since a formal contract is rarely prepared. *Marquez v. University of Wash.*, 32 Wn. App. 302, 305, 648 P.2d 94 (1982)*, review denied, 97 Wn. 2d 1037 (1982), cert. denied,* 460 U.S. 1013 (1983). However, while "'some elements of the law of contracts are used and should be used in the analysis of the relationship between [students] and the university to provide some framework into which to put the problem ... This does not mean that 'contract law' must be rigidly applied in all its aspects." *Id.* at 305-06.

Whitman's Student Handbook is precisely the type of "university bulletin and other publications" that inform Plaintiff's contractual rights when attending Whitman. The Handbook contains a specific section regarding "Student Rights and Responsibilities," which states in relevant part that "Whitman College has a strong commitment to the principle of nondiscrimination in all its forms. In its admission, educational and employment practices, programs and activities, Whitman College does not discriminate on the basis of… sex… or any

MOTION FOR TEMPORARY RESTRAINING ORDER - 15

**Cedar Law PLLC**
113 Cherry Street
PMB 96563
Seattle, Washington 98104
Phone (206) 607-8277 • Fax (206) 237-9101

other basis prohibited by… Title IX of the Educational Amendments of 1972…"[3] The Handbook also specifically links to the Colleges Sexual Harassment, Discrimination and Sexual Misconduct Policy.[4] *Doe Decl.* exhibit 6 at 3. Specifically, within the policy, Whitman states;

> the college has developed internal policies and procedures that provide a prompt, fair, and impartial process for those involved in an allegation of sexual harassment, sexual misconduct or retaliation that reflect college policy and are in compliance with the 2020 Title IX Regulations. Whitman values and upholds the equal dignity of all members of its community and strives to balance the rights of the parties in the grievance process during what is often a difficult time for all those involved.

*Doe Decl.* exhibit 6 at 8. The remainder of the policy identifies the procedural rights that a Respondent has during the Title IX process. *Doe Decl.* exhibit 6 at 29-30. These include:

- "All parties have a full and fair opportunity, through the investigation process, to suggest witnesses and questions, to provide evidence and expert witnesses, and to fully review and respond to all evidence on the record."
- The right to a "thorough, reliable, and impartial investigation"
- The right to have "all available, relevant witness" be interviewed
- The right to review the draft investigative report, and make comments, to which the investigator "will incorporate relevant elements of the parties' written responses into the final investigation report…"
- Limiting the investigator's role to "gather, assess, and synthesize evidence, but make no conclusions, engage in no policy analysis, and render no recommendations as part of their report."

*Id*. Regarding sanctions, the Handbook describes eight factors, which are nonexclusive factors the panel is expected to consider when deciding on an appropriate sanction. *Doe Decl.* exhibit 6 at 34.

---

[3] Whitman's Student Handbook is available online at https://www.whitman.edu/dean-of-students/student-handbook/student-rights-and-responsibilities.
[4] https://www.whitman.edu/documents/Global/Policies/Whitman-College-TitleIX-Policy.pdf

MOTION FOR TEMPORARY RESTRAINING ORDER - 16

**Cedar Law PLLC**
113 Cherry Street
PMB 96563
Seattle, Washington 98104
Phone (206) 607-8277 • Fax (206) 237-9101

The College breached each of the above promises with Doe. Instead of providing a "prompt, fair, and impartial" process for resolving the Title IX complaint against Doe, the College stacked the deck against him for the same reasons articulated above. It refused to allow him to introduce rebuttal evidence concerning a "pattern of conduct" and complainant's mental health, it relied on retracted statements by witnesses, and allowed the investigator to conclude, at multiple points in her investigation, that witnesses "corroborated" the allegations. And the College failed to disclose that the investigator and hearing chair had a prior professional relationship regarding Title IX. Each one of those actions breached the contractual promise made to Doe to provide a "prompt, fair, and impartial" process.

### 3.  Violation of the Covenant of Good Faith and Fair Dealing

Furthermore, under Washington law, "[t]here is in every contract an implied duty of good faith and fair dealing" that "obligates the parties to cooperate with each other so that each may obtain the full benefit of performance." *Badgett v. Sec. State Bank*, 116 Wash.2d 563, 569, 807 P.2d 356 (1991). In particular, the duty of good faith and fair dealing arises "when the contract gives one party discretionary authority to determine a contract term." *Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 86 Wn. App. 732, 738, 935 P.2d 628 (1997). "[G]ood faith limits the authority of a party retaining discretion to interpret contract terms; it does not provide a blank check for that party to define terms however it chooses. *Rekhter v. State,* 180 Wn. 2d 102, 113 (2014)(quoting *Scribner v. Worldcom, Inc.*, 249 F.3d 902, 910 (9th Cir. 2001)). It is possible to breach the covenant of good faith and fair dealing, even if all of the specific contractual terms of fulfilled. *Rekhter,* 180 Wn. 2d at 111-112 ("As the Seventh Circuit has said, 'It is, of course,

MOTION FOR TEMPORARY RESTRAINING ORDER - 17

possible to breach the implied duty of good faith even while fulfilling all of the terms of the written contract'").

While the overall process employed by the college against Doe violates the covenant of good faith because it was biased against him from the start, there is one component specifically worth highlighting here - the decision to expel Doe just seven weeks before graduation. Expulsion – and thus withholding the college degree that Doe has worked for years and paid over $140,000 in tuition to complete – is the ultimate punishment a college can employ, and the decision to expel Doe in this case is not based on the terms of the handbook.

Rather than analyze all eight factors to develop its sanction decision, the panel only considered the nature of the sustained allegations when it concluded "The sustained policy violations relate to some of the most egregious forms of conduct prohibited by Whitman College. Therefore, the panel determined that Respondent should be expelled from Whitman College." *Doe Decl.* exhibit 3 at 13. This statement ignores the remaining factors the panel was expected to consider.

For example, the College should have taken into account that fact that Complainant no longer attends Whitman, thus there would be no further impact on the Complainant. The Panel should have also considered the lengthy time frame between when the alleged events occurred, when the allegations were first made, and when this decision was handed down – encompassing all four years of Doe's enrollment. Finally, the College should have considered Doe's proximity to graduation and the fact that it had accepted Doe's tuition payments just to pull the rug out seven weeks before graduation.

MOTION FOR TEMPORARY RESTRAINING ORDER
- 18

Having failed to consider all the relevant factors identified in the policy, the College violated the covenant of good faith and fair dealing when it expelled him in a heavy-handed and overzealous decision guided more by political pressure and a desire to appear tough on sexual assault then by a reasoned and individualized determination that fits the nature of the allegations and the circumstances of this matter.

### 4.  Consumer Protection Act

The Consumer Protection Act provides that unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful. RCW 19.86.020.  To prevail on a CPA action, the plaintiff must prove an "(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; (5) causation." Klem v. Washington Mut. Bank, 176 Wn. 2d 771, 782, 295 P.3d 1179, 1185 (2013)."

Here, the complaint shows that the College engaged in the deceptive practice of guaranteeing to its students a fair and unbiased process for adjudicating disciplinary issues, as stated numerous times in its Code of Conduct, but instead offered a system that was one-sided, and intent on finding Doe responsible for the allegations. As discussed above, the College allowed numerous procedural irregularities, including personal bias, one-sided use of pattern of conduct evidence, and reliance on retracted statements, to fully deny Doe a fair opportunity.

The College's conduct occurred in the course of commerce, considering the fact Doe has spent $140,000 over the last four years in order to attend the college (*Doe Decl.* at 18), and is likewise damaging to Doe's property interest in the education he was pursuing, including the credits he has already received, and his general proximity to graduation. Additionally, the College's actions further delay Doe's entry into the work force, as it is likely he will have to

MOTION FOR TEMPORARY RESTRAINING ORDER - 19

**Cedar Law PLLC**
113 Cherry Street
PMB 96563
Seattle, Washington 98104
Phone (206) 607-8277 • Fax (206) 237-9101

?repeat one to two years of study he has already completed. *Doe Decl.* ¶ 17. The College's unlawful conduct is also of interest to the public. As the Supreme Court explained in *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co,* 105 Wn. 2d 778, 790 (1986), the public interest prong turns on a number of factors, generally regarding whether the action is subject to repetition – "(1) Were the alleged acts committed in the course of defendant's business? (2) Are the acts part of a pattern or generalized course of conduct? (3) Were repeated acts committed prior to the act involving plaintiff? (4) Is there a real and substantial potential for repetition of defendant's conduct after the act involving plaintiff? (5) If the act complained of involved a single transaction, were many consumers affected or likely to be affected by it?" As discussed in detail above, given the enormous pressure on the College and the College's swing towards overzealously prosecuting Title IX complaints, it is likely that more male respondents will find themselves denied a fair opportunity under the College's process.

For those reasons, Doe is likely to prevail on his CPA claim.

## C. Plaintiff Has a Well-Grounded Fear That He Will No Longer be Allowed to Attend Whitman

The Plaintiff has clearly demonstrated a well-grounded fear of immediate invasion of his right to attend Whitman as a student. On February 13, 2023, the College's Hearing Panel found Plaintiff responsible for "Forcible Rape" and rendered a decision to expel him from Whitman. *Doe Decl.,* exhibit 2 at 13. On February 23, 2023, Plaintiff submitted an internal appeal of the decision to expel him. *Doe Decl.,* exhibit 4. That appeal was denied on March 22, 2023 and the expulsion was upheld. *Doe Decl.,* exhibit 5 at 3. The letter to Plaintiff upholding his expulsion stated that it "constitutes final institutional action regarding this matter. This matter is considered resolved." *Id.* On April 4, 2023, Doe received an email from Cassandre Beccai, the College's

MOTION FOR TEMPORARY RESTRAINING ORDER
- 20

Title IX coordinator confirming that the College's registrar had processed the expulsion, effective March 28, 2023. *Doe Decl.*, ¶ 16. As such, Plaintiff has exhausted any and all internal appeal processes and has been expelled.

**D. Plaintiff Will Suffer Substantial Harm If He Is Unable to Continue Towards His Degree**

Plaintiff is a mere seven weeks away from graduation. *Doe Decl.* ¶ 3. Absent an injunction from this court, he will be unable to complete his degree before his expected graduation date. Neither money damages nor injunctive relief enabling his readmission at the end of this litigation will resolve the harm Doe will suffer. Doe is in the middle of his last semester of classes, meaning an expulsion at this time will require Doe to retake those classes, which would only further delaying his graduation. Further, even when he does complete his degree, his records will indicate it is a "delayed degree," meaning it was not completed in the traditional four-years, which will expose him to questions by potential employers about this issue. Finally, derailing Doe's academic momentum at this critical moment in his undergraduate career would be devastating and it is entirely possible that even if he should prevail in this action, he is not able to muster the resolve to reengage in his studies once he has been out of school for a period of time.

Plaintiff is willing and able to complete his degree remotely, such that he does not need to be on campus during the pendency of this litigation. *Doe Decl.* ¶ 14. Further, there is no harm to the college. The Complainant no longer attends Whitman and does not live in Washington. *Id* at ¶ 15. And if Doe is not successful in this litigation, then the University can revoke the degree Doe does earn during the course of this litigation. As such, the prejudice to Doe far outweighs any prejudice to the University and Plaintiff has demonstrated substantial and irreparable harm should the Court not provide immediate injunctive relief.

MOTION FOR TEMPORARY RESTRAINING ORDER - 21

## VI. CONCLUSION

The Plaintiff is likely to prevail on the merits of the complaint and will suffer substantial and irreparable harm if Whitman is not enjoined from expelling him just seven weeks before his graduation date for contested claims arising from 2019 and related to another student who is no longer even on campus. For the foregoing reasons, Plaintiff asks that this court enter a temporary restraining order and set a date to hear argument on a full preliminary injunction.

Dated this 10th day of April, 2023.

CEDAR LAW PLLC

Lara Hruska, WSBA No. 46531
113 Cherry Street
PMB 96563
Seattle, WA 98104
Lara@cedarlawpllc.com
Attorney for the Plaintiff

MOTION FOR TEMPORARY RESTRAINING ORDER
- 22

**FILED** 

APR 14 2023

KATHY MARTIN
WALLA WALLA COUNTY CLERK

SUPERIOR COURT OF THE STATE OF WASHINGTON
AND FOR THE COUNTY OF WALLA WALLA

JOHN DOE,

Plaintiff,

vs.

THE BOARD OF TRUSTEES OF WHITMAN

COLLEGE, a nonprofit corporation,

Defendants

Case No.:

**23 2 00228 36**

DECLARATION OF JOHN DOE IN
SUPPORT OF MOTION FOR TEMPORARY
RESTRAINING ORDER

    I, John Doe, am over the age of eighteen, otherwise competent to testify, and declare under the penalty of perjury under the laws of the State of Washington that following is true and correct to the best of my knowledge;

1. I am the plaintiff in the above captioned matter. John Doe is a fictious name used to protect my identity. I am the respondent in the underlying Title IX process that occurred at Whitman College.

2. Whitman College is aware of my identity.

3. I was a student at Whitman College, studying economics and psychology, until I was expelled from the College in February 2023. I expected to graduate this in June of this year with a bachelor's degree.

4. I am a student athlete and played soccer for Whitman.

Declaration of John Doe in support of motion for
Temporary Restraining Order - 1

**Cedar Law PLLC**
113 Cherry Street
PMB 96563
Seattle, Washington 98104
Phone (206) 607-8277 • Fax (206) 237-9101

5. On April 25, 2022, my ex-girlfriend made a report to the Title IX coordinator regarding our consensual sexual relationship that occurred freshman year (Fall 2019).

6. The Title IX process I have been forced to go through as a result of that inaccurate allegation has been fundamentally unfair and biased against me. I have been repeatedly denied opportunities to present evidence in direct rebuttal to claims raised by the complainant.

7. On December 14, 2022, the College issued its report following an investigation. A true and correct copy of that report is attached to this declaration as **EXHIBIT 1.**

8. Prior to issuing the report, I was given an opportunity to respond to a draft of the report. A true and correct copy of my response to that draft report is attached to this declaration as **EXHIBIT 2.**

9. A Title IX hearing was held on January 20, 2023.

10. On February 13, 2023, the Hearing Panel produced the Statement of Finding, Final Determination, and Rationale, which found me responsible for "dating violence" and "forcible rape." The document recommended that I be expelled from Whitman. A true and correct copy of the Findings are attached to this declaration as **EXHIBIT 3.**

11. On February 23, 2023, I submitted an appeal to the College's Title IX coordinator. My appeal included the entirety of **EXHIBIT 2** as an attachment. A true and correct copy of the appeal, except for the documents already contained in **EXHIBIT 2**, is attached to this declaration as **EXHIBIT 4.**

12. The College upheld my expulsion in a letter dated March 3, 2023. A true and correct copy of that letter is attached as **EXHIBIT 5**.

**Cedar Law PLLC**
113 Cherry Street
PMB 96563
Seattle, Washington 98104
Phone (206) 607-8277 • Fax (206) 237-9101

13. The College publicly posts its student handbook and Title IX policies. True and Correct copies of those policies found online are attached to this document as **EXHIBIT 6.**

14. If permitted, I am willing to finish my degree remotely. I have no need to return to campus, and am familiar with attending college remotely, given the COVID-19 pandemic. I do not live on campus.

15. Complainant no longer attends Whitman, and has not since the spring of 2021, and in fact does not live in Washington.

16. On April 4, 2023, I received an email from Cassandre Beccai, the College's Title IX coordinator confirming that the College's registrar had processed the expulsion, effective March 28, 2023.

17. I will be required to retake 1-2 years of classes at another university or college before I am allowed to graduate. This would further delay my entrance into either the workforce or graduate school and further the total cost of my education.

18. Since my enrollment, I have paid $140,000 in tuition, room and board, and related expenses to Whitman College.



Dated this 10th day of April, 2023 in Walla Walla, Washington.



_____
John Doe

Declaration of John Doe in support of motion for
Temporary Restraining Order - 3

# Exhibit 1



NORTHWEST
WORKPLACE
LAW PLLC

Respondent Advisor

## INVESTIGATION REPORT

Whitman College

Trish K. Murphy, Investigator
December 14, 2022

Exhibit 1 Page 1 of 68

**TABLE OF CONTENTS**

I.    INTRODUCTION, JURISDICTION & SCOPE...................................................................1

II.   INVESTIGATION PROCESS ...........................................................................................2

III.  RELEVANT POLICY LANGUAGE & DEFINITIONS.....................................................5

IV.   BACKGROUND ............................................................................... 6

V.    SUMMARY OF EVIDENCE – FACTS NOT IN DISPUTE .................................. ...7

VI.   SUMMARY OF EVIDENCE – FACTS IN DISPUTE...................................9

VII.  PARTIES' CLARIFICATIONS OF EARLIER STATEMENTS ..............................29

VIII. WITNESS INFORMATION ........................................................32

IX.   POSSIBLE MOTIVES ATTRIBUTED TO COMPLAINANT. .....................64

X.    CREDIBILITY CONSIDERATIONS.............................................65

XI.   CONCLUSION.................................................................66

## I.  INTRODUCTION, JURISDICTION & SCOPE

On April 25, 2022, Complainant, a former Whitman College student, made a report to Title IX Coordinator Cassandre Beccai regarding Respondent, who is a current student at Whitman. Both were Whitman students at the time the alleged incidents occurred. As provided in the Notice of Investigation and Allegations, Complainant alleged:

> Respondent grabbed Complainant's face, leaving a bruise, shoved Complainant against the wall, slapped them, and choked them. Complainant also alleged that Respondent molested them and raped  h m on numerous occasions beginning in Fall semester 2019 in Jewe t Hall.[1]

In her role as Title IX Coordinator, Beccai signed a Formal Comp aint on May 18, 2022.[2]

Beccai determined that the alleged behavior falls within the jurisdiction of Title IX at Whitman College.[3] If true, the alleged conduct could violate the following provisions of the Whitman College Sexual Harassment, Discrimination and Sexual Misconduct Policy and Procedure:

> **Part II Prohibited Conduct (A) Sexual Harassment**: "unwelcome conduct, determined by a reasonable person, to be so severe, and pervasive, and objectively offensive, th t it  ffectively denies a person equal access to the College's education program or activity."

> **Part II Prohibited Cond ct (A) Sexual Harassment (3) Sexual Assault (a) Sex Offenses, For ible; Forcible Rape**: "penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration without the consent of the complainant."

> **Part II Prohibited Conduct (A) Sexual Harassment (3) Sexual Assault (a) Sex Offens s, Forcible; Forcible Fondling**: "the touching of the private body parts of another person (buttocks, groin, breasts) for the purpose of sexual gratification, forcibly, and/or against that person's will (n n-consensually) or not forcibly or against the person's will in instances in which the complainant is incapable of giving consent because of age or because of temporary or permanent mental or physical incapacity."

---

[1] Complainant uses they/them pronouns.
[2] Complaint documentation is attached as Appendix A.
[3] The alleged conduct occurred after August 14, 2020 in Walla Walla, Washington, in a residence hall on the College campus and involved two enrolled students. The allegations, if true, would constitute covered sexual harassment as defined in College policy.

**Part II Prohibited Conduct (A) Sexual Harassment (4) Dating Violence**: "violence, on the basis of sex, committed by a person, who is in or has been in a social relationship of romantic or intimate nature with the complainant. The existence of such a relationship will be determined based on the complainant's statement and with consideration of the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship. For the purposes of this definition—Dating violence includes, but is not limited to, sexual or physical abuse or the threat of such abuse. Dating violence does not include acts covered under the definition of domestic violence."

On May 19, 2022, Beccai sent each party a Notice of Allegation  and Investigation.

Beccai retained Investigator Trish Murphy of Northwest Workplace Law to conduct an impartial investigation of Complainant's allegations in a  cordance with College Policy and Procedure and applicable legal authority.

## II.    INVESTIGATION PROCESS

Individuals interviewed included[4]:

| Name | Position/Rol | Interview Date(s) |
|------|--------------|-------------------|
| Complainant | Former Stud  nt | June 7, 2022<br>June 20, 2022<br>September 28, 2022<br>October 3, 2022 |
| Respondent | Student | August 4, 2022<br>September 23, 2022 |
| Witness A | Student | September 16 2022 |
| Witness B | Student | August 15, 2022 |
| Witness C | Student | August 18, 2022<br>September 30, 2022 |
| Witn  ss D | Student[5] | September 22, 2022 |
| Witness E | Student | August 25, 2022 |
| Witness F | Former Boyfriend of Complainant | August 24, 2022 |
| Witness G | Former Student | August 23, 2022 |
| Witness H | Former Student | August 19, 2022<br>September 14, 2022 |

[4] This investigator reached out to two individuals who did not agree to be interviewed for the investigation. Person 9 responded and declined to be interviewed. Three attempts were made via email and text message to reach Person 6, but she did not respond.

[5] Witness D stated that he is taking the current semester (fall 2022) off.

*Final Investigation Report 12/14/22*

| Witness I | Student | August 26, 2022 |
| Witness J | Boyfriend of Witness C | September 8, 2022 |
| Witness K | Student | September 25, 2022 |

Respondent was accompanied to his interviews with an advisor of his choice. For their interviews, Complainant chose not to be accompanied by an advisor.

Interviews were conducted by videoconference.[6] The investigator's role as a neutral fact finder was explained. The expectation for interviewees to answer questions truthfully and completely was communicated to each of them. All witnesses were reminded that allegations are just allegations until proven otherwise. As part of the conclusion of interview sessions, interviewees were invited to add any additional information considered useful or relevant that had not already been discussed.

Interviews were audio recorded with the permission of each participant. All interviewees were provided with a copy of the transcript from their respective interviews and provided an opportunity to edit, add, or adjust as needed.

Interview transcripts are included in the appendices to this report. Portions of the transcripts assessed as having relevance to the facts at issue in this investigation have been highlighted in gray.

Documentation reviewed included complaint documentation; Whitman College Sexual Harassment, Discrimination and Sexual Misconduct Policy and Procedure; September 29, 2021 email from community member to soccer coaches; WWPD Police report and related documentation; messages exchanged between Complainant and Respondent in October 2021; Complainant's November 20, 2021 Instagram post; November 23, 2021 cease and desist letter from Respondent's advisor/attorney to Complainant; Complainant's December 3, 2021 Instagram post; screenshots of texts between Complainant and Witness C in the fall of 2021; a January 28, 2021 message from Complainant to Witness I; a list of witnesses provided by Complainant; an undated email exchange between the Interim Title IX Coordinator and Complainant; October 2021 email correspondence between Complainant and K. Joshua; copies of tweets sent by Complainant in July 2022, submitted by Respondent; a "procedural history" and "timeline" emailed from Respondent's advisor to this investigator in July 2022; Complainant's written response to the evidence and initial report, received November 29, 2022; Respondent's written response to the evidence and initial report, received November 30, 2022; supplemental information from Witness G; supplemental information from Witness I; March 2020 email about a rally, reportedly sent by Complainant; and C.V. for proposed expert

---

[6] A few follow up interviews were conducted by telephone.

Exhibit 1 Page 5 of 68

*Final Investigation Report 12/14/22*

witness.[7] Documentary evidence determined to be relevant to the issues in this investigation is referenced in this report.[8]

Both parties were given opportunities to:
- Select an advisor of their choice
- Submit documentary evidence
- Suggest questions to be asked of the other party
- Suggest individuals to be interviewed
- Review all gathered evidence to identify new information, witnesses or questions for the other party
- Submit an optional written statement

Respondent suggested questions for the investigator to ask Complainant. Information about these questions can be found attached as Appendix B. Complainant did not suggest questions to be asked of Respondent.

Complainant and Respondent both indicated interest in interviews of specific individuals. Information about the individuals contacted and interviewed can be found attached as Appendix C.

On November 14, 2022, interview transcripts, documentation gathered in the investigation, and an initial version of this investigation report were posted on a secure, cloud-based site. The parties and their advisors were provided with links to access the site. Consistent with College policy, they were given a period of ten business days to review the evidence and submit a written response. The ten-day period concluded on November 30, 2022.

Each party submitted a written response prior to the end of the ten-day period. Complainant's response is attached as Appendix HH. Respondent's response is attached as Appendix II. This investigator considered each response before preparing this final report. This investigator addressed some of the items from the responses in footnotes above. Some of the items raised by Respondent have been addressed Appendix JJ. This investigator recommends that the decisionmakers review the responses in their entirety.

On November 30, 2022, this investigator notified each party of the inclusion of some additional information in the "Other Evidence" folder. The parties were told that because this investigator did not assess the items as being relevant to the issues in the

---

[7] Respondent requested that both parties reconnect on Snapchat to enable access to saved messages. Respondent did not identify specific information he believed could be retrieved from Snapchat that would have probative value to material issues in dispute in this investigation. When asked about reconnecting with Respondent on Snapchat, Complainant did not indicate an interest in doing so.

[8] Other evidence gathered can be found in the folder titled "Other Evidence."

Exhibit 1 Page 6 of 68

investigation, they were included in this folder containing other directly related evidence.[9] While this investigator offered the parties an opportunity to submit any responses to the added information by December 5, 2022, neither submitted a response.

The standard of proof for finding a policy violation is a preponderance of the evidence commonly defined as "more likely than not."

## III. RELEVANT POLICY LANGUAGE & DEFINITIONS

The full text of the Whitman College Sexual Harassment, Discrimination and Sexual Misconduct Policy and Procedure can be found in Appendix D. Key definitions from Part III Standards for Assessing Conduct are set forth below:

(A) Consent

Consent is:
- knowing, and
- voluntary, and
- clear permission
- by word or action
- to engage in sexual activity.

Individuals may experience the same interaction in different ways. Therefore, it is the responsibility of each party to determine that the other has consented before engaging in the activity.

If consent is not clearly provided prior to engaging in the activity, consent may be ratified by word or action at some point during the interaction or thereafter, but clear communication from the outset is strongly encouraged.

For consent to be valid, there must be a clear expression in words or actions that the other individual consented to that specific sexual conduct. Reasonable reciprocation can be implied. For example, if someone kisses you, you can kiss them back (if you want to) without the need to explicitly obtain *their* consent to being kissed back.

Consent can also be withdrawn once given, as long as the withdrawal is reasonably and clearly communicated. If consent is withdrawn, that sexual activity should cease within a reasonable time.

Consent to some sexual contact (such as kissing or fondling) cannot be presumed

---

[9] The documents were placed in a subfolder titled "11-30-22 items."

Exhibit 1 Page 7 of 68

to be consent for other sexual activity (such as intercourse). A current or previous intimate relationship is not sufficient to constitute consent.

Proof of consent or non-consent is not a burden placed on either party involved in an incident. Instead, the burden remains on the college to determine whether its policy has been violated. The existence of consent is based on the totality of the circumstances evaluated from the perspective of a reasonable person in the same or similar circumstances, including the context in which the alleged incident occurred and any similar, previous patterns that may be evidenced.

Consent in relationships must also be considered in context. Wh n p rties consent to BDSM or other forms of kink, non-consent may be shown by the use of a safe word. Resistance, force, violence, or even saying "no" may be part of the kink and thus consensual, so the college's evaluation of communi ation in kink situations should be guided by reasonableness, rather than s rict adherence to policy that assumes non-kink relationships as a default.

(B) Force

Force is the use of physical violence and/or physical imposition to gain sexual access. Force also includes threats, in imidation (implied threats), and coercion that is intended to overcome resis ance or produce consent.

(D) Coercion

Coercion is <u>unreasonable</u> pressure for sexual activity. Coercive conduct differs from seductive c nduc based on factors such as the type and/or extent of the pressure used to obtain consent. When someone makes clear that they do not want to engage in certain sexual activity, that they want to stop, or that they do not want to g past a certain point of sexual interaction, continued pressure beyond that point can be coercive.

## IV. BACKGROUND

Complainant and Respondent were first year students at Whitman in the fall of 2019.[10] Bo h lived in Jewett Hall on the same floor a few doors away from each other. Complainant's roommate was Witness A. Respondent's roommate was Witness B.

For the second semester of their first year (spring 2020), Respondent left that semester early. Complainant did not attend the fall 2020 semester. Complainant briefly returned to

---

[10] The parties first met in the spring of 2019 when both attended the Garret Sherwood Scholar fly-in program.

Whitman for the 2021 spring semester before leaving. Complainant did not continue their studies at Whitman after that.

On September 29, 2021, the Whitman soccer coaches received an email from a community member who raised concerns about Respondent's treatment of a girlfriend at Whitman.[11]

On December 2, 2021, Complainant contacted the Walla Walla Police Department (WWPD) to report being raped multiple times by Respondent in 2019 and 2020  The WWPD gathered information and produced a report.[12]

## V.   SUMMARY OF EVIDENCE – FACTS NOT IN DISPUTE

The following facts were not in dispute:

- The parties began spending time together shortly after arriving on campus for the fall 2019 semester. At the beginning, they were just kissing.

- Some time passed before they had sexual intercourse. Complainant said they had sex within a week and a half or two weeks. Respondent estimated that it occurred after a few weeks.

- The parties' sexual activity  ook place in Jewett Hall, primarily in Respondent's room.

- Neither Complainant  R  spondent, nor witnesses offered information to suggest that alcohol or drugs played a role in the sexual interactions between the parties or the allegations made  Complainant and Respondent did not indicate that they thought that alcohol or drugs impacted either of their memories of what occurred between them

- The parties did not use or discuss a "safe word."

- Their relationship status fluctuated and included being exclusive, not being exclusive, and dating.

- Complainant and Respondent broke up prior to winter break.[13]

---

[11] Appendix E.
[12] Appendix F.
[13] In his written statement dated November 30, 2022, Respondent indicated that he wanted it noted that he broke up with Complainant. Appendix II p. 5.

*Final Investigation Report 12/14/22*

- The parties had one or more hookups during the spring semester of 2020, prior to Respondent leaving campus before the semester ended.

- Complainant and Respondent consensually sexted during the summer of 2020.

- In the spring of 2021, before Complainant left Whitman, they met and engaged in some flirting but no sex.

- At some point after leaving Whitman in the spring of 2021, Complainant called Respondent and apologized for some of their behavior while they were se ing each other.

- Complainant was Respondent's only ex-girlfriend at Whitman

- After learning of the email to the soccer coaches, on or about October 2, 2021, Respondent called Complainant to talk about it.[14]

- Shortly thereafter, Complainant sent Respond nt a message. It said in part:

  It's fucked up and idk how this is being fabricated and spread
  And I do want to clarify that I haven't talked about our relationship to anyone at Whitman and when I did I n ver said you abused me or anything remotely like that
  Whoever's doing this knows nothing about me or you[15]

- On October 6, 2021, Complainant sent Respondent a message that began with, "Listen I need to be honest with you. You did abuse me." It went on to allege some of the conduct that is at issue in this complaint. The content included but was not limited to:

  You bruised my face within the first couple days of knowing you. You yelled at me that if I didn't fuck you you'd find someone else to fuck. You pu  your hands inside me without asking . . . . I told you I didn't want to have sex and you fucked me anyway. I told you I wasn't comfortable sucking your dick and you shoved me down anyway. I told you I didn't want you to cum in my mouth and you did anyway. You never stopped. No matter what I said or did it would just turn you on more. You wouldn't stop.[16]

---

[14] During this call, Complainant did not tell Respondent that Complainant thought he had been abusive.
[15] Appendix G.
[16] Appendix H.

Exhibit 1 Page 10 of 68

*Final Investigation Report 12/14/22*

- Also on October 6, 2021, Respondent sent Complainant a response. It stated in part: "I don't remember this happening this way but I trust your perspective and I am really sorry for clearly hurting you. I clearly acted like an idiot and I hate that that I may have affected you in a negative way."[17]

- On November 20, 2021, Complainant posted a two-part Instagram story. The first screen showed a photo of Respondent and said, "this man r@ped me until I developed stockholm syndrome - the sexual abuse continued throughout the relationship @respondent." The second screen included the following text

  if you're one of his victims I encourage you to reach out t  me  There are more of us than you think, you are not alone
  we all know whitman and tke aren't going to do anything  but i m tired of staying silent
  there's strength in numbers [red heart][18]

- On November 23, 2021, Respondent's advisor  who is an attorney, sent Complainant a letter titled "Demand to Cease & Desist Defamatory Statements re Respondent."[19]

- On or about December 3, 2021  C  mplainant posted another Instagram story. The screens included "WARNING: v  ry graphic details of sexual violence," "your lawyers don't scare me neith  r do you," and screen shots of sexual assault allegations Complain  nt had sent Respondent.[20]

## VI. SUMMARY OF EVIDENCE – FACTS IN DISPUTE

### A. Allegations an  Res  onse

Complainant alleged that Respondent subjected them to nonconsensual sexual and physical activity during their first year at Whitman. The allegations included:
- Engaging in nonconsensual sex with Complainant
- Grabbing Complainant's face, leaving a bruise
- Slapping Complainant
- Choking Complainant
- Grabbing Complainant's hair

---

[17] Appendix I.
[18] Appendix J.
[19] Appendix K.
[20] Appendix L.

Exhibit 1 Page 11 of 68

*Final Investigation Report 12/14/22*

- Using physical power, including shoving Complainant against a wall
- Putting his hands inside Complainant
- Using threats
- Using verbal pressure
- Subjecting Complainant to nonconsensual oral sex

Respondent denied the allegations. He stated, "I think everything we did I under stood to be consensual. At no point during our relationship, did [they] say anything else to me "[21]

### B. Complainant's Written Complaint

The following text is excerpted from Complainant's written complaint:[22]

#### 1. Initial contacts

I first met Respondent in spring of 2019 during the Garret Sherwood Scholar fly-in program. It was a weekend program to introduce the scholars to each other and to the campus. We didn't communicate then other than a brief comment about lunch in passing  A month or two later he followed me on Instagram and reached out to ask a q estion about the program. From then on we talked occasionally th ough this platform.

Before arriving we discovered we lived in the same building just a couple doors down from each other (Jewett Hall fourth floor). Because of this he offered to help me move in. From there we began to hang out fairly often.

#### 2. First kissed – Day A

We first kis ed a couple days later after a lot of flirting. That same night we attended a party together. We met there and spent the rest of the night together. He expressed to me that he didn't like it when I talked to other people and was getting jealous. I didn't think much of it and he walked me home a terwards. We spent the night together but did not engage in any physical activity.

#### 3  The day/night after they first kissed – Day B

The next day we started hooking up more in his room and he started to be fairly dominant which is something I typically enjoyed so I didn't say

---

[21] Appendix Q p. 7.
[22] The full text can be found at Appendix A. Here, the subheadings were added to clarify the alleged chronology. Because the dates were not identified, the days are differentiated by using Day A, Day B, etc.

Exhibit 1 Page 12 of 68

anything at first, but then it began to get scary. I kept saying that I didn't want to have sex or do anything physical other than make out and he wasn't stopping. I expressed many times that I wanted to take things slow. I kept turning away and pushing him off of me but he seemed to get more aroused by that and would get more aggressive. Since this was the first day it wasn't as bad as it would get later, but I was already fairly uncomfortable and a little scared.

That night we both attended another party. After some time inside he pulled me aside away from the crowd outside. He kept pulling me close to him saying he only wanted to be with me and for me to stop talking to other people. I kept trying to leave and go back to the party but he was physically restraining me. I finally pulled away and was walking in ide when he grabbed my arm to prevent me from leaving. His friend Person 3 intervened and asked us what was happening. I replied I wanted o go dance and he wasn't letting me. Person 3 said I should talk to him for a minute before going inside. We went back to the previous spot where he continued to try and convince me to be with him. After a minute I walked away again and he attempted to stop me and multiple people interv ned seeing that he was physically restraining me by grabbing my arm and not letting go. Witness D was one of those people and when he asked if everything was okay I used that as an excuse to walk aw y at that moment. Because he was very charming and kind in social settings during the day I thought I should give him a second chance.

4. **The following day/night – Day C**

The next day we ended up back in his room. I expressed that his behavior wasn't appropriate the night before and he mumbled 'sorry.' We began to makeout and it v ry quickly devolved into an unsafe situation. He began to be incredibly aggressive, grabbing my face and hair to control my movements. He shoved me against the wall and pushed himself against me. I continuously said 'no' and pushed him away to no avail. I was scared and didn't know what to do because he was physically overpowering me. I said I didn't want to have sex yet and he said there wasn't a difference between now and later so I should just do it.

Thankfully we needed to do something for the school so I used that as an excuse to leave. That night at another party he did the same thing as before where he took me outside to convince me to be with him and this time it had more of an emphasis on the sexual aspect of our relationship. He was adamant that I have sex with him that night. Someone else came outside to

Exhibit 1 Page 13 of 68

*Final Investigation Report 12/14/22*

ask if everything was okay before going inside. When I said I didn't want to have sex he yelled that if I didn't sleep with him he would sleep with someone else. I said "okay" and went back inside.

## 5. The next day – Day D

The next morning I told him once again that his behavior was inappropriate. He apologized and said it wouldn't continue. This day contained the sexual assault orientation and I was excited for him to go because I thought he might realize that what he was doing wasn't consensual. However, he did not end up going because he said h  kn  w everything about consent, including the "difference between no's   Again, in his room that day it was the same as before, but even mor  aggressive. He left a bruise on my face when he grabbed it. He also  lapped me. I wanted to leave and even made it to the door but I felt trapped and scared. He lived down the hall from me and was a part of the same program which meant I would be seeing him for the next throughou  the rest of my time at Whitman. Not only this but he was one of th  only people I knew on campus and already had a great support system. I was afraid to make him upset since there was no real way at a s  hool that small and under those circumstances I could ever really   scape him. I knew he was going to rape me in that moment so I started laughing to de-escalate the situation.

This gave me the opportunity to change the subject to why I needed to leave. It was as if the second w  were behind closed doors he would turn into a different person. I called a friend from home to ask for advice on how to get out of the situation because I knew what was going to happen and didn't know what to do to get out.

## 6. The next day – Day E

The next day I worked up the courage to tell him he was being too violent w th m  and pointed out the fact that I had a bruise on my face. He said sorry and looked away grinning. Within that week he molested me repeatedly. He would then complain that 'he was doing things to me but I wasn't doing things to him.' It was a constant conversation throughout this time that I had to continually come up with excuses on why I didn't want to have sex. I felt like physically I couldn't get him away from me or get him off of me.

Exhibit 1 Page 14 of 68

### 7. Subsequent days

Between the verbal and physical pressure we had sex within a week and a half. The disregard for boundaries and my verbal and physical objections continued throughout the relationship. When we had sex it was painful and always rough. The more I resisted the more aggressive he would become. He would often choke me so hard I would begin to lose my vision. He would pull my hair to control my movements. He had complete control over me and he knew that. I told him I wasn't comfortable sucking h s dick and he shoved me onto my knees. I told him I didn't want him to  um in my mouth and he pushed my head down so I couldn't pull away As a coping mechanism I developed stockholm syndrome and   rape kink. I would get turned on by the fact that he was raping me so it f  lt like it was consensual, yet I had no say in when, how or where we had sex.

To cope with the shock and trauma of being raped  o often my brain needed to rationalize what was happening to survive  The cons ant high state of anxiety and great effort to make everything feel okay resulted in an intense brain fog.[23]

## C. Parties' Communications About Consent

### 1. Complainant

According to Complainant, for the most part the parties did not discuss consent. Complainant stated:

There was never any conversation about it, about what I was okay with, what I wasn't okay with. I did say that I wasn't okay with him slapping me. I did say that. He did stop doing that.[24]

Complainant was a ked how they showed consent when the sexual activity was consensual. Complainant said that for the times it was consensual, Complainant just did not say no  When asked if Complainant gave verbal or nonverbal indications that they want d to continue, Complainant said no. They explained:

But you know why? Because it didn't matter. That's why I'm having such a hard time remembering. It didn't matter. It did not matter whether or not I wanted to have sex at any point in time. . . . Because the phrasing of

---

[23] In the first two interviews of Complainant, at times this investigator erroneously referred to Complainant's written complaint as Cassandre Beccai's notes, not initially realizing that the document was typed and submitted by Complainant.

[24] Appendix M p. 30; Appendix N p. 26-27. See also the discussion involving oral sex in Section VI.N.

Exhibit 1 Page 15 of 68

anything to indicate to him that you wanted to keep going, no, because that wasn't something that he ever cared about.[25]

Complainant disputed Respondent's assertion that they both initiated sex. Complainant stated:

> That is not true. I remember that so well because it was really frustrating for me, because every time that I wanted to have sex, we wouldn't. Every time that he did, we would. It didn't matter whether or not I wanted to. . I remember really just thinking that it was really frustrating for me because I no control over when we had sex, where we had sex. I just was not in control of it at all.[26]

### 2. Respondent

Respondent was asked how he and Complainant communicated consent. He responded:

> I remember at the beginning of the relationship we weren't having sex. We talked about that and both, she wasn't . . or they said they weren't ready and so we waited. Eventually we talked and we wanted to. I remember that not as being a sit-down conversation, but it was just more happening. But then we had sex and from tha point on it felt like we were in a relationship. It was like we maybe didn't sit down and talk before we had sex every time, but sometim s I would be initiating sex. Sometimes [they] would initiate. Sometimes I would be on top. Sometimes [they] would be on top of me. It just I guess, felt normal in our relationship and felt like we both wanted to b doing it.[27]

Respondent also ta ked about how he showed consent:

> I gues if they st rted kissing me or started touching me or got on top of m , I felt like my consent was implied to them because of our relationship a d tha if it wasn't that I would speak up and say, "No, sorry, please don't right now." As far as if Complainant ever asked me for consent for specific actions, I don't really think so.[28]

---

[25] Appendix M p. 21-22.
[26] Appendix M p. 22.
[27] Appendix Q p. 7-8.
[28] Appendix R p. 13.

Exhibit 1 Page 16 of 68

*Final Investigation Report 12/14/22*

Respondent was asked if he and Complainant ever had conversations or communications ahead of time about "Do you like this?" or "Is this okay with you? Do you want to do such and such?" He said:

> I'm not sure. I feel like the sex we did have was not … I guess there wasn't that many new things we did at any points and it seemed like stuff was reciprocated both ways. I don't remember specific explicit conversations about that. We may have, but I'm not sure.[29]

Respondent was asked if there were ever any times when Complainant told him, "Stop," in some part of sexual activity – beginning, during, or at any point. He said no. Respondent was asked if there were times when Complainant said, "No, I don't want to have sex," or, "I don't want to do this." Respondent said no.[30]

In one of his interviews, Respondent mentioned slapping Complainant's butt. He was asked how he would have known that Complainant consent d to that.

> I guess it's hard to break down every sexual  ct that occurs in hooking up. I think that, I don't know, just Complainant might touch me in a certain way when we were kissing or hooking up and I might touch them back. I think that in our relationship we wouldn t s op every time we were about to do something. I think that there was  lso maybe a level of trust that I would expect, where I trusted them, if they wanted to put their hands somewhere on me, that I trusted that then I would be able to say, "No, I don't want that," or something. I think that that was understood by them and me, that if one of us was uncomfortable with something that they could say something. I don't explicitly remember if we did talk about me slapping their butt, we may have, I'm no  sure, but I think even if we had not, there was that level of trust established, it seemed like.[31]

After his first inter  iew for this investigation, Respondent shared the following in an August 15, 2022 email:

> [A]s I was reviewing the transcript I remembered a time where after Complainant had done oral sex on me and afterwards [they] expressed to me that [they] felt like I had been holding [their] head and putting pressure on it in a way that [they] didn't like. We discussed this and I apologized and made sure to not do it again. I was reminded of this while I read over the part of the transcript concerned with how Complainant and I discussed

---

[29] Appendix R p. 5.
[30] Appendix R p. 5.
[31] Appendix R p. 10-11.

Exhibit 1 Page 17 of 68

*Final Investigation Report 12/14/22*

> consent and initiated sex. I think this moment is an example of how it
> seemed to me that if Complainant was uncomfortable with something
> [they] would have told me, and that we had built up that trust both ways.[32]

In a subsequent interview, Respondent referred back to the situation mentioned in the
email. He stated, "I felt like after [sex], if something had somehow been uncomfortabl
or that they didn't want, I understood that they would've expressed that to me becaus
they did at one point."[33]

Respondent denied having a "consensual nonconsent kink" or "CNC." He said that CNC
never came up with Complainant during the time when they were engaging in sexual
activity.[34]

## D. Alleged Nonconsensual Sexual Activity – Introduction and Overview

### 1. Complainant

Complainant reported that some of the sex with Respondent was consensual.
Complainant stated that the first time they were kissing it was consensual. They said that
when he had his hands on their neck very gently, it was consensual.[35]

Complainant shared, "Most of the non-c nsen ual, like blatantly non-consensual stuff
happened in the beginning."[36] Complainant said that the first time they had sexual
intercourse was after two weeks  and it was not consensual. They said, "It was definitely
coercion and physical and verbal pressure."[37]

Complainant was asked if they told Respondent "no" when the sexual activity was not
consensual. They responded:

---

[32] Appendix Q p  41.
[33] Ap endix R p. 4-5.
[34] Appendix Q p. 10-12. In their written statement dated November 29, 2022, Complainant said, "▮▮▮▮
and I never talked about CNC. I didn't know what that was at the time. I said it in my messages to him
afterwards to explain that what he was doing was just rape but that I began to enjoy it later as a
consequence of what was happening. It was my own assertion that he had a rape kink, which I realized
when he said 'you should resist more next time' after our interaction in the spring of 2021." Appendix
HH.
[35] Appendix M p. 11-13; Appendix N p. 24.
[36] Appendix M p. 20. Note: During the investigation, Complainant provided few specifics in terms of
timelines and when sexual activities with Respondent were or were not consensual.
[37] Appendix O p. 10-11; Appendix N p. 15.

Exhibit 1 Page 18 of 68

*Final Investigation Report 12/14/22*

So many times. Or even if it wasn't, "No," it was, "I don't want to do that. We shouldn't do that. I don't feel comfortable doing that." Variations of what could be interpreted as the word no.

Complainant indicated that part of saying no involved nonverbal communication. They said:

But that's what turned him on. . . . And that's what was scary about it, is that the more I would push him off of me, the more aggressive he would get. And then that was very scary.[38]

Complainant was asked about the alleged verbal pressure. They stated "I mean it had been two weeks of just any time I said no." Complainant explained:

It was just a lot of arguing. I couldn't say no without being argued with. I couldn't say I wasn't comfortable without being argued with. So it was just two weeks of just, "Do it, do it, do it, do it do it." And finally I was like, "Okay, fine. I'll do it."[39]

Complainant was asked how often Respondent was saying these things during those two weeks. Complainant said:

I don't know. I'd say frequently. I don't think I could give you more specific than that. Frequently. Maybe, I don't know, close to every day. Maybe five times a week. I'm just guessing, though, I feel like. I just remember hearing it a lot and being really tired.[40]

Complainant emphasized that while Respondent was pressuring Complainant verbally for sex, "[S]imultaneously, he's doing all these things like pushing me against a wall, choking me."[41]

Complainant was asked how many times they thought there was sexual activity with Respondent that was not consensual. Complainant answered:

Complainant:      I think the times and all the times in the beginning weren't. So, I'd say maybe that was like... I don't know. It was like a week of that or like two, two weeks, a week and a half, like really not consensual.

---

[38] Appendix O p. 10
[39] Appendix O p. 11.
[40] Appendix O p. 11.
[41] Appendix M p. 16.

Exhibit 1 Page 19 of 68

| | |
|---|---|
| Investigator: | So how many times do you think in that time period? Was it every single day? |
| Complainant: | No. I want to say like... Well, and it also depends on how much you're considering because if you want to talk about specifically entering my body, then I'd give it three times, like maybe once with his hands. Maybe like twice with his hands. Maybe once with his dick, but then if you're counting all the stuff around it, then that would be every day. |
| Investigator: | So, like sexual touching that wasn't consensual? |
| Complainant: | Yeah, that was every day for sure for like two weeks, and just throwing me around. That was so big and then after that completely non-consenual, it was like the time I gave him head and then when he came in my mouth and then... but af er that, all of the times that we had sex were the lik  I did want to and then got turned on because he's raping me. So, other than those times that I just said, the o her not consensual times were the ones that turned to consensual later.[42] |

Complainant was asked how often the nonconsensual sexual activity happened. They stated that after the first two w eks, when everything was "really, really, really not consensual," it was mos ly consensual although there were things that were not. Complainant explained their perspective:

> I didn't r ally understand what was happening because I wouldn't want it, but when it was happening, I was like, "Well, I guess this is nice." So it's really confusing for me because I didn't feel like, "Oh, I'm being raped a bunch." You know what I mean? I think that would be too hard for my brain to really process.

Complainant said that this made it hard for them to say, "Oh, I felt like it was this often."[43]

---

[42] Appendix N p. 23-24.
[43] Appendix M p. 35.

Exhibit 1 Page 20 of 68

*Final Investigation Report 12/14/22*

### 2.  Respondent

In his April 4, 2022 written statement to the Walla Walla Police Department, Respondent wrote: "Each time Complainant and I had sexual relations I understood it to be completely consensual. Complainant never mentioned to me that it wasn't . . . ."[44] And in interviews for this investigation, Respondent was consistent in saying that he believed his sexual activity with Complainant to have been consensual.[45]

Respondent was asked about two statements made by Complainant: "It did not matter whether or not I wanted to have sex at any point in time" and "I had no s y in when, how, or where we had sex." He disagreed with Complainant's assertions.[46]

### E.  Alleged "Rape Kink"

### 1.  Complainant

Complainant's written complaint stated:

> As a coping mechanism I developed [S]tockholm syndrome and a rape kink. I would get turned on by the fact  hat he was raping me so it felt like it was consensual, yet I had no say in when, how or where we had sex.
>
> To cope with the shock and trauma of being raped so often my brain needed to rationalize what was happening to survive.[47]

When interviewed for this investigation, Complainant talked about a transition in how they felt about what was happening with Respondent:

> It is tricky though  because there were a lot of times where it ... where I didn't w nt to  and that wasn't really mattering, but because it wasn't matter ng at a certain point, that was what made it hot because I was like, oh, I have no control over what's happening right now. But then that was k nd of hot. Because your brain does what it needs to. So then I was kind of into that later. So that's why it's tricky, because it's like, no, it wasn't be ause I didn't want to, but then eventually it was.[48]

Complainant further explained:

---

[44] Appendix F.
[45] See, e.g., Appendix Q p. 7.
[46] Appendix R p. 9.
[47] Appendix A.
[48] Appendix M p. 11-12.

Exhibit 1 Page 21 of 68

[A]t a certain point, I sort of gave up that idea of control. So I mean, I really forgot that you could say no to sex. I mean, afterwards too. I genuinely forgot that was an option. I mean, I had a lot of sex after that I wasn't comfortable having just because I forgot that you could say no. I remember the first time somebody asked me, I was shocked. I was like, "Whoa, I don't know. I haven't checked in with myself to see if I even want to yet. I didn't even think about that." Because I don't know, I got used to not really mattering.[49]

Complainant indicated that during the time they were seeing Respondent, their brain made a switch that impacted their memory of what was happening with him

Once my brain did the switch, I didn't remember any of that. I could not remember it. And it wasn't until later I ran into [Person 6] at a party, maybe a week later after my brain switched, and I ran into her and she was like, "How is all that stuff with Respondent going?" And I was like, "What stuff are you talking about?"[50]

Complainant added:

And [Person 6] was like, "Well, the aggre siveness. How is that going?" And I was like, oh my God. It all hit me. And I was like, whoa, I do not remember any of that.[51]

### 2. Respondent

Respondent stated that during the time that he and Complainant were engaging in sexual activity, Complainant never told him about having a rape kink.[52]

## F.  Allegation: Grabbed Complainant's Face, Leaving a Bruise

### 1. Complainant

In their written complaint, Complainant said that in the first few days they spent time together, Respondent grabbed Complainant's face and left a bruise.[53] They described the bruise as being blue in color and about the size of a penny. Complainant characterized it

---

[49] Appendix M p. 36.
[50] Appendix M p. 20.
[51] Appendix M p. 21.
[52] Appendix Q p. 12.
[53] Appendix A.

Exhibit 1 Page 22 of 68

*Final Investigation Report 12/14/22*

as being "very noticeable."[54] They said that it was on their right side and pointed to their chin area. Complainant said that they did not take a photo of the bruise.[55]

According to Complainant, a lot of people saw the bruise, although they did not think that anyone really asked about it. Complainant said that they told a couple people but did not remember who.[56]

Complainant said that early in the semester, they raised it with Respondent. Complainant stated, "I said that I wasn't comfortable with how aggressive he was being and he bruised my face."[57]

Complainant was asked if Respondent ever bruised them later on. Complainant said that it was possible because of how hard Respondent would grab them. They said they did not notice other bruises.[58]

Complainant reported that Witness C remembered the bruise and also said she saw bruises on Complainant's neck. Complainant indicated that they did not recall neck bruises.[59]

### 2. Respondent

When interviewed, Respondent stated that he did not remember grabbing Complainant's face and causing a bruise, although a hickey probably happened at some point.[60]

He said that he did not remember ever seeing a bruise or mark on Complainant's face. Respondent indicated that he did not know if he would remember that.[61]

## G. Allegation: Slapping

### 1. Complainant

Complainant alleged that Respondent slapped their face.[62] Complainant also said that after they told Respondent they were not okay with him slapping them, he stopped.[63]

---

[54] Appendix N p. 24.
[55] Appendix M p. 17.
[56] Appendix N p. 24-25.
[57] Appendix N p. 5. See also Appendix M p. 14.
[58] Appendix M p. 30.
[59] Appendix M p. 17.
[60] Appendix M p. 8-9.
[61] Appendix M p. 11-12.
[62] Appendix A.
[63] Appendix M p. 30.

Exhibit 1 Page 23 of 68

*Final Investigation Report 12/14/22*

### 2. Respondent

Respondent denied slapping Complainant's face. He said, "I could see myself at some point my hand going on their face during sex, but it definitely would not be a slap or trying to hit their face with force or anything like that."[64] Respondent stated that he had slapped Complainant's butt but no other body parts.[65]

### H. Allegation: Choking

### 1. Complainant

In their written complaint, Complainant stated, "He would often ch ke me so hard I would begin to lose my vision."[66] When asked about this in an interv ew, Complainant indicated that this would happen "a lot. All the time." When  sked if they were okay with some choking, Complainant said, "Yeah. I mean, like a normal amount, but for him, it was always like I'm going to black out kind of choking."[67] Complainant reported that Respondent would usually choke Complainant with one hand.[68]

Complainant was asked if they knew how many times Respondent choked them where it was not consensual. Complainant said they did n t know and explained, "I mean, choking was just really regular. So, I don't know how to really answer that question. Choking was just a part of it."[69] Complainant said they might have told Respondent that the choking was too hard, but they did not remember [70]

Complainant indicated that the e was a point when the choking became somewhat consensual. When asked about this, Complainant explained:

> To a degree  I mean, I never consented to him making me not be able to breathe f r long periods of time. That's not what choking is supposed to be. So to a d gree. I feel like a lot of it was to a degree later. None of it in the beginning  Later, some of it.[71]

---

[64] Appendix R p. 11.
[65] Appendix Q p. 9-10.
[66] Appendix A.
[67] Appendix N p. 18. See also M p. 27. Complainant said she did not pass out but "did get close." Appendix N p. 27.
[68] Appendix N p. 27.
[69] Appendix N p. 27.
[70] Appendix N p. 26. In Complainant's interview with the WWPD, when asked if Respondent choked (or "strangled") them more than twenty times, Complainant said, "I'd say so." Appendix F.
[71] Appendix M p. 30.

Exhibit 1 Page 24 of 68

*Final Investigation Report 12/14/22*

   **2.  Respondent**

When interviewed, Respondent was asked if he ever had a conversation with Complainant about whether they liked choking. He replied, "I guess not specifically about that, that I can recall, but also, I don't think that that was something I did often."[72]

Respondent shared, "[W]e would hook up and I remember that I think at least once w did light choking stuff, but more just having ... I maybe had my hand around [the r] ne k, but not even really applying pressure.[73]

Respondent was asked to describe the "light choking."

>    Respondent:      I guess it would just be where maybe if I was on top of [them] during sex, I don't think this was something that we did all the time at all, but jus  having my hand like that, but not really squeezing, just positioning my hand there. Yeah.

>    Investigator:    Okay. Some pressure?

>    Respondent:      Maybe very lightly, but not to the point, not at all trying to actually res rict  their] airflow or [their] breathing or anything.

>    Investigator:    Okay  For the recording, I just want to be able to capture the w y you used your hand. Basically you're showing me your hand just over the neck.

>    Respondent      I was just resting on the neck. [showed palm down][74]

Respondent was    ked if he had any indication that Complainant found that action consensual or welcome. He responded, "I can't remember how that developed exactly, but it w  s nev  r communicated to me that they didn't. At the same time, it seemed like we b  th enjoyed what we were doing."[75]

---

[72] Appendix R p. 5.
[73] Appendix Q p. 8-9.
[74] Appendix Q p. 10. See also Appendix R p. 3, 5.
[75] Appendix Q p. 10

Exhibit 1 Page 25 of 68

*Final Investigation Report 12/14/22*

## I.  Allegation: Grabbing Complainant's Hair

### 1.  Complainant

In Complainant's written complaint, they described Respondent grabbing their hair to control their movements.[76] When interviewed, Complainant indicated that at the time in question, the length of their hair was at the shoulder area.[77]

Complainant said that Respondent would grab their hair at the base, right above the neck. They stated that Respondent would "grab it pretty hard and then he could move [Complainant's] head in whatever way he so pleased." Complainant explained that Respondent would move their head so that he had complete control over their actions.[78]

Complainant was asked if the hair pulling was ever consensual. They said:

> I feel like it was all the same thing where I didn't want any of it at first and then eventually grew to like it, to an extent  Again, all this to an extent, because I can remember very distinct times where it just hurt a lot. And I was like, "I can't say anything."[79]

### 2.  Respondent

Respondent was asked about Complain nt s allegation that he grabbed their hair to control or move their head. He repl ed that he did not remember that. He said he thought he would remember it. Responden  stated that he may have had his hand on Complainant's head but would not have been trying to force anything.[80]

## J.  Allegation: Using Physical Power, Including Shoving Against a Wall

### 1.  Complainant

In their written complaint, Complainant indicated that on Day 3:

> We began to makeout and it very quickly devolved into an unsafe situation. He began to be incredibly aggressive, grabbing my face and hair to control my movements. He shoved me against the wall and pushed himself against me. I continuously said 'no' and pushed him away to no avail. I was scared

---

[76] Appendix A.
[77] Appendix M p. 18.
[78] Appendix M p. 16-17.
[79] Appendix M p. 34.
[80] Appendix R p. 4.

Exhibit 1 Page 26 of 68

*Final Investigation Report 12/14/22*

and didn't know what to do because he was physically overpowering me. I said I didn't want to have sex yet and he said there wasn't a difference between now and later so I should just do it.[81]

In an interview, Complainant described a physical experience:

> He was pushing me around, you know? And he was grabbing my throat really hard. And I like, I just couldn't get him off of me. And I kept being like, "I like don't want to do this." I was like, "Get off, get off."[82]

They continued:

> I was very afraid and I kept trying to get him off of me. And I was like, I like, "Stop, no." Said all the words that you're supposed to say. And also all the physical things trying to get him off me. And  hen eventually because he was just like, oh God, he just had complete cont ol. He was a lot bigger than me and a lot stronger than me.[83]

## 2. Respondent

Respondent was asked about Complainant s cont ntion that the way he handled them was "always very hard and aggressive." He s ated, "I don't think it would be excessively in that way."[84]

Respondent said that he did not remember pushing Complainant against a wall. He indicated that he thought he would remember that.[85]

Respondent was asked a  out Complainant's assertions that he was pushing them around, they could not get him off them, and they were saying, "I don't want to do this. Get off, get off"? Respondent denied these claims. He said, "I know that never happened."[86]

Respondent denied physically overpowering Complainant. He also denied doing anything that wou d cause Complainant to not be able to physically move. Respondent added, "Out ide of sometimes during sex I would be on top of them and sometimes they would  e on top of me, and so obviously the weight of another person was on top of you, but nothing past that."[87]

---

[81] Appendix A.
[82] Appendix M p. 13.
[83] Appendix M p. 13.
[84] Appendix R p. 8.
[85] Appendix R p. 3-4.
[86] Appendix R p. 3-5.
[87] Appendix R p. 8.

Exhibit 1 Page 27 of 68

*Final Investigation Report 12/14/22*

### K. Allegation: Putting Hands Inside Complainant

#### 1. Complainant

Complainant alleged that Respondent put his hands inside them without Complainant's consent.[88] In their interview with the Walla Walla Police Department, Complainant said that "maybe a week in, he started nonconsensually fingering me."[89]

#### 2. Respondent

Respondent denied putting a hand inside Complainant without consent.[90]

### L. Allegation: Use of Threats

#### 1. Complainant

According to Complainant, Respondent never threatened Complainant physically. They described him saying, "If you don't have sex with me, I will find someone else," which they perceived as a threat.[91]

#### 2. Respondent

Respondent denied making the statement in question, although he said he thought he knew the situation that Complainant was referring to. He explained:

> It was a situation where we had been exclusive and then Complainant didn't want to be exclusive anymore. We weren't officially dating yet, but we were deciding not to hook up with other people. Then I believe we were at a party or something and there was a girl flirting with me and Complainant was upset with that and told me that [they] didn't want me to hook up with this other person, but I was confused and felt like I was being told one thing and another thing, because [they] had said that [they] didn't want to be exclusive anymore.
>
> I then was like, "Well, look, if we're not going to be exclusive, I'm going to hook up with other people if that's what we're doing," and so I then did. [They were] upset that I did, but I know the context, it wasn't me being

---

[88] Appendix M p. 19.
[89] Appendix F.
[90] Appendix R p. 5-6.
[91] Appendix N p. 21; Appendix M p. 18.

Exhibit 1 Page 28 of 68

*Final Investigation Report 12/14/22*

upset that [they] wouldn't have sex with me, it was me feeling confused that [they] didn't want to be hooking up with only each other, having relations with only each other, and so then when I had the opportunity to not do that, that [they were] trying to make me not.[92]

## M.  Allegation: Other Verbal Pressure

### 1.  Complainant

Complainant alleged that Respondent would say things that made them r ally uncomfortable. Examples included "you made me do this," "if you wer n't wearing that skirt," and "I have to punish you." Complainant said there was a "vibe of 'with you looking like that, of course, I'm going to do this to you. You were asking for it.'" Complainant characterized this communication as making it seem like the sex was not consensual, even when it was. According to Complainant, th y said to Respondent, "This is so weird because I want to be having sex with you and you're making it like I'm not."[93]

### 2.  Respondent

Respondent was asked whether he made stat ments such as those alleged by Complainant. He said he did not.[94]

## N.  Allegation: Nonconsensual Oral Sex

### 1.  Complainant

In Complainant's written statement, they stated:

> I told him I wasn't comfortable sucking his dick and he shoved me onto my knees. I t ld him I didn't want him to cum in my mouth and he pushed my head down so I couldn't pull away.[95]

---

[92] Ap endix R p. 2. In their written statement dated November 29, 2022, Complainant offered the f llowing: "Respondent denies making that claim and explains a situation that occurred later in the sem ster. I just want to clarify that that wasn't the situation I was talking about. He yelled that at me at a party the first week I knew him, which [the investigator] referred to as Day C in the report. The event he's describing occurred a month or two later, after our relationship had already been off and on." Appendix HH.

[93] Appendix N p. 18-19. In their written statement dated November 29, 2022, Complainant indicated that they did not state out loud the sentence starting with "This is so weird . . ." Complainant said this is what they were thinking at the time. Appendix HH.

[94] Appendix R p. 10, 13.

[95] Appendix A.

Exhibit 1 Page 29 of 68

*Final Investigation Report 12/14/22*

When interviewed, Complainant said that in November of 2019, there was a time when Respondent pushed them down to give him oral sex after Complainant specifically pulled away. Complainant said that they told him that they did not want to do that, and then he pushed Complainant down on their knees.[96]

Complainant was asked if this happened multiple times. Complainant replied:

> Yeah, but the second time, I will say... It happened twice. The first time was not consensual. I was really mad afterwards . . . . The second time wa consensual because at that point, I was getting to a place where I was . This was before he [left school for the rest of the semester], I was a wreck about it, the whole thing. And so that second time was consensual because I was like, "Yeah, you can do that to me. Totally. Please just pay attention to me."[97]

### 2. Respondent

Respondent denied ever forcing Complainant to give him oral sex. He also denied ever forcing Complainant to let him come in their mouth. Respondent acknowledged that he did come in Complainant's mouth on on oc asion. He explained:

> This is embarrassing, but it was more of just they were giving me oral sex and I came, and it wasn't a conscious decision trying to do that right then, but it just happened. When hey talked to me after, I explained that. I was like, "I'm sorry, I wasn t trying to do that. It's just that is what happened." Then I apologized, I said, "I'll try to not do that next time," but I didn't know that that was going to happen.[98]

Respondent rec lled a situation involving oral sex where Complainant raised a concern with him. He stated

> I remembered a time where after Complainant had done oral sex on me and afterwards [they] expressed to me that [they] felt like I had been holding [th ir] head and putting pressure on it in a way that [they] didn't like. We discussed this and I apologized and made sure to not do it again.[99]

---

[96] Appendix M p. 36. See also Appendix N p. 18.
[97] Appendix M p. 36-37.
[98] Appendix R p. 7.
[99] Appendix Q p. 41 (August 15, 2022 email from Respondent to Investigator).

Exhibit 1 Page 30 of 68

*Final Investigation Report 12/14/22*

### 3. Complainant

Complainant also reported talking to Respondent about the oral sex. Complainant described a conversation right before winter break where they told him, "I want to bring up the fact that I told you I didn't want to give you head, and you pushed me down anyway and that made me really uncomfortable because I told you ahead of time." Complainant continued:

> [H]e was like, "Oh, I didn't realize that," like he said he didn't realize so then I kept going and I was like, "Well, yeah, and you also made me really uncomfortable a lot in the beginning too," and we had a whole conversation about it. So, I did bring it up. Anyway, so I wanted t  say that, and then it didn't really change because then after that conversation, when we got back from campus, that's when he pushed my he  d down so I couldn't come up, so that he could come in my mouth [100]

## VII. PARTIES' CLARIFICATIONS OF EARLIER STATEMENTS

In their communications in early October 2021, Complainant and Respondent each made statements that they subsequently backed away from. This section details the communications in question and the parties  explanations of why they no longer stood by their earlier statements.

### A. Complainant's Initial Response to  he Email Received by the Soccer Coaches

On multiple occasions, Respondent emphasized Complainant's initial response when he contacted Complainant  bout the email to the soccer coaches. For example, in his written statement to the WWPD, Respondent wrote:

> [They] d  nied everything the email was saying and was upset that someone would ha  e  aid this. [They] then snapchatted me the next day saying how upset [they were] and stating that this wasn't true at all and that whoever was saying this clearly did not know either them or me.[101]

A screenshot of the October 2, 2021 message from Complainant to Respondent showed the following text:

> It's fucked up and idk how this is being fabricated and spread

---

[100] Appendix N p. 5-6.
[101] Appendix F.

Exhibit 1 Page 31 of 68

*Final Investigation Report 12/14/22*

> And I do want to clarify that I haven't talked about our relationship to
> anyone at Whitman and when I did I never said you abused me or anything
> remotely like that
> Whoever's doing this knows nothing about me or you[102]

When interviewed for this investigation, Complainant addressed their thought process n
their communications with Respondent at this time. Complainant recalled Responden
calling Complainant to tell them about the letter sent to the soccer coaches and asking f it
was true that he abused Complainant. Complainant said it was a "[v]ery jarring phone
call."[103]

> So, when he first told me about abuse, I was like, "I said that I hadn't told
> anybody anything," and because that was true. So, I was really shocked
> when I first found out and he was texting me or calling me, saying like that
> "I abused you." . . .  I was like, "No, I haven't told anybody that," because I
> hadn't in years.
>
> So to me, it's not that I hadn't ever talked about it, but I was like, "Well, I
> didn't tell anybody anything," because I m an, I hadn't even been there. I
> hadn't even been on campus in so long. So, I meant that I hadn't spoken to
> anybody recently for that to have been the case or for there to have been
> rumors, and then I was like, I said  "Whoever's spreading these rumors
> fabricated them," and I think fabricated was the wrong choice of words...[104]

In regard to their statement in the screenshot that says "Whoever's doing this knows
nothing about me or you," Complainant said, "That was true. They didn't know us."
Complainant stated that it wa  immediately after this that they messaged that it was true
and he did abuse Complainan .[105]

Complainant empha ized:

> I think fabricated wasn't a good word to use, but I don't know. I was really
> shocke  and so that's how that conversation played out, but I wasn't
> saying, "Oh, it's not true. Just kidding. It is true." It was more of like, "Oh
> my God. I don't know where that's coming from," but yes, it's true.[106]

---

[102] Appendix G.
[103] Appendix M p. 9; Appendix N p. 13.
[104] Appendix N p. 7.
[105] Appendix N p. 7; Appendix H.
[106] Appendix N p. 7.

Exhibit 1 Page 32 of 68

*Final Investigation Report 12/14/22*

## B.  Respondent's Initial Response to Complainant's Concerns About His Actions

Although he later denied engaging in nonconsensual sexual activity with Complainant, Respondent's initial response to their concerns did not include a denial. On October 6, 2021, after Complainant messaged him to tell him about their concerns, Respondent responded:

> Ok Complainant I'm really sorry. This is really alarming for me to hear and I am really going to think about this a lot. I didn't know this stuff but it's clear I made you feel shitty and uncomfortable and I'm sorry to h ve had that effect on you. I don't remember this happening this way but I trust your perspective and I am really sorry for clearly hurting you. I cl arly acted like an idiot and I hate that that I may have affected you in a negative way. It's not an excuse but I really feel like I wasn't myself fr shman year in a lot of different ways and I need to reflect on this. Thank you for telling me
> If you ever want to talk about this more or want to t lk on the phone or something please let me know
> I want to say that I never wanted to harm you in anyway but that of course doesn't detract from the effect of the w y I made you feel
> I'm sorry Complainant I'm thinking about this rn because you just told me but I'll keep trying to process it[10]

During this investigation, Respondent was asked about the contrast between the statements in his message to Complainant and his subsequent position that nothing nonconsensual had occurred. He explained:

> I was basically just kind of in shock at that point when I received those texts being like, you did all this. And so I was just completely in shock and my first thought wasn't, oh, why [are they] making all this up? My first thought was, this is my relationship from two years before, I was trying to think about it. And I couldn't really think, I couldn't really sleep . . . If s meth ng had happened, I didn't want to be, no, that didn't happen, like I just want to defend myself . . . it's hard to imagine someone saying this stuff and it not being true.
>
> And I think at the beginning, that really just being in the shock of it, all that really got me. . . I think I did make a point in there because I didn't remember any of this saying, I don't remember this happening . . . But then

---

[107] Appendix I.

Exhibit 1 Page 33 of 68

*Final Investigation Report 12/14/22*

I also felt like, okay, but something had to have happened or why would [they] be saying this to me?[108]

Respondent shared his thought process:

I really sat there and was like, I need to slow down and think through what they're actually saying to me and think about what I know and what I remember and think about if this actually happened, rather than just kind f try to be agreeable and understand what's going on. . . . And so I stayed up all night just thinking about it and I was just like, this did not happen.[109]

## VIII.  WITNESS INFORMATION

### A. Summary

Of the witnesses interviewed, four indicated that they had seen a bruise or mark on Complainant's face or neck,[110] and another one said that th re was a good chance that she had seen a bruise or mark on Complainant.[111] Four of them indicated that Complainant talked to them about the bruise or mark.[112]

In regard to what Complainant told witnesse  during the time they were seeing Respondent, three of the witnesses s id that C mplainant told them about nonconsensual activity with Respondent.[113] Another witness indicated that Complainant had shared information that raised a question about whether the sexual activity with Respondent was consensual.[114]

Additionally, multiple witnes es said that in 2021 Complainant talked to them about nonconsensual sexual ac ivity that had occurred with Respondent during the time when they were seeing e ch other.[115]

---

[108] Appendix Q p. 25-26.
[109] Appendix Q p. 26-27.
[110] Witness C, Witness E, Witness G, Witness H.
[111] Witness K.
[112] Witness C, Witness E, Witness G, Witness H.
[113] Witness E, Witness F, Witness H.
[114] Witness K.
[115] Witness A, Witness C.

Exhibit 1 Page 34 of 68

*Final Investigation Report 12/14/22*

## B. Witness C

### 1. Witness C's Observations of Complainant

Witness C is a student at Whitman. She said that she did not know Complainant well and described Complainant as "more of an acquaintance." Witness C reported that she met both Complainant and Respondent on the first day of math class at the beginning of their first year. She stated that she is not currently in touch with Respondent.[116]

Witness C said that she had been aware of a relationship between Complainant and Respondent. She explained that she had noticed that they were close in the math class, and she heard through a mutual friend that they were dating.[117]

Witness C recalled that she noticed some bruising on Complainant: "[O]ne day in math class, I noticed some bruising on Complainant's neck, but at that moment while they were still dating, I didn't have any other information or know either of them personally." She said, "I remember noting that it didn't look like bruising from hickeys." Witness C described it as "reddish purple." She indicated that she did not recall whether there was more than one spot.[118] In regard to the size, Witness C estimated that it was bigger than a quarter.[119]

### 2. Witness C's Alleged Experience with Respondent

Witness C stated that the first time she interacted with Respondent was a week into spring semester of their freshman year, at the end of January 2020. She shared: "Respondent and I got to talking and ended up exchanging numbers. . . . We started talking on a Thursday and he came to my room that Friday during lunch."[120]

According to Witness C, she and Respondent "had talked about maybe something happening sexually."[121] She said that while they had not made "any specific plans or agreements to anything," there seemed to be kind of an unspoken agreement or thought that something sexual was going to happen.[122]

---

[116] Appendix S p. 1-2.
[117] Appendix S p. 2.
[118] Appendix S p. 3. In one interview, Witness C described the bruise as being on the left side, and in her other interview she described the bruise being on Complainant's right side.
[119] Appendix T p. 1.
[120] Appendix S p. 7
[121] Appendix S p. 7.
[122] Appendix S p. 11.

Exhibit 1 Page 35 of 68

Witness C lived in Lyman House. She stated that her room was a divided double, so there was a door and a wall in between her space and her roommate's.[123] Witness C said that Respondent came over around 11:55 or noon. She estimated that the whole interaction with Respondent in her room lasted about ten minutes.[124] She said her roommate was not present.[125]

Witness C reported that when Respondent came to her room, they engaged in consensual kissing.[126] She said that he then shoved his hands down her pants.[127] Witness C s ated that she was wearing "a skirt with tights, a jeans skirt with a zipper and a button  And then tights underneath that." She indicated that her clothes were loose enough for Respondent to put his hands underneath the skirt and tights. Witness C stated that R spondent's hands were touching her skin in the vaginal area. When asked if it ever felt like Respondent had any finger or any part of his hand inside of her, Witness C responded, "Yes, he definitely did." She emphasized that this was not consensual.[128]

Witness C said that Respondent then lifted her up onto he  bed by her hips. She noted that her bed was much higher than a regular bed height. Witnes  C said that after Respondent lifted her onto the bed, she was sitting on the edge of the wide side of the bed with her back to the wall. She stated that for a while he was just standing in front of her and then they changed positions.[129]

Witness C reported that Respondent non  onsensually choked her with one hand around her neck and at the same time pulled her hair all the way back so that she could not breathe. When asked what position she was in at this time, Witness C said, "I was laying down on the bed with my head on my pillows and he was straddling my waist on top of me, I believe." When asked how they got into these positions, she said, "I think I scooted back myself and then he got onto the bed, but I'm not positive." When asked if Respondent getting onto  he bed was consensual, Witness C replied, "I think that was fine. It was all just happ  ning really fast."[130]

Witness C in  icated that there was no verbal or nonverbal communication about what was happening.  She said she did not know exactly how long Respondent was choking her with one hand and pulling her hair back.[131]

---

[3] Appendix T p. 6.
[124] Appendix S p. 11.
[125] Appendix S p. 7.
[126] Appendix S p. 7. In her first interview, Witness C indicated that just the initial kissing had been consensual. Appendix S p. 7.
[127] Appendix S p. 7.
[128] Appendix T p. 7-8
[129] Appendix S p. 7; Appendix T p. 6-7.
[130] Appendix T p. 7; Appendix S p. 7.
[131] Appendix S p. 7-9.

Exhibit 1 Page 36 of 68

Witness C indicated that she thought it was obvious that she could not breathe, and Respondent was "using quite a bit of force." She said that she felt an extreme amount of pressure on her neck, and her skull hurt from her hair being pulled.[132] Witness C said it was relatively painful but not excruciating.[133]

Witness C stated that she did not know how long she was like that for.[134] When asked what happened next, Witness C said:

> He let go and he either asked me to give him a blow job then and I sat up or I sat up and then he asked me to give him a blow job. I don't know exactly the order.[135]

She indicated that when Respondent wanted the blow job, he was still on her bed. When asked who would have been closer to the door at that point, Witness C said they both would have been pretty equally close to the door. When asked if she felt she had a clear path to the door, Witness C responded:

> I guess. I mean, my bed is raised, so I would've had to jump off my bed and run out of my room, but he was right there, so it's not like I would've been able to get past him.[136]

Witness C described how she felt when Respondent wanted the blow job:

> I was very apprehensive and I didn't want to, and I kind of questioned if we had enough time. And then he started pushing my head towards his penis and was saying, "You're the one that got me so turned on. This is your fault. You need to deal with it."[137]

Witness C stated that she did not really feel like she could get out of it and ended up giving him a blowjob. She described expressing some reluctance, "I think I like slightly shook my head and I said I didn't know if we had enough time." She explained: "I think from him pushing my head down, as well as telling me that it was my fault that he was turned on and I sort of owed him, I didn't really feel safe to say no."[138]

---

[132] Appendix S p. 7-9.
[133] Appendix T p. 8.
[134] Appendix S p. 7.
[135] Appendix T p. 8.
[136] Appendix T p. 8-9.
[137] Appendix S p. 7.
[138] Appendix S p. 7, 9.

Exhibit 1 Page 37 of 68

Witness C described feeling like she could not get out of it: "I think it was more that I didn't think that if I said no, that would be respected and listened to." She indicated that she felt like it was doing to happen either way.[139]

When asked if she had any subsequent encounters with Respondent, Witness C said: "Not in person. We texted and we had texted about potentially meeting up again and I had pushed a little bit for that, but we ended up not having contact again."[140]

Witness C stated that she did not really fully accept what had happened until about a year later. She said she then told her current boyfriend, who she was seeing then, her close circle of friends, and her therapist at Whitman. When asked what she told them, she said: "My therapist has the whole detailed version of all of our interaction   And then my boyfriend is the only one who knows exactly what happened. Everyone else just knows something happened."[141]

Witness C said that she spoke with Cassandre Beccai in the Whitman Title IX office in March or April of 2022. Witness C stated that sh  spoke wi h Beccai about her own experience and to find out what her options were fo  Title IX.[142] Witness C decided not to make her own complaint.[143]

### 3. Respondent's Response to Witness C's Claims

Respondent recalled having a conversation with Witness C in one of the common areas early in the second semester of thei  first year. He said after that they started texting about how they wanted to hook up  Respondent stated, "I just had a small window of time where I could see her. She invited me over to her room and then we hooked up."[144] He said he was in her room sometime midday, and he thought he was there for about a half hour.[145] According to Respondent, "We kissed and I think they gave me oral sex, and then we kissed more and then I left."[146] When asked if anything happening between the oral sex and th  kissing  he said no, not that he remembered.[147]

When asked if he put his hands down Witness C's pants, Respondent said he did not remember that  He stated that it was unlikely that he picked Witness C up. When asked if

---

[139] Appendix S p. 10.
[140] Appendix S p. 8.
[141] Appendix S p. 11-12.
[142] Appendix T p. 5. Earlier, on December 2, 2021, Witness C submitted an anonymous Title IX incident report that named Respondent. Appendix GG.
[143] Appendix S p. 12.
[144] Appendix R p. 15.
[145] Appendix R p. 16-17.
[146] Appendix R p. 16.
[147] Appendix R p. 20.

Exhibit 1 Page 38 of 68

*Final Investigation Report 12/14/22*

he choked her with one hand around her neck, Respondent said he did not remember that. When asked if he thought it was possible, Respondent responded, "I'm just not sure, I don't remember doing that. It's just catching me off guard. It was three years ago, so I'm not sure right now."[148]

Respondent was asked if putting his hand around someone's neck was something he would ever do without asking them first. He replied:

> I don't think so. . . . I might, if it felt mutually understood or we had trust . . . I think maybe I'd put my hand on someone's neck just like I'd put my hand maybe on their arm or some other body part, but I would n t try to choke them or restrict airflow like that.[149]

When asked about Witness C's claim that he pulled her hair and head back while he was choking her, Respondent said, "No." He added, "[T]hat doesn't sound like something that I would've done or something that I remember doing at al ." Respondent was told that Witness C said that she could not really breathe and that sh  thought it would have been apparent to Respondent that she could not. He resp nded, "No, I think that would be highly unlikely. No." When asked about Witness C's a  ertion that he was using physical force, Respondent stated:

> I would not have tried to forc  them to do anything or tried to apply force to move them in any way. I guess I understood it as we were having consensual encounter, that they invited me over and kissed and then progressed to more stu f, b  t I definitely did not forcibly jerk them around or something.[150]

Respondent was asked if he had a response to Witness C's claim that the oral sex she gave him was not consensual. He said his memory was that the oral sex was consensual.[151] When asked how Witness C consented to the oral sex, Respondent said that he did not rem  mber.[152]

Respondent w s asked about Witness C's assertion that he told her, "You're the one that got me so turned on. This is your fault. You need to deal with it." He replied that he did not rem  mber saying that.[153]

---

[148] Appendix R p. 18.
[149] Appendix R p. 19.
[150] Appendix R p. 19.
[151] Appendix R p. 20.
[152] Appendix R p. 21.
[153] Appendix R p. 20.

Exhibit 1 Page 39 of 68

*Final Investigation Report 12/14/22*

Respondent volunteered that he thought there was a chance that he may have hurt Witness C's feelings.[154] He said after their encounter it seemed like she wanted to see him again. Respondent said, "When I texted her and said I didn't want to anymore, it seemed like she was trying to be like, 'No, no, I want to see you again.'"[155]

Additionally, Respondent provided a written response to Witness C's claims in an email dated September 30, 2022:

> I absolutely did not use violence or coercion with Witness C and I'm confused about why she's coming out with this after so long. . . . Witness C and I had a couple weeks of texting about how we were going to hook up and so when I finally went to her dorm room that afternoon things were already in motion. If I was eager or enthusiastic it was because I sincerely believed that we had an agreement about what was going to happen and I thought she was into it. She never gave me any indication before or during that she was not on board with the hook up and if she had told me at any time that she had changed her mind, I would have respected that and left without pressuring her.
>
> I never choked or hit her. I did not pull her head back like you described as a controlling or violent thing. Any touching or physical interaction was part of the intimate encounter that I re lly thought we were both totally on board with. I'm very sad and surprised to hear that she doesn't remember it that way.[156]

Later, in an email sent on October 10, 2022, this investigator shared some additional details obtained from W tness C subsequent to Respondent's last interview.

> In her follow up interview on 9/30/22, Witness C elaborated on her allegation that you put your hands down her pants, and it wasn't consensu l. She said that your hands were under her skirt and tights, touching her skin in the vaginal area. She indicated that you touched inside of her vagina.[157]

In an em il dated October 12, 2022, Respondent responded to the additional details:

> Thanks for sharing the update although it's obviously troubling information. I maintain my position that I sincerely believed the Witness C encounter

---

[154] Appendix R p. 23.
[155] Appendix R p. 21.
[156] Appendix R p. 28-29.
[157] Appendix R p. 29.

Exhibit 1 Page 40 of 68

was consensual since we had planned it over a period time via text, she was engaged and enthusiastic during, and then indicated she'd like to meet up again afterwards until I called it off.[158]

### 4. Witness C's Communications with Complainant

Witness C indicated that she and Complainant did not have contact at the time when she saw the bruise. Witness C said that the two of them did not have contact until November 2021. She stated that in September 2021, she had told a mutual friend, Person 11 that she had a bad experience with Respondent. According to Witness C, she thought that Person 11 told Complainant about her, after which Complainant added Witness C on Instagram. Witness C stated that after she put together why Complainant added her, she sent Complainant a message.[159]

She said that after messaging on Instagram, they spoke "pretty lengthily" on the phone.[160] Witness C said that she believed they only talked on the phone once.[161]

Witness C said that she told Complainant that she h d seen their bruising.[162] Witness C reported that Complainant told her about noncons nsu l things that happened with Respondent.[163] Witness C said the information from Complainant was "mostly just kind of broad, like being pressured into things they weren't ready for. . . . nothing super specific."[164] Witness C shared the details to th  extent she could recall:

- Complainant said that Respondent would tell her things like "Well, you owe me this."[165]

- Complainant mentioned a forced blow job.[166]

- Hair pulling sounded familiar, but Witness C was not positive Complainant talked about it.[167]

---

[158] Appen ix R p  29.
[159] Ap endix S p. 4, 12; Appendix T p. 1.
[160] Appendix S p. 1. Both Witness C and Complainant provided copies of the messages they exchanged. These can be found at Appendix U.
[161] Appendix T p. 5.
[162] Appendix S p. 5.
[163] In her first interview, Witness C said that Complainant shared her story about Respondent before Witness C shared hers. Appendix S p. 5. In her second interview, she said she did not remember who talked first about what happened to them with Respondent. Appendix T p. 2.
[164] Appendix S p. 5-6.
[165] Appendix S p. 5-6.
[166] Appendix T p. 3.
[167] Appendix T p. 3.

Exhibit 1 Page 41 of 68

- Complainant mentioned choking that was not consensual.[168]

- Complainant talked in general about how Respondent was very pushy or coercive.[169]

- Complainant mentioned being bruised.[170]

Witness C described what she shared with Complainant about what happen d between herself and Respondent. She indicated that she told Complainant that there had b en nonconsensual sexual activity, including nonconsensual oral sex. She stated that she thought she told Complainant about the hair pulling, although sh  was not positive. Witness C said that she did not believe that she shared any specifics of what Respondent said to her in her room on the day in question.[171]

When asked if she told Complainant anything about choking or Respondent's hand being on her throat, Witness C said, "I don't believe I specifically told her, but she and I had talked about how we were both aware that he had a preference for choking and he didn't always ask." She said she was aware of this from Complainant but no one else.[172]

### 5. Complainant's Communications with Witness C

Complainant was asked how it was that they came to talk with Witness C about Respondent. Complainant said they thought Person 11 gave Witness C Complainant's number, and then told Witness C that Complainant had a similar situation happen.[173] According to Complainant  Person 11 did not tell them anything about what happened to Witness C.[174]

Complainant said Witne s C reached out to them, and then after texting they spoke on the phone.[175] Compl  inant provided screenshots of the messages with Witness C.[176]

Complainan  said that Witness C told them that Respondent said things to her like "Y  u're making me do this" and made her give him nonconsensual oral sex in her room  Complainant stated that Witness C talked about Respondent choking her and how

---

[168] Appendix T p. 3.
[169] Appendix T p. 3.
[170] Appendix T p. 3.
[171] Appendix T p. 4
[172] Appendix T p. 4.
[173] Appendix N p. 14; Appendix O p. 4.
[174] Appendix O p. 5.
[175] Appendix O p. 5.
[176] Appendix U.

Exhibit 1 Page 42 of 68

*Final Investigation Report 12/14/22*

scary it was.[177]

Complainant said that they shared with Witness C what their experience with Respondent had been and told her everything Complainant remembered. This included the hair pulling and the choking. When asked if Witness C told Complainant about the choking before Complainant talked about it, Complainant said, "I think so. It was very conversational. I remember she told me her what her story was first, but it was a conversation after that."[178]

Complainant stated that Witness C told them that when they had math together, Witness C saw a bruise on Complainant's face.[179]

When asked how many times they might have talked about what happened with Respondent, Complainant said that other than the one "big" phone call, they did not really talk about what happened after that.[180] Complainant indicated that their conversation with Witness C happened before Complainant made the Instagram posts about Respondent.[181]

## C. Witness J

Witness J is Witness C's boyfriend. Witness J was interviewed for this investigation, because Witness C said that she had told him what she had experienced with Respondent. He is not a current or former Whitman student. Witness J reported that they met in February in 2020 and became boyfriend and girlfriend at the end of August 2020. He said they have been together since that time.[182]

Witness J was asked if he knew Complainant or Respondent. He responded that he had heard the names but had neve  met them.[183]

Witness J confirmed that Witness C had told him about Respondent's alleged conduct. He said that she shared the information with him in person in late September or early October of 2021  Witness J stated that Witness C did not give a date as to when the situation occu red. When asked how the subject came up, he said:

---

[177] Appendix O p. 5-8.
[178] Appendix O p. 6-8.
[179] Appendix O p. 7-8.
[180] Appendix O p. 8.
[181] Appendix O p. 8-9.
[182] Appendix V p. 2.
[183] Appendix V p. 3.

Exhibit 1 Page 43 of 68

*Final Investigation Report 12/14/22*

> Witness C and I were getting a little intimate and she started to have a panic attack. And before this I had knew she had gotten assaulted. I just didn't know the details. And so we were getting intimate and she started to have a panic attack so we stopped. And then after the panic attack started to simmer down, she told me what had happened between her and Respondent.[184]

He stated that Witness C told him Respondent's name at that time. When asked what information Witness C had shared, Respondent said:

> [W]hat I remember from her telling me is she and Respondent had h ng out and they were back in one of their rooms. I don't remember if it was Respondent's room or her room, but it was one of their rooms. And they were kissing or making out and then he had asked if she wanted to suck his dick. And she was kind of hesitant, but he whipped it out and pushed her head towards his dick anyways. She didn't give an answer beforehand, he just kind of went for it and forcibly had her give him a blowjob and finished.[185]

Witness J said that he believed that Witness C said he had his hand on the back of her head pushing her down. When asked what he me nt by the word forcibly, Witness J indicated that he meant the use of physical for e and intimidation. He stated that Witness C told him that she felt like she did not have a choice.[186]

Witness J said that he did not remember Witness C sharing other details of the event. He indicated that it was clear to him that Witness C was communicating that the blowjob was not consensual.[187]

Witness J said that Witn ss C indicated to him that she had not really understood that she was assaulted until l ter, when it started to dawn on her what had happened and started to become more of an issue down the road. He said that he thought he was the first person that Witness C talked to about it. According to Witness J, Witness C had been struggling in the spring of 2021, and his understanding was that that was really when she figured out what happened. When asked if he had any reason to think that Witness C might tell this investigator something that was not true, he said no.[188]

---

[184] Appendix V p. 3-4.
[185] Appendix V p. 4.
[186] Appendix V p. 4-5, 8.
[187] Appendix V p. 5.
[188] Appendix V p. 5-6.

Exhibit 1 Page 44 of 68

*Final Investigation Report 12/14/22*

### D. Witness E

Witness E was interviewed, because Complainant reported that she talked to Witness E about Respondent.[189]

Witness E said that she and Complainant were pretty close during freshman year  She explained that while they are still friends, they do not really keep in touch much  nym re. Witness E said that she knows Respondent, although they have never been friends. She indicated that she recalled Complainant and Respondent hooking up during their first year.[190]

Witness E said that Complainant would come to her and compl  in about Complainant's relationship with Respondent, and this started pretty early on. She said these conversations would typically involve just the two of them in Witness E's room.[191]

When asked if Complainant ever told her about something happening with Respondent that was not consensual, Witness E said yes. Although she said that there may have been other instances, there was one specific situation that sh  remembered. Witness E said that Complainant came into her room one night and showed her marks on Complainant's jaw. She stated that Complainant told her that Respondent had grabbed Complainant's face and pulled it down.[192]

Witness E said that she saw red ma ks on Complainant's jaw, although she did not know if they were bruises or just red marks. In regard to the location, Witness E said the marks were under Complainant's jaw, "as if someone was grabbing their chin basically." When asked if she understood Complainant to be describing unwelcome behavior, Witness E said yes. When asked if Complainant ever mentioned any other behaviors by Respondent that seemed physically forceful, such as hitting, slapping, or choking, Witness E said not that she could recall.[193]

While she said she did not recall other specific situations that Complainant shared, Witness E said she recalled Complainant telling her:

> I also remember them saying something very tentatively, didn't really come out and say it, but they said something like there's a lot of times I don't

---

[189] Appendix M p. 23.
[190] Appendix W p. 3.
[191] Appendix W p. 4.
[192] Appendix W p. 4.
[193] Appendix W p. 5.

Exhibit 1 Page 45 of 68

want to have sex and Respondent does type of thing. But I again don't
remember exactly what was said, so that's kind of me paraphrasing.[194]

Witness E said that she definitely remembered Complainant saying that Respondent was
"very rough." However, she stated that she did not recall Complainant explicitly saying
something like, "I don't want to do this." She also said that Complainant expressed some
fear that if things got "messed up with Respondent or whatever," some friendships
Complainant had with Respondent's friends would not continue. Witness E went on to
observe that at times Complainant would be "kind of flip flopping between good and
bad" in regard to how Complainant felt about Respondent.[195]

When asked if Complainant might have a motive to tell this investigator something that
was not true, Witness E said no, not in this context. When asked the same question about
Respondent, Witness E said, "I think he does have a motive to lie about this because it
makes him look really bad." She also noted that Respondent had already been in trouble
with the school before."[196]

According to the Walla Walla Police Department report, Witness E was interviewed by a
detective on January 10, 2022. The information summarized in the report was essentially
consistent with what she shared with this investigator.[197]

## E. Witness F

Complainant reported that she talked to Witness F about what she was experiencing with
Respondent.[198] Both Complainant and Witness F described themselves as former
romantic partners prior to Complainant coming to Whitman.[199] They agreed that they
remained in contact by telephone as each started at their new campuses. Witness F stated
that he does not know Respondent.[200]

Witness F reported that he does not currently have a relationship with Complainant. He
said, "We really rarely speak. We're on bad terms actually, but I'm not really one to hold
grudges, especially in a situation like this."[201]

Witness F described a telephone call where Complainant shared concerns about
Respondent:

---

[194] Appendix W p. 5.
[195] Appendix W p. 6.
[196] Appendix W p. 7-8.
[197] Appendix W p. 14.
[198] Appendix M p. 20; Appendix N p. 22.
[199] Witness F has never been enrolled at Whitman.
[200] Appendix X p. 4.
[201] Appendix X p. 2.

Exhibit 1 Page 46 of 68

*Final Investigation Report 12/14/22*

I remember [they were] just telling me that he was doing stuff to them that they didn't really appreciate and they were trying to communicate to him about, and it wasn't working. And so, I remember [Complainant] said he would slap [Complainant] and [Complainant] told him one time, "I don't like that." And I guess, I don't really know if [Complainant] persisted in telling him when they weren't having a sexual encounter, but it was to my understanding that almost every time they were having sex, there was something that he would do that [Complainant] didn't like. And [Complainant] made it seem like [Complainant] had tried to attempt to communicate about it at least once on whatever thing it was. But again, my memory tells me that he... The one thing I do remember certain w s that he had smacked [Complainant] a couple times during sex and [Complainant] had said, "I don't like to"... They had said, "I don't like to be hit in the face, so don't do that anymore." But he just kept doing it e ery time.[202]

When asked if he thought Complainant had any motive to be untruthful with this investigator, Witness F said he did not think that Complainant would lie about something like this.[203] When asked if he remembered Compl inant mentioning a bruise, Witness F said not to his knowledge.[204] When asked if C mplainant talked to him about nonconsensual choking with Respondent, he said that did not ring a bell.[205]

According to the Walla Walla Poli e D partment report, Witness F was interviewed by a detective on January 25, 2022. The information summarized in the report was generally consistent with what he shared with this investigator.[206]

## F. Witness G

Complainant stated that she talked to Witness G about fighting with Respondent, but did not tell her about any of the "sex stuff."[207]

Witness G reported that she met Complainant in the fall of 2019, when Complainant was the roommate of one of Witness G's really good friends, Witness A. She said that she and

---

[202] Appendix X p. 5, 8. In his written statement dated November 30, 2022, Respondent quoted from a portion of Complainant's June 7, 2022 interview, in which they mentioned skimming through the police recordings. Complainant said, "I don't know, Witness F, the boyfriend, was like, 'Oh, he hit her a bunch.' And I was like, 'I told you one time.'" Appendix II p. 15.
[203] Appendix X p. 10.
[204] Appendix X p. 8.
[205] Appendix X p. 10.
[206] Appendix X p. 15-16; Appendix F.
[207] Appendix M p. 26.

Exhibit 1 Page 47 of 68

*Final Investigation Report 12/14/22*

Complainant were friends during their first year at Whitman but have grown apart. She said that she did not currently have any relationship with Complainant.[208]

Witness G stated that she and Respondent met during their first year. She said that they later lived together in a house with a few other people in the fall of 2020. According to Witness G, she and Respondent are "pretty close," although they do not talk regularly. [209]

She reported that she and Respondent first had "intimate relations" in March 2020. Witness G said that because of the quarantine, the two of them did not see each other again until they moved into the shared house in the fall of 2020. She stated that they also had intimate relations through the fall of 2020. Witness G added, "And then we moved out of that house and that was the end of that." She noted, "We never labeled it as us being a couple."[210]

Witness G recalled that Respondent and Complainant started "hooking up" at the beginning of their first year in the fall of 2019, and then they were "sort of on and off for that whole fall semester." She said that they became an exclusive boyfriend-girlfriend at some point during that semester.[211]

Witness G acknowledged that she, Complainant, and Witness A had conversations about the relationship between Complainant and Respondent. Witness G was asked if there was a point when she understood Complainant to have had some concerns about interactions with Respondent. She said yes, although they seemed like common relationship concerns to her and Witness A. When asked if Complainant ever said or implied that something had happened with Respondent that Complainant did not consent to, Witness G said no, not that she remembered, and she thought she would remember that. She indicated that she was not aware of any reason that Complainant would withhold such information from them or that Complainant would be taking with other people about it.[212]

Witness G was asked if Complainant had ever given her reason to think that Respondent might have hit, slapped, or choked them. She responded, "Hit [Complainant] or slapped [Complainant]? No, definitely not. Choking... That one's different because of the way that choking during sexual relationships isn't always a super violent act. Definitely no hitting or slapping, nothing that violent." When asked about choking that was unwelcome, Witness G said, "No. I can't recall [Complainant] ever saying that." She said that she thought she would remember.[213]

---

[208] Appendix Y p. 3-4.
[209] Appendix Y p. 4.
[210] Appendix Y p. 5.
[211] Appendix Y p. 5.
[212] Appendix Y p. 6-7.
[213] Appendix Y p. 7.

Exhibit 1 Page 48 of 68

Witness G was asked, "During the time they were seeing Respondent, did you ever see them with a bruise on their face or neck or any anywhere that was visible?" She replied, "Yeah. There was one, I think, on [Complainant's] jaw, actually." When asked to describe the bruise, Witness G said, "It was a very faint yellow. It was only noticeable because [Complainant] pointed it out. It wasn't a shocking bruise." She stated that she did not remember what Complainant said about the bruise. When asked if Complainant had seemed upset about it, Witness G said:

> It was kind of hard to tell with Complainant because [Complainant] had a very joking way of talking. [Complainant] would always laugh when talking about such things. I can't remember how [Complainant] felt about that.[214]

Witness G was asked if she was suggesting that there may have been times when there was something Complainant felt serious about but [they were] nevertheless laughing about it when they were talking. She said yes.[215]

When asked if Complainant mentioned the bruise in connection with Respondent, Witness G said that she did not remember. When asked if she thought she would remember if Complainant had said that Respondent had something to do with the bruise, Witness G said, "Yeah, I do think I d rem mb r. I'm trying really hard to remember. And I'm assuming that yes, [Complainant] s id that it was him." This investigator then asked, "Can you say that again? You do think [Complainant] said it was him?" Witness G said yes. When asked if she had any sense of whether the bruise was caused by something that was consensual or not consensual, Witness G said, "I did not have a concern about that. No."[216]

Witness G indicated tha  she had talked to Respondent about the allegations. She said, "I think that he has acknowledged that there may be some small truths to certain pieces, but I think he largely d nies the allegations." Witness G was asked what the small truths to certain pieces would be. She responded:

> I had this conversation with him so long ago. I think that he may have thought that certain acts during their sex was more consented than [Complainant] thought, but it was not talked about between them, so he never knew. So when the allegations came out, he sort of realized that

---

[214] Appendix Y p. 8.
[215] Appendix Y p. 7.
[216] Appendix Y p. 8-9.

Exhibit 1 Page 49 of 68

*Final Investigation Report 12/14/22*

maybe there were things that he didn't know were non-consensual. That is what I remember from talking to him about that.[217]

When asked if hitting or slapping had come up, Witness G said no. However, she said that choking did come up. She stated, "I think I remember talking about him choking [Complainant] in a way that may have been more forceful than [Complainant] may have wanted." When asked how the two of them came to be talking about this, Witness G indicated that after Complainant posted the allegations on Instagram, she reached out to him to talk and they set up a phone call or FaceTime and "hashed it out."[218]

When asked, Witness G denied that Complainant or Respondent had a motive to be untruthful with this investigator.[219]

As with other interviewees, Witness G was provided with a copy of the transcript from her interview and given an opportunity to edit, add, or adjust as needed. On August 29, 2022, Witness G responded to this investigator via email, saying "Those look good to me." One month later, on September 29, 2022, Witness G sent this investigator a message stating that she wanted to "clear up" some things.[220]

In regard to the bruise, Witness G said:

> At the bottom of page 8, we were discussing the means by which Complainant obtained the bruise, and I want to very clearly retract my statement in which I appear to have suggested that the bruise may have been the result of violence on Respondent's part.
>
> When I said, "I'm assuming that yes, [Complainant] said that it was him." That was NOT to say that I thought Respondent gave Complainant the bruise, it was more of a generalized assumption that [Complainant] could have spread that rumor. I would like this to be removed from my transcript. It does not accurately portray what I remember happening.[221]

In regard to her response to this investigator's question about hitting, slapping, or choking, Witness G asked to change the wording. She said:

> I would like to refine this to be more specific and remove the implication of violence to say, "Hit [Complainant] or slapped [Complainant]? No,

---

[217] Appendix Y p. 10.
[218] Appendix Y p. 10.
[219] Appendix Y p. 12.
[220] Appendix Y p. 16.
[221] Appendix Y p. 16.

Exhibit 1 Page 50 of 68

definitely not. Choking... That one is different because choking during sex can be pleasurable for many people, and I distinctly remember Complainant saying they liked it. Definitely no hitting or slapping."[222]

Additionally, Witness G stated that she wanted to note that she and Complainant had more of a falling out than she shared in her interview. Some of the information provided by Witness G was critical of Complainant. The details offered were not determined to be of probative value to this investigation.[223]

## G. Witness H

Complainant reported that she talked extensively to Witness H about the sex with Respondent.[224]

When interviewed, Witness H recalled that she and Complainant met shortly before classes started in the fall of 2019. She said that she and Complainant were friends during their first year, and said they were confidants for each other.[225]

Witness H said that she met Respondent and Complainant as a couple when they first got to Whitman. She explained that she and Respondent had always been friendly but had never been close friends.[226] Witness H indicated that while she and Respondent had never had a particular conflict, she "very much openly didn't like him." She added that she also was very civil and kind to him whenever they encountered each other.[227]

Witness H remembered that Respondent and Complainant started seeing each other right when school started and then were on and off. She described their relationship as "toxic" and "abusive." Witness H explained:

> [Complainant] would totally explain things that he did to [Complainant] physically and stuff like that, that was abusive in nature, both sexually abusive but physically abusive as well. So that's why [abusive] popped into my head in particular, but I would say toxic on just a basic level. It was very tumultuous rollercoaster-y a lot the whole time.[228]

She talked about when her concerns about the relationship started:

---

[222] Appendix Y p. 16.
[223] All of Witness G's requested changes can be found at Appendix Y p. 16-17.
[224] Appendix M p. 26.
[225] Appendix Z p. 3. All page references are to Witness H's first interview on August 19, 2022.
[226] Appendix Z p. 4.
[227] Appendix Z p. 17.
[228] Appendix Z p. 4-5.

Exhibit 1 Page 51 of 68

*Final Investigation Report 12/14/22*

> I became concerned probably in end of September, October, because I think [they were] like, "Oh, I thought that he was just into maybe rougher sex, and whatever and I just kind of went with it, but he hit me in the face yesterday," and I was like, "Okay, because that seems like... Were you okay with that? And did he ask?" And [they were] like, "No and no, but what do you do when he's on top of you?"[229]

Although Witness H said it was hard to put a timeline together, she said:

> I would say definitely he physically hurt [Complainant] in October for sur . I know [Complainant] became concerned with his behavior during sex in September and that's when I was a little concerned as well and then he definitely hit [Complainant] in October though, October or November, because the season, it was colder out and I remember studying for one of my final chem exams one night and [Complainan ] came to me and we had been talking all afternoon.[230]

Witness H was asked, "When [Complainant] said that he hit [Complainant] in the face, did it sound like that was in a sexual context?" Sh  replied:

> It was. It was during sex, he was on top of [Complainant]. See, and here's the thing. I don't remember timelines o  anything, but I remember this quite vividly. He was on top of [Complainant], they were having penetrative sex at that point and he slapped [Complainant] in the face and it was to the point where [Complainant] had a bruise and it wasn't like a huge bruise, but there was a mark there from something. . . . I was like, "And were you okay with it?" She was like, "No." So it was in a sexual context.[231]

Witness H indicated tha  she could see the mark on Complainant's face. When asked what it looked like, she  aid, "[I]t wasn't super noticeable, but the second that [Complainan ] said that he hit [Complainant], I was like, 'Is that from that?' So it was just like maybe redness, a little bit of discoloration." When describing it, Witness H touched her lower face by her jaw. She noted that there had been other bruises:

> I remember there would be bruising from [Complainant's] neck as well from like choking and some other bruising around [Complainant's] body I think in other parts where he might have like hit [Complainant], but like not

---

[229] Appendix Z p. 6.
[230] Appendix Z p. 6.
[231] Appendix Z p. 7.

Exhibit 1 Page 52 of 68

*Final Investigation Report 12/14/22*

that it's okay to hit a butt, but I think stuff like that would leave marks as well. I remember just small bruises all the time.[232]

She indicated that Complainant showed her marks on [Complainant's] neck and other places, too.[233]

When asked whether Complainant had indicated that the marks were from something consensual, Witness H said:

In all honesty, I think the hitting was the first time that [Complainant] ever... like I could tell that [they were]n't okay with it, even though [they were] like, "Well, it wasn't that hard," and like, "This happen d but it wasn't that hard." So I think that was the first time that [Complainant] seemed really not okay with it . . . .[234]

Witness H went on to say:

I would say with the hitting, that was the only thing that I knew was not consensual. I can't say with certainty or ac uracy at this point, like three years down the line, if any of the rest of it was. I know that it made [Complainant] uncomfortable how physic l and rough he would be sometimes. So it's like [Complainant] might have consented to him choking [Complainant], but gently, not leaving a bruise. So I can't say with certainty about any of the other stuff, but I know for sure him hitting [Complainant] in the face was not okay at a lot of levels.[235]

In regard to whether the hitting of Complainant in the face ever happened again, Witness H stated, "Yeah or hitting [Complainant] somewhere else." When asked if Complainant suggested that they were all right with that, Witness H said no.[236] She added:

I do remember Complainant and him fighting quite a bit about like, "No, you hit me, and that happened," and him being like, "Well, it wasn't in that c ntext " or "I didn't mean it like that. I would never hurt you." So [they were] also being told that messaging as well while being abused.[237]

---

[232] Appendix Z p. 8.
[233] Appendix Z p. 7-8.
[234] Appendix Z p. 8.
[235] Appendix Z p. 9.
[236] Appendix Z p. 9.
[237] Appendix Z p. 9.

Exhibit 1 Page 53 of 68

*Final Investigation Report 12/14/22*

Witness H was asked if Complainant ever indicated that there had been sex acts with Respondent that were not consensual. She replied:

> Absolutely. There were times after sex that [Complainant] would come to
> me and be like, "Yeah, he slapped me in the face," and that was like the
> part that [Complainant] wasn't okay with, but there would be parts of sex
> that [Complainant] also wasn't okay with. Like sometimes he would choke
> [Complainant] too hard, sometimes they would have sex, even though
> [Complainant] didn't want to. Whether or not [Complainant] expressed that
> in the moment, I'm not sure, but this is [Complainant] coming to me after
> the fact, just as like a confidant and sharing and venting. . . . [T]there was
> always something, like, "That made me uncomfortable," r he was just
> physically aggressive or just like stuff that would make [Complainant] just
> base level uncomfortable. Whether or not [Complainant] actively said no
> during sex and whether or not he continued, I don't know, I can't remember
> specifically.[238]

Witness H was asked if she remembered Complainant ever saying something like, "I didn't tell him it was okay and he did it anyway. She esponded:

> Stuff like that for sure. I know for sur  that they didn't communicate super
> well throughout those experiences  clea ly because these things continued
> to happen and happen in rea ly not okay ways, in pretty big ways. I know
> for sure... Yeah, [Complainant] would come to me and be like, "I wanted
> him to choke me, but not th  t hard and I need to breathe. Like, and yeah,
> it's fun to maybe be tos ed around or push me onto the bed or something
> like that, but I didn't a  k for him to manhandle the shit out of me," and stuff
> like that.[239]

When asked how often Complainant would complain to her about another thing that happened, W tn ss H s id that she would hear about something new at least once a week. When Witness H was asked if she was referring to something new that was noncons nsua  she said "just something not great."[240]

Witness H was asked if Complainant had ever talked about how they would handle situations with Respondent where they didn't want to consent. Witness H replied that Complainant would have sex with Respondent because Complainant felt pressured to and did not know how to handle that situation. Witness H was asked if Complainant ever

---

[238] Appendix Z p. 11.
[239] Appendix Z p. 11-12.
[240] Appendix Z p. 12.

Exhibit 1 Page 54 of 68

*Final Investigation Report 12/14/22*

suggested that Respondent might have used physical force to engage in some sexual activity. She stated:

> I don't think like that. I don't think it was ever like, "I don't want to," and then he physically forced [Complainant] to then have sex. I think he would've maybe then been like verbally manipulative, like, "Well, I want to," but I can't recall a time when he was physically aggressive to start sexual intercourse. That being said, I don't know how [Complainant] would've taken that, being a sexual partner of his, because he was pretty aggressive all the time. So it was kind of like, "Is this forcing me?" I think that it was really hard to figure out what the fuck was going on the majority of the time.[241]

During the course of her interview, Witness H shared that over ime the emotional burden of listening to Complainant became too much for her. She said that their relationship "got a little rocky." According to Witness H, although she and Complainant patched things up in the spring, they never became good friends ag in [242]

Witness H stated that Complainant also confided in Witness A and Witness G, "as much as or even more" than herself. She indicated that she knew this because Complainant openly talked about it and they were all each other's best friends. Witness H added, "So I know for a fact that they listened to it jus as much as I did because they were there physically."[243]

However, Witness H expressed doubt that Witness A and Witness G would speak on Complainant's behalf. She said that she thought they would be quite biased toward Respondent. Witness H said that they were good friends with Respondent and characterized them as "Team Respondent" at this point.[244]

Witness H indicated tha she did not think Complainant made up "any of this shit." As for Respondent, wh n sked if she thought he had a motive to tell this investigator something untruthful, Witness H said "to cover his ass."[245]

Acco ding to the Walla Walla Police Department report, Witness H was interviewed by a detective on January 25, 2022. The information summarized in the report was essentially consistent with what she shared with this investigator.[246]

---

[241] Appendix Z p. 15-16.
[242] Appendix Z p. 6-7.
[243] Appendix Z p. 14.
[244] Appendix Z p. 12-13.
[245] Appendix Z p. 16.
[246] Appendix F.

Exhibit 1 Page 55 of 68

## H. Witness K

Witness K was interviewed after Complainant reported that they told Witness K about their situation with Respondent.[247]

When asked about her relationship with Complainant, Witness K said, "I was moderately close with Complainant freshman year, but I have not been in contact with them very much since." She indicated that she would consider Complainant a friend, although they had not talked in a long time. Witness K stated that she knew Respondent through Complainant but added that she and Respondent had never been friends.[248]

Witness K said that she was aware of a "slightly tumultuous relationship" between Complainant and Respondent during their freshman year. She stated that she did not think that Complainant had disclosed any "major details." When asked if Complainant had shared anything that happened with Respondent that Complainant did not consent to, Witness K said, "No, not to my knowledge." When asked if she thought that she would remember if Complainant did, Witness K said that she thought so.[249]

When asked if she had seen a bruise on Complainant's face, neck, or jawline, Witness K responded:

> I want to say yes, but I'm also trying to remember whether or not that was because I actually did see it, or because one of my friends told me they had seen it. I knew that Complainant and Respondent were involved with some, what Complainant called at the time was consensual non-consensual, role play type aspect of their sex life, and I think some problems came from that. But I think if I did see it I just maybe assumed it was part of that, I don't think I asked them any details because I felt that wasn't appropriate, if they wanted to talk to me about it they would. Which they never did.[250]

When asked how likely she thought it was that she had seen a bruise on Complainant herself, Witness K said:

> Considering that one of my very close friends saw it and Complainant went to them about it, and that I lived in the same dorm as Complainant, I think there's probably a pretty good chance that I did see it.[251]

---

[247] Appendix M p. 23.
[248] Appendix AA p. 3-4.
[249] Appendix AA p. 4.
[250] Appendix AA p. 6.
[251] Appendix AA p. 7.

Exhibit 1 Page 56 of 68

She estimated the likelihood at 70-30.[252]

Witness K was asked what Complainant had told her about the "consensual nonconsensual" (CNC). She replied:

> What I remember was Complainant mentioning that that was something that they, Respondent especially, really liked, and [Complainant] went along with it. I definitely felt that there was probably an issue there because it's not a super comfortable territory to go into with someone who you don't even, you haven't been together with for a while, so I was definitely a little iffy on whether or not that was something that [Complainant] actually wanted to be doing, or if [they were] just doing it with him because [Complainant] felt like [Complainant] had to in order to stay with him. I don't think we ever went into any in depth conversati ns about it . . . .[253]

When asked if Complainant ever said or implied that Respondent might be pressuring Complainant, Witness K said that she never got tha  impression directly from Complainant. Witness K was asked what she meant when she said that Complainant "went along with" the CNC.

> I guess in that sense then ther  was a lit le bit of pressure that I was noticing, but I think what I  m trying to say by that is I think that there were times that Complainant seemed to be enjoying it just based on quick interactions with [Complainant], or brief conversations with them, and then there also seemed to be times that Complainant seemed run down, not how Complainant normally acted, just less happy than they normally were. And so I think there w  re times that the CNC thing wasn't what she wanted to

---

[252] Appendix AA p. 7. In his written statement dated November 30, 2022, Respondent stated the following on page 18:
> Witne s K fir t stated that she was not sure if her knowledge of a bruise came from Witness K herself having seen it, or if one of her friends had told her they had seen it. (Report  p. 53.) However, the Investigator (and the report) then jumps to the conclusion that Witness K did see a bruise, concluding with an odd, and baseless, percentage estimate of 70-30 that Witness K had seen it. (Report, p. 54.) This is all very unfair, especially because of how strongly the Investigator presents this speculative evidence as fact in the report.

Appendix II. The following statement was not an accurate reflection of what was written in the report: "[T]he Investigator (and the report) then jumps to the conclusion that Witness K did see a bruise, concluding with an odd, and baseless, percentage estimate of 70-30 that Witness K had seen it." Both the text of the report ("She estimated the likelihood [that she had seen a bruise] at 70-30") and Witness K's interview (Appendix AA p. 6-7) reflected that the 70-30 likelihood was offered by Witness K, not this investigator.

[253] Appendix AA p. 7.

Exhibit 1 Page 57 of 68

do, just based on those brief interactions. I'm not entirely sure if that was the reason for [Complainant's] energy to be lower, or [Complainant's] attitude to be a little bit different that day, but yeah.[254]

When asked if she thought that Complainant may have a motive to tell this investigator something that was not true, Witness K said no. When asked the same question about Respondent, she said maybe but also noted that she did not know Respondent very well.[255]

### I. Witness A

#### 1. Complainant

Complainant and Witness A were roommates in Jewett Hall during their first year at Whitman. Complainant described their relationship as "like best friends" and "super close," although they said that they were not super close at the beginning. Complainant said that the two of them got close toward the end of the semester.[256]

Complainant indicated that when they were seeing Respondent, they did not talk to Witness A about the sexual activity with him. Complainant noted that Witness A was friends with him.[257]

Complainant estimated that they first told Witness A about the sexual issues with Respondent in late October 2021.[258] Complainant stated that they are not still in touch with Witness A.[259]

#### 2. Witness A

Witness A described being "very good friends" with Complainant while they were roommates, although it took a little bit of time to warm up to each other. Witness A shared that she thought it had taken about two weeks before they were close friends. She noted, "I know by the end of September, we were pretty close."[260] Witness A stated that her friendship with Complainant came to an end in the fall of 2021.[261]

---

[254] Appendix AA p. 8.
[255] Appendix AA p. 9.
[256] Appendix M p. 4.
[257] Appendix M p. 25; Appendix N p. 9.
[258] Appendix N p. 9-10.
[259] Appendix M p. 5.
[260] Appendix BB p. 2-3, 5.
[261] Appendix BB p. 2-3.

Exhibit 1 Page 58 of 68

Witness A reported that she and Respondent have been friends since Complainant and Respondent were seeing each other.[262] Witness A said she recalled that the relationship between Complainant and Respondent started pretty soon after moving in at Whitman.[263]

This investigator asked Witness A if, during the time Complainant and Respondent were seeing each other, she had had reason to think there was an issue around whether their sexual activity was consensual. Witness A indicated that at that time, she was not aware of such an issue. She characterized the relationship between Complainant and Respondent as toxic "on both sides." Witness A indicated that she did not perceive the toxicity to involve their sexual relationship; rather, "[I]t was more just th[e] on and off aspect."[264]

She stated that Complainant told her that Respondent was rough, although the way it was described "did not seem to be anything extremely out of the ordinary." She said that Complainant did not seem to be sharing the information as a concern.[265]

Witness A stated that in the fall of 2021, Complainant started sharing concerns with her about the relationship with Respondent. She recalled:

> [S]he described the email [to the soccer coaches] to me. That's when [Complainant] shared with me that he had bruised [Complainant], but [Complainant] only told a certain amount of people when it happened, and that [they were]n't extremely concerned about it then. [Complainant] shared concern of if there is his other report, maybe he did do stuff wrong, but [Complainant] didn't think he was that wrong. Initially, it was just about the email and then maybe of the beginning of questioning their relationship. [Complainant] were not extremely concerned at that point, but [they were] like "Maybe I did overlook things," or something.[266]

Witness A said that in regard to the bruising, "[Complainant] was like, 'I didn't tell you this happened.'"[26]

> [L]ast fall [2021], [Complainant] shared with me that he had bruised [Complainant's] face at the beginning of the relationship. However, that was during that period that I mentioned, where we weren't exactly close

---

[262] Appendix BB p. 2. Respondent agreed, stating that he and Witness A became good friends. He said she has been a good friend of his since that time. Appendix Q p. 4.
[263] Appendix BB p. 2-3.
[264] Appendix BB p. 4.
[265] Appendix BB p. 5.
[266] Appendix BB p. 7.
[267] Appendix BB p. 7-8.

Exhibit 1 Page 59 of 68

*Final Investigation Report 12/14/22*

friends yet. It was just roommates. So [Complainant] did not share that with me at the time, and I did not notice it then.[268]

In regard to whether the bruising was consensual, Witness A said that Complainant "expressed that it was not consensual. That I know for sure." She reported some transition in Complainant's expressed perspective as they talked in the fall of 2021. Witness A said that there was "a bit of an unfolding, definitely, between the first and last phone call." She recalled that in the third phone call, "I think they expressed that they had thought a lot about their past sexual times, I guess I'd call them, and had realized that a lot of it was not consensual."[269]

Witness A said that when Complainant and Respondent were seeing each other she did not really talk to Respondent about their relationship. She pointed out that Respondent had been Complainant's boyfriend before he was Witness A's friend. Witness A stated that she did not talk to Respondent about his sexual relationship with Complainant until the fall of 2021. She said that after Complainant began talking to her about Respondent, "I would talk to him about what Complainant was telling me and hear what he had to say."[270]

Witness A described what Respondent told her about the conduct alleged by Complainant:

> At the beginning, he was trying very hard to reflect on their relationship. I believe that he expressed this to Complainant as well, that he didn't see it that way, did not do it on purpose. But it was a little bit of like, "I don't remember. I don't ever recall doing anything like that on purpose. I haven't done that on purpose to anyone." It felt like in shock, the same way that Complainant felt in their first phone call with me, sort of like, "I don't know. Now I have to think about all this stuff. I don't remember anything on that level."
>
> He didn't deny it, necessarily. It was more like, "I don't know." There was some things where he was like, "I didn't do this, but I don't know. Maybe I did make them feel uncomfortable. I didn't realize I was doing it then." Sorry. I think it's the same way that Complainant's thought evolved over time. The more they thought about it, the more they saw that they thought it was very wrong. Respondent sort of evolved on an opposite thing, of like,

---

[268] Appendix BB p. 5.
[269] Appendix BB p. 10-11.
[270] Appendix BB p. 6.

Exhibit 1 Page 60 of 68

"I know I did not do that specific thing. I did not do that specific thing."
That is not how he remembered any of their interactions going.[271]

She further stated:

I think last fall, he definitely felt a lot of remorse for making Complainant
and any other person feel uncomfortable. He felt like that was never his
intention. I can't say I recall a very explicit "I need help" sort of thing. Bu
I know that it was not like an I-have-no-fault mindset, either, if that makes
sense.[272]

When asked, Witness A denied that Complainant or Respondent had a motive to be
untruthful with this investigator.[273]

## J.  Witness D

### 1.  Complainant

Complainant described an off-campus party wher  Respondent was trying to physically
restrain their movements by grabbing and holding Complainant's arm to keep them from
going inside. Complainant asserted that Pers  n 3 intervened. Complainant indicated that
Respondent physically restrained them again, and Witness D intervened.[274]

### 2.  Witness D

When interviewed, Witness D indicated that he considered himself a Whitman student,
although he was taking the current semester off. He said he started at Whitman in the fall
of 2019.[275]

Witness D reported that he did not know Complainant well. He said that he would not
consider Compl in nt a friend of his. He stated that he had seen Complainant around
Jewett Hall and at a couple of parties and probably exchanged a few words every now
and then [276] W tness D said that he did not know Respondent and had never spoken with
him.[2 7]

---

[271] Appendix BB p. 10-11.
[272] Appendix BB p. 12.
[273] Appendix BB p. 14.
[274] Appendix M p. 15-16.
[275] Appendix CC p. 1-2. He described himself as "on campus and still involved with stuff."
[276] Appendix CC p. 2.
[277] Appendix CC p. 3.

Exhibit 1 Page 61 of 68

*Final Investigation Report 12/14/22*

He described an incident that occurred at an off-campus party early in the fall semester of 2019. According to Witness D, he did not drink that night. Witness D said the incident was a physical altercation in which Respondent grabbed Complainant on the bicep and shook Complainant by the arm. He said that they were on a porch, and it seemed as though Complainant either was trying to walk away or was trying to disengage. Witness D recalled that when Respondent grabbed Complainant's arm and shook it, Complainant kind of recoiled. He said it was like Respondent was trying to tell Complainant something. Witness D described the arm grab as "aggressive and sustained." When asked how long he thought it occurred for, he said probably a few seconds.[278]

He said that Respondent grabbing Complainant's arm was the first thing he really noticed. Witness D said that when he came over to the two of them, Respondent kind of let go of Complainant's arm, looked at Witness D, and then walked away without engaging with Witness D. He stated that he thought the only reason Respondent let go was because Witness D intervened. Witness D said that he asked Complainant if she was okay. He reported that she seemed surprised but did tell him she was okay. Witness D recalled that other people who were around were drunk, doing their own thing, and not paying attention.[279]

### 3. Respondent

Respondent denied grabbing Complainant's arm and also denied shaking it. He stated, "I didn't ever try to restrain them or restrict them from moving anywhere."[280]

## K. Witness B

Witness B and Respondent were roommates in Jewett Hall during their first year at Whitman. Witness B was interviewed to ask if he had witnessed anything relevant. Neither Complainant nor Respondent claimed that they had spoken to Witness B about their relationship.

Respondent indicated that when he and Witness B were roommates, the were "definitely friends."[281] Complainant said that she and Witness B had been friends but did not really interact.[282]

---

[278] Appendix CC p. 3-5, 8-9.
[279] Appendix CC p. 5-7.
[280] Appendix R p. 13.
[281] Appendix Q p. 3.
[282] Appendix M p. 5.

Exhibit 1 Page 62 of 68

*Final Investigation Report 12/14/22*

Witness B said that he and Respondent were mostly just friendly roommates and not close friends. He reported that they do not socialize.[283]

Witness B stated that he and Complainant do not currently have any relationship. He indicated that during their first year they were friendly and had a rapport but did not socialize together.[284]

Witness B reported that he was aware that Complainant and Respondent had a relationship during their first year. He said, "I guess you could call it dating  Hooking up. . . . [Complainant] definitely spent a number of nights in our room with Respondent."[285]

When asked if he remembered seeing any bruises on Complainant, h  said no. He indicated that that was something he thought he would definitely notice and remember.[286]

Witness B said that he was not aware of any issue coming up regarding whether the sex between Complainant and Respondent was consensual. H  indicated that he thought he would probably remember something like that.[287]

Witness B did not indicate that he thought that Complainant or Respondent would have a motive to tell this investigator something that was not true.[288]

## L. Witness I

### 1. Respondent

According to Respondent, Complainant told him that they and Witness I kissed when Respondent and Complainant were seeing each other. When interviewed, Respondent said, "Complainant was like, 'Well, actually I was just like sitting there,' or something. 'They actually just kissed me, and I didn't want them to,' and just put it all on my friend."[289] In his statement to the WWPD, Respondent described Complainant's communication as follows: "She told me that another guy on the soccer team had forcibly kissed her without consent."[290]

---

[283] Appendix DD p. 2.
[284] Appendix DD p. 3.
[285] Appendix DD p. 3.
[286] Appendix DD p. 4, 7.
[287] Appendix DD p. 5.
[288] Appendix DD p. 5.
[289] Appendix Q p. 19-20.
[290] Appendix F.

Exhibit 1 Page 63 of 68

*Final Investigation Report 12/14/22*

### 2. Witness I

Witness I is a current student at Whitman. He described himself as a really good friend of Respondent and a teammate of Respondent's on the soccer team.[291]

Witness I reported that Complainant was his best friend during his first semester at Whitman (fall 2019). He reported that he currently has no relationship with Complainant and said that has been the case since the winter break of his first year.[292]

According to Witness I, he was aware of the relationship between Complainant and Respondent while it was going on. He indicated that Complainant never sta ed or implied that something had happened with Respondent that was not consensual  Witness I stated, "[Complainant] just would talk about how much she loved [sex with Respondent] and how good Respondent was in bed." He denied seeing a bruise or a m rk on Complainant during that time and denied hearing her talk about choking.[293]

Witness I offered information that he maintained was relev nt to the issues in this investigation:

> Similar to Respondent, I had an experience where Complainant accused me of a false thing that didn't happen  . .  We were out at a party one night. I remember leaving the party and went b ck to right outside my residence hall. I was sitting on our big grass field, Ankeny. . . . We ended up kissing once. . . . This was right at the beginning of [fall semester] 2019. . . . Then, when he was in the process of breaking up with [Complainant], [Complainant] was pret y upset by that. [Right before winter break Complainant] spread a false rumor that I tried to force myself onto [Complainant]   .   When [Complainant] spread this lie, it was absolutely devastating  or me. It basically put me on social suicide. I didn't want to leave my room  I thought that everybody on campus thought I was just some rapist  r p rvert. . . . After that, I just never really spoke with [Complainant] again.[294]

Witn ss I indicated that he thought this scenario was related to the fact that Respondent wa  breaking up with Complainant. He stated that Complainant "wanted to direct [R spondent's] anger towards me, so it ruined our friendship for a while, too, until he realized that it was just a lie that [Complainant] was spreading around."[295]

---

[291] Appendix EE p. 1-3.
[292] Appendix EE p. 3.
[293] Appendix EE p. 6-7.
[294] Appendix EE p. 3-4.
[295] Appendix EE p. 4.

Exhibit 1 Page 64 of 68

*Final Investigation Report 12/14/22*

Witness I reported that Complainant later sent him a "big long apology text message." He reported that he gave a copy to Respondent:

> I shared it with him a few weeks back, I think, because I learned that he was going through this whole process, and I gave it to him. I was like, "This is a good piece of evidence, just to show that [Complainant] has a pattern of doing this."[296]

Witness I provided a copy of a screen shot of a text message associated with Complainant's name. It was dated January 28, 2021. The content of the message was an apology. It did not specify what the apology was for.[297]

Later in the interview, Witness I was asked additional questions about the "false rumor" that Complainant allegedly spread. When asked how Complainant spread it, Witness I said, "She just told Respondent directly. That's how she spread it. She didn't tell anybody else because I think she knew how crazy it was. Her main goal was just to get Respondent's anger pointed at me instead of her." Witness I was asked, "So, to your understanding, it wasn't something that was being broadcast across campus?" He answered: "Yeah. No. No. I don't even think she spread that rumor to anybody else besides Respondent because she understood how just crazy it was."[298]

When asked if he thought Complainant had any motive to tell this investigator something that was not true, Witness I said "I think this whole thing is not true. I think that she's doing this to stay relevant in Respondent's life . . ." When asked the same question in regard to Respondent, he said no.[299]

## 3. Complainant

In an interview for this investigation, Complainant was asked about the situation with Witness I and the screen shot. She confirmed that she did send the message to Witness I. She denied that the basis for the apology was spreading a false rumor about him. Complainant stated that she was apologizing for being "a really shitty friend."[300]

---

[296] Appendix EE p. 4-5.
[297] Appendix FF.
[298] Appendix EE p. 11. Witness I did not offer an explanation as to how Complainant telling something to only Respondent constituted spreading a rumor and resulted in him not wanting to leave his room and thinking "everybody on campus thought [he] was just some rapist or pervert."
[299] Appendix EE p. 9-10.
[300] Appendix P p. 1-2.

Exhibit 1 Page 65 of 68

*Final Investigation Report 12/14/22*

She acknowledged that she and Witness I had kissed early in their freshman year and described it as "very consensual." She said that the two of them then agreed not to tell Respondent about it. She detailed what subsequently occurred with Respondent:

> And so fast forward all of these months later. We're in this argument. He's complaining that I'm not honest or something, or that I'm not telling him things, so I figured that was an appropriate time to be like, "Oh, well there is another thing I haven't mentioned." And so I told him that Witness I had kissed me, or I just said that we had kissed, and then he was like "Did you kiss him or did he kiss you?" And I was like, "He kissed me," sort of to try and obviously take the heat off myself. It was true that he had kissed me, but I was like, "No, he kissed me."
>
> After that, we had sort of worked things out, and Respondent told me that Witness I was trying to break us up and that he had told him a bunch of things about me that weren't true. And so I got really angry at Witness I. I was like, "Oh my God. He's lying about me to Respondent, and I'm sure he's lying about Respondent to me, and he's trying to break us up," all the stuff like that. So the next time I saw him, I was just like, "Well, fuck you, Witness I." And just flipped him off and walked away. And I just didn't talk to him after that.[301]

Complainant continued:

> So I sent that apology to try and mend things, but that's what I was referring to is flipping him off and not talking to him.[302]

Complainant did not agree with Respondent's characterization that Complainant told him that Witness I forcibly kissed them without consent. They stated that they never implied to Respondent that the kiss with Witness I was not consensual.[303]

## IX  POSSIBLE MOTIVES ATTRIBUTED TO COMPLAINANT

In regard to Complainant's possible motivation for making the allegations, Respondent raised a few topics.

---

[301] Appendix P p. 1-2; Appendix O p. 12.
[302] Appendix P p. 1-2.
[303] Appendix O p. 12.

Exhibit 1 Page 66 of 68

*Final Investigation Report 12/14/22*

- Respondent stated that Complainant had made an effort to "kind of stay relevant in [his] life" throughout the last two years. At the same time, he offered, "[I]t doesn't make sense to me then that would lead to this."[304]

- Respondent also suggested that Complainant wanted attention and wanted to be remembered at Whitman. But again he volunteered that even if Complainant was wanting to be remembered or wanting attention, "it doesn't really make sense to do this."[305]

- He maintained that Witness A told him that Person 9 told her that Complainant told Person 9 that they had been "emotionally abusive" to Respondent [306]

- Respondent talked about Complainant being upset after finding out he hooked up with Witness G after Respondent and Complainant were no longer seeing each other. He said that in the spring of 2021, Complainant "went up to Witness G when Witness G was walking to the cafeteria in the middle of the day and was just like, 'you're a bitch. That you should neve  hooked up with Respondent, that was so messed up, we were friends. I can't believ  you did that and it really hurt me.'"[307]

## X. CREDIBILITY CONSIDERATIONS

In determining whether College policy was violated, credibility should be evaluated to determine whether the evidence relevant to the allegations is reliable. In assessing credibility, the decision make (s) may want to consider the following.

- Information tend ng to support Complainant's allegations was offered by several witnesses who said they did not currently have an active friendship relationship with her:
  o Witness A
  o Witness C
  o Witness D
  o Witness F

---

[304] Appendix Q p. 28.
[305] Appendix Q p. 29.
[306] Appendix Q p. 18. When asked about this in an interview, Complainant denied (a) that they were emotionally abusive to Respondent and (b) that they ever said they had been emotionally abusive to him. Appendix O p. 2-3.
[307] Appendix Q p. 36; Appendix F.

Exhibit 1 Page 67 of 68

*Final Investigation Report 12/14/22*

   o Witness G
   o Witness H[308]

- As detailed in Section VIII above, witnesses corroborated: (a) seeing a bruise or mark on Complainant's face or neck; (b) Complainant talking to them about a bruise or mark; and (c) Complainant telling them about nonconsensual activity with Respondent.

- Like Complainant, Witness C contended that Respondent subjected her t nonconsensual sexual activity. If the decision maker finds Witness C's testimony to be credible, then it may lend credibility to Complainant's testimony due to the similarities in the conduct described.

- Complainant and Witness C spoke to each other about their al eged experiences with Respondent prior to being interviewed for this in   stigation.

## XI.  CONCLUSION

This investigator submits this report for consideration by the decision makers appointed by Whitman College.

---

[308] While Witness H did not state that she and Complainant are not friends, she did say that their relationship had gotten rocky and they never became good friends again. Appendix A p. 6-7.

Exhibit 1 Page 68 of 68

# Exhibit 2

**RESPONDENT'S 10 BUSINESS DAYS RESPONSE TO
INVESTIGATOR'S 11/11/22 DRAFT REPORT TO WHITMAN UNIVERSITY**

TO: Independent Investigator Trish Murphy, Northwest Workplace Law (for Whitman University)
FROM: Respondent, ███ ███
DATE: November 30, 2022

## I.    INTRODUCTION

I, Respondent, am presenting this response to Ms. Murphy's Nov. 11, 2022 draft investigation report that was provided to me and my advisor, Lara Hruska, via email that same day. I will try my best to track each section of the draft report when I set forth my points regarding the report, evidence that I believe should be included/cited, etc. I will also do my best to refer to the parties, witnesses and evidence using the anonymous labels that Ms. Murphy has assigned to each via the draft report and related Identity Key and List of Appendices.[1]

I will say that I hope and expect that the Investigator understands, and remains impartial when considering the below and engaging in further proceedings, whenever I highlight issues that I see with the investigation and the draft report. The allegations against me, which I deny, could have devastating impact on me and so I can do nothing less than insist that all issues – evidentiary and procedural – be considered by the Investigator. Thus, I am not intending to be offensive with the Investigator, but I must defend myself against Complainant's false allegations. I thank the Investigator for her anticipated objectivity and disinterest as an independent, third party investigator.

With that said, at the outset, I would like to note that although my Advisor, Lara Hruska, requested on my behalf an extension of the 10-day deadline to provide this response due to the voluminous number of transcripts and other documents in the record, as well as the extended Thanksgiving holiday weekend, on November 17, 2022, the Investigator denied my request. I feel that was unreasonable and prejudicial to my ability to fully present a response to the draft report. Regardless, I have done the best I can in doing so with this response.

## II.    INVESTIGATION PROCESS
### a.  Absence or Exclusion of Evidence

#### i.  Corroborating Evidence About Respondent's Positive Sexual Relations with Others/Exclusion of Respondent's Alleged Non-Consensual Relations with Witness C

I want to initially say that because this matter is not arising from a complaint by Witness C then Witness C's information, including any information from any other source – Complainant, witnesses and documents – regarding my alleged non-consensual encounter with her, should be omitted from this investigation, report and consideration by the decisionmaker. The use of such information as purported support for a "pattern of conduct" by me is improper, and I do not see

---

[1] I would ask that the Investigator please ensure that the real name references to various witnesses be redacted/omitted from the underlying documents (*e.g.*, the police report). It appears that the names of various individuals still appear to be present in those in certain instances.

**RESPONDENT'S 10 BUSINESS DAYS RESPONSE TO
INVESTIGATOR'S 11/11/22 DRAFT REPORT TO WHITMAN UNIVERSITY**

anywhere in the procedures applicable to this investigation that an accused's "pattern of conduct" is to be presented to the decisionmaker.

That said, if the Investigator still intends to present the information from and related to Witness C to the decisionmaker, I want to note that my advisor previously emailed with the Investigator to request that I be allowed to introduce evidence of my positive sexual relations with any other partners from Whitman College. I was not initially allowed to do that. Considering that the Investigator is offering in her report Witness C's allegations as a "pattern of conduct," although, again, Witness C is not a Complainant, then I should be (and should have been) allowed to submit and have considered evidence that demonstrates a "pattern of conduct" where I engaged in consensual/positive sexual relations. If that is not allowed, then the Investigator should exclude from her report and this investigation Witness C's statements/evidence. It is not fair to allow "pattern of conduct" evidence that supports Complainant to be considered in this investigation if I am not allowed to have the same type of evidence that supports me included in this report and investigation.

Therefore, I am including with this response the November 29, 2022 emailed "Additional Evidence" statement sent by Witness G to the Investigator which speaks to her consensual, positive sexual relations with me, which included three text message screenshots from April 2020 between Complainant and Witness G, intended for the Investigator and decisionmaker. In the text exchange between Complainant and Witness G **Complainant specifically concurs that they were not in an abusive relationship with me** and Complainant states, "**Yeah it's crazy it shapes your understanding of reality so much. I've done that so many times where I completely change an entire scenario.**"

> **ii. Evidence About Complainant's Motivation to Attack Respondent, Including the Intent to "Fuck With" Complainant's Future**

I request that the Investigator include in the report reference to Appendix U, because in Complainant's text messaging with Witness C, Complainant specifically says, "He fucked with my future so now I'm going to do my best to fuck with his. I literally don't have anything going for me right now and he has everything going." I understand that the entirety of the text thread would be considered, as it should, but the decisionmakers should be allowed to consider if the preponderance of the evidence shows that (a) Complainant is engaging in a misplaced and devastating smear campaign against me and/or (b) that her credibility is in question, considering that I do and did deny that I ever engaged in any non-consensual sex with her.

Complainant's own statement about "gaslighting" me also could lead the decisionmaker to question Complainant's motivation, and therefore their credibility, in this proceeding. Complainant's following statements should be incorporated into the report:

> And I know he's going to bring this up too. I was really flirty with other people **and he claims that I gaslit him. I think I might have once or twice, to be honest,** but mostly, he was doing the same thing. So I didn't[2]

---

[2] Appendix M, p. 32.

**RESPONDENT'S 10 BUSINESS DAYS RESPONSE TO
INVESTIGATOR'S 11/11/22 DRAFT REPORT TO WHITMAN UNIVERSITY**

> Emotionally abusive, that is a really strong term. No. I definitely said that I had been... I had apologized because I felt like I'd been a shitty girlfriend, and **I felt like there were a lot of times that I would flirt with other people, and then be like, "No, I didn't flirt with them, what are you talking about?" And I think that's really mean.** Emotionally abusive? No, that's very intense. I did not say that.[3]

I also believe that the investigation and report should include information regarding Complainant's pattern of conduct of falsely accusing and/or harassing others. For instance, as discussed more below, Person 14 should be interviewed in that regard. Also, Complainant's tweets regarding their recent former (male) housemate deserve inclusion, which I include with this response for consideration, should also be referenced in and included with the final report. Finally, Witness I's supplemental information regarding Complainant's false accusations against others should also be referenced and included, and thus I include Witness I's supplemental information with this response.

### iii.  Evidence About Complainant's Mental Health

Because Complainant herself placed her mental health at issue – both back when we were at Whitman and afterwards – it should be referenced in the report and considered by the decisionmakers. I have always wanted to be mindful and considerate of Complainant's mental health challenges, and so I do not suggest this lightly. However, since I believe their goal is to essentially destroy my future, I have no choice but to make this request.

Complainant states:

> **I am bipolar. I'm also on medication and I wasn't on medication at the time. So I did have manias and depressions.** But I'm on medication now and I've been on medication for a year and I feel like I should say that.[4]

This clearly should be included in the report and considered by the decisionmaker because it goes to Complainant's credibility; specifically, it goes to their past and current recollection of, and even the ability to recollect, our relations and would definitely demonstrate that they are not actually recalling our sexual encounters correctly, which they are not.

### iv.  Complainant's Admission that I Never Threatened or Coerced Them, But Instead the Only "Coercion" Cited to Is That I Would Find Someone Else to Have Sex With

The report should reflect that I never physically threatened Complainant to have sex with me, because the decisionmaker could reasonably conclude that if I did not do that then it is more likely than not that I was, or at least reasonably believed I was, engaging in consensual sex with Complainant:

---

[3] Appendix O, p. 2.
[4] Appendix M, p. 39.

Not physically other than that one time where he said like, "Well, if you don't, I'll find someone else to." **But there was always the threat of him leaving or being with other people, but I would never say he threatened me physically.**

\*\*\*

Yeah. **I think the first time was very explicitly, "If you don't have sex with me, I will find someone else." That was a threat. After that though, there was always a threat of him leaving, but more so I wouldn't say it was sexual. More so like if I didn't do what he wanted or if I talked to this specific person or it was more of that. I wouldn't say it was a threat sexually, more of just like in the relationship.**[5]

While I dispute that I actually said this to Complainant, even if I had although the above statement attributed to me is embarrassing, it is not at all unreasonable for a teenager, or any adult, to state an ultimatum that if their partner will not have sex with them, then the person will find another willing adult in that regard.

This is further shown by Complainant acknowledging that they were (or, at least the decisionmaker could reasonably conclude), for lack of a better term, particularly "possessive" of me and that when things ended with me, then they either engaged in conduct to get me back or to "get back at" me:

Complainant: …. Before he left because he got suspended. I'd say before then **because once he got suspended and that whole thing's happening, then I was like, "Oh my God. Please don't leave."** So, for sure, I would say then on it was.

Investigator: It was consensual then?

Complainant: Yeah, I would say if I had to pinpoint like a switch to where everything after that point was, that would be where it was, was in the spring of... What was that? 2020, I guess.[6]

The decisionmaker could easily conclude that there is no evidence of any actual threats or coercion that occurred in our relations, and thus then reasonably conclude that I did not engage in non-consensual sex with Complainant.

**v. Expert Witness Opinion About Complainant's Contentions**

In a November 17, 2022 email exchange with you (the Investigator) and Whitman's Title IX coordinator, my advisor asked if we could have an expert psychologist witness testify at the hearing to unpack Complainant's allegations that they developed Stockholm syndrome during our relationship, and also to discuss the impact of Complainant's unmedicated bipolar disorder on the credibility of their allegations. We were told by the Title IX Coordinator that she suggested that the Investigator needed to question the expert. However, at this time we have not gotten any more

---

[5] Appendix N, p. 21.
[6] Appendix N, p. 27.

**RESPONDENT'S 10 BUSINESS DAYS RESPONSE TO
INVESTIGATOR'S 11/11/22 DRAFT REPORT TO WHITMAN UNIVERSITY**

information about how to make that happen. I'm asking again here that Whitman engage with Dr. Stacy Cecchet to examine the mental health components of the allegations against me. I am including Dr. Cecchet's CV to this response. She has particular expertise in sex crimes and does work for law enforcement in this area. Please contact my advisor to set up your (the Investigator's) interview with Dr. Cecchet, per Whitman's Title IX Coordinator's email, since we need to retain Dr. Cecchet for this work.

### III.    RELEVANT POLICY LANGUAGE & DEFINITIONS

I have nothing that I would request be added to this section of the report.

### IV.    BACKGROUND

I have nothing that I would request be added to this section of the report.

### V.    SUMMARY OF EVIDENCE – FACTS NOT IN DISPUTE
#### a.    Break Up with Complainant

I, and the evidence, dispute that "Complainant and Respondent broke up prior to winter break." (Report, p. 7.) That should be corrected to note that I broke up with Respondent.

> But, with that friend of mine I mentioned, Witness I, part of why we broke up, or part of why I broke up with Complainant, was because I basically had been going to a social gathering. As I was walking there, a guy came up to me and was like, "Hey, I just wanted to tell you. I'm sorry, but I saw Complainant dancing with this other guy," or something. I think he said like grinding or something. So it spurred me being like, "Hey, look, this guy has told me this." And then Complainant being like, "No, I wasn't at all. It was just a small room, so it might have I looked like that." From there, a conversation developed over a few days of where I felt like, "Look, there's been a lot of stuff, and I think I just want to move on. I think we should break up."[7]
>
> ***
>
> My freshman year, the second semester, at the beginning of it, after I'd broken up with Complainant.[8]

As my above statements to the Investigator show, the break up was not a mutual decision and so that is not an "undisputed fact." That is relevant because it goes to how Complainant was (and is) upset with me and motivated to attack me now, which in turn goes to their motivation and credibility.

Also, as to the "undisputed fact" regarding Appendix I, since the report is quoting from it in part, then I would ask that it be quoted as follows, so more of a context is noted:

> Ok Complainant I'm really sorry. This is really alarming for me to hear and I am really going to think about this a lot. I didn't know this stuff but it's clear I made you feel shitty

---

[7] Appendix Q, p. 19.
[8] Appendix R, p. 15.

**RESPONDENT'S 10 BUSINESS DAYS RESPONSE TO**
**INVESTIGATOR'S 11/11/22 DRAFT REPORT TO WHITMAN UNIVERSITY**

and uncomfortable and I'm sorry to have had that effect on you. I don't remember this happening this way but I trust your perspective and I am really sorry for clearly hurting you. I clearly acted like an idiot and I hate that I may have affected you in a negative way.

This is important because when I was blindsided by Complainant's allegations I felt responsible to at least consider and be cognizant that they felt like they did. However, as the above shows, I also needed time to think about it (the accusations) and I did not remember it happening as Complainant claimed. This is all consistent with the fact that as I further considered Complainant's allegations following the above exchange I quickly became certain that I never coerced or forced Complainant to engage in any non-consensual sex with me.

## VI.    SUMMARY OF EVIDENCE – FACTS IN DISPUTE

Please note that I am unable to follow subpart-by-subpart with Section VI of the draft report because it would be too confusing, and because of the extreme time constraints placed upon me in reviewing the voluminous evidence and providing this response. Therefore, I will focus on the evidence with a view to the overall consideration of my and Complainant's sexual encounters and relationship and how all of the allegations fall under the overarching consideration of if our sex was consensual or not. For that, I, in turn, will highlight Complainant's own statements that contradicts their own statements and/or positions and/or that I believe should be included and cited in the report.

### a.    Complainant's Statements About Consent/Non-Consent & Related

There is ample evidence in Complainant's own statements that should be included in the report which could (and would) demonstrate to the decisionmaker that our sexual encounters presented me with clear signals that Complainant sought, welcomed and approved of how we had sex, all of which is contradictory of their allegations against me.

For instance, Complaint told the Investigator:

> Investigator: [prior questions omitted due to the Investigator's following rephrasing] **Maybe a better way to ask that would be, do you think he had any reasonable basis to think you were consenting to that behavior?**

> Complainant: **Yes, I guess.**[9]

> ***

> Here's what I would guess my final answer. When it comes to him holding me down, I think when it... **By the time it got to the point where we would be having sex, I would already have been convinced.** You know what I mean? I think that's a really hard question too is because, yes, there was a lot of holding me down. Oh, that was a huge part of it. **There were many times that I couldn't get away if I wanted to, but I think to me, it never felt like, oh, he's raping me because even if looking back, I can be like, "Yeah,**

---

[9] Appendix N, p.

**RESPONDENT'S 10 BUSINESS DAYS RESPONSE TO
INVESTIGATOR'S 11/11/22 DRAFT REPORT TO WHITMAN UNIVERSITY**

that's what was happening." In the moment, if we had gotten up to that point where he would be having sex, then I'd be like, "Oh, then I do want this." You know what I mean? So, I think that's a hard question and in the beginning, I remember we had sex like the first time. I would not call it consensual at all, but it wasn't like he was holding me down and I couldn't leave.[10]

Complainant also stated:

But he sort of, **the way he like had his hands on my neck, very gently. And I said to him, "You're doing the things that I like." So I was like, "We shouldn't have sex." I was like, "And you're doing the doing things that I like." So I felt very turned on or whatever. But I turned around to push him off and a little bit. And then because this part was ... this was all fine. This was all consensual.** But I remember when I turned around, he said, "Well, you're doing things I like too." And then I felt kind of like, oh weird. I guess the things that he likes me not wanting it, but I didn't like think that deeply into it because I didn't like ...[11]

Not only does this show Complainant consented to how we engaged in sex generally, it also demonstrates that the physical nature of our sex (e.g., the "choking" that they complain about now) was welcomed. Further, that Complainant remembered that "[I was] doing the things that [they] like," also suggests that they had previous experience with our physical type of sex before we ever had sex. In other words, they were familiar with, liked and welcomed the type of sex that they are now alleging with me was non-consensual.

This is also similarly set forth in a later interview of Complainant:

So, there was that two-week period where things were good **right after the two-week periods where things were bad and then after that, it was more of just things about the things that he would say that I would be really uncomfortable with or certain things that like he would take it too far or he would choke me too hard** or you know what I mean?[12]

While I previously communicated that I had put my hand on Complainant's neck during sex, and although I deny engaging in any choking, even if it occurred Complainant confirmed that they were okay with "a normal amount" of choking.[13]

This shows not only that Complainant's newly-raised issues that occurred back then were about what I would say to them or the "choking," which I deny, would occur. However, even as perceived by Complainant, the fact that I apparently choked them "too hard" could show the decisionmaker that I was placed in a position where I would not (because I did not) have any way to understand when I had crossed some type of line when having sex with Complainant.

---

[10] Appendix N, pp. 20-21.
[11] Appendix M, p. 13.
[12] Appendix N, pp. 17-18.
[13] Appendix N, p. 18.

**RESPONDENT'S 10 BUSINESS DAYS RESPONSE TO
INVESTIGATOR'S 11/11/22 DRAFT REPORT TO WHITMAN UNIVERSITY**

The following should also be lifted up and set forth in the report for the same reason that it shows Complainant found our relations consensual. And the following statement also explains in their view the alleged grabbing and resulting bruising of their face – which I deny actually occurred – could also be seen by the decisionmaker as a byproduct of how we consensually engaged in sex:

> So I wasn't sure what to do. And at one point, he bruised my face. He grabbed it so hard, it bruised. And that's where all the rumors started later. But anyway, bruised my face, didn't know what to do. And I brought that up to him. That was the amount that I could bring up. I was like too scared to say anything else. **So I was like, "Hey, you bruised my face. That was a little too rough for me because it bruised."** But then he got turned on by that. And he was like, "Oh yeah, whatever." Or he mumbled. He was like, "Oh sorry." Or something like that.[14]

This is also reflected where Complainant told the Investigator when they were asked, with respect to the choking, if Complainant had a sense of whether Respondent had reason to think that it was consensual, when it was not:

> Yeah. I mean, I think that... No. I would say I think the fact that I never explicitly... No. You know what? Wait. Oh my God. Wait. Okay. **I feel like I might have actually brought up that he was choking me too hard in one of the conversations that we had. I think it was when I said that he was grabbing my face too hard. I think I mentioned also that the choking was too hard. I can't say that for certain. If I didn't explicitly say that, then I would say that would be the only indication that it was okay is that I didn't explicitly say it.** I do remember mentioning that because it was one of the... **I remember like I was like, "You're grabbing my face too hard, and you're overall being too rough with me," and I might have said something about the choking, but I definitely said something. I definitely talked about how it was... He was being too rough. Other than that though, it's really hard to know.**[15]

Again, Complainant also informed the Investigator that in Complainant's view our interactions had involved consensual sex, but also that there were times where even if it was not (in Complainant's view) it was part of the "game" that they saw was part of our relations. Thus, a factfinder could decide that the preponderance of the evidence shows that I could not have reasonably believed I was engaging in any non-consensual sex with Complainant – whether actual or perceived choking, holding and the like occurred.

Complainant stated the following with respect to consensual sex, as well as the "game" they perceived colored our sexual relations:

> **I think times that it was 100% consensual. I didn't say no.** That would be, I feel like the number one. I think that he ... yeah, I really think that's what it was. It was that I didn't say no. **We still had a little bit of that, like I don't know, the game or whatever. There was definitely still a little bit of that**, but I would say that it probably wasn't as, "No, I

---

[14] Appendix M, p. 14.
[15] Appendix N, p. 26.

**RESPONDENT'S 10 BUSINESS DAYS RESPONSE TO
INVESTIGATOR'S 11/11/22 DRAFT REPORT TO WHITMAN UNIVERSITY**

don't want to do that." It was more of just like, oh, you know what I mean? I feel like there's I was like ... It's really hard to explain. I don't know. I guess it was ...[16]

The following statements from Complainant also would support me in showing the decisionmaker that ours was a relationship of unclear "lines" because Complainant would represent that they did not want to have sex when in fact they did want to have sex. This could reasonably confuse someone like me about whether and when my partner would want to have sex, especially when a decisionmaker could conclude that Complainant perceived it all as a "game." Complainant stated:

> **No. If I wanted to have sex, we didn't have sex.** That was not part of it. In fact, I think it was the fact that I wanted to have sex that meant that we weren't going to have it. **I'd pretend like I didn't if I wanted to. It was really a lot.**[17]

Similarly, Complainant said:

> Yeah. He would say things that made me really uncomfortable a lot in the beginning and more towards the beginning. Just stuff like, "You made me do this. If you weren't wearing that skirt, like I have to punish you," stuff like that. I don't know. I always was like, "Ooh." That vibe of "with you looking like that, of course, I'm going to do this to you. You were asking for it." It was hard. Even when it was consensual, it was so he made it like it wasn't. **Even those times, I remember him saying all that and I was like, "This is so weird because I want to be having sex with you and you're making it like I'm not."** You know what I mean? That was being really uncomfortable.[18]

Complainant's reference to "free use" – an apparent term and role-playing relationship used in porn[19] that neither I nor the Investigator were familiar with before Complainant raised it in this process – is also relevant to this matter because it could show the decisionmaker that (a) Complainant welcomed relationships where an imbalance in power dynamics, whether real or imagined, were employed and/or (b) our relationship was viewed broadly, and our sexual encounters were viewed specifically, as within a power dynamic with which Complainant was familiar and comfortable with, even when I had no intent, nor even an idea, that such was the case.

The following of Complainant's statement should also be included in the report:

> Oh, there's something that I should tell you on my end that happened. **There was this one time that I was really, really drunk and we were going home together and he said that he wasn't going to sleep with me. And then I got really mad and...** I don't remember. **I think I yelled at him or something about how I was angry at him. And that was really bad of me, and I'm not saying that wasn't.**[20]

---

[16] Appendix M, p. 21.
[17] Appendix M, p. 23.
[18] Appendix N, p. 19.
[19] Appendix M, p. 22.
[20] Appendix M, p. 34.

## RESPONDENT'S 10 BUSINESS DAYS RESPONSE TO
## INVESTIGATOR'S 11/11/22 DRAFT REPORT TO WHITMAN UNIVERSITY

This is relevant to the decision-making process because it shows, at a minimum, that I was and am mindful of if and when a potential sexual partner would have the capacity to consent to sex, and would not and will not engage in non-consensual sex. And of course, it should be included because it directly relates to me and Complainant in this regard.

Another piece of evidence that should be included in the report is that going to the fact that although Complainant claims that I engaged in non-consensual sex with them due to some type of coercion, which I address elsewhere in this response, the decisionmaker should be made aware via the report of our sexting. This highlights that although Complainant and I were physically apart, in separate geographic locations, they willingly engaged in sexually texting with me:

> Investigator: And then was there sexting before the summer or was that the only time that happened?

> Complainant: No. Sexting only happened like... or if it was, yeah, yeah, there was. Sorry. I misunderstood the question. Yes, there was.[21]

### b. Complainant's Statements About Their Relationships with Others at Whitman University, and How Those Are Contradicted by Evidence

There are instances where the evidence shows, and the report should reflect, that Complainant's statements about their relationships with other Whitman students, as well as statements made by others, would lead the decisionmaker to a reasonable conclusion that if I had engaged in non-consensual sex with Complainant then they would have been expected to share that information with Complainant's close friends and acquaintances.  For instance, Complainant stated that they did not become friends with Witness A until later on in both of their time at Whitman.[22] However, that is not accurate. For one, I only became friends with Complainant due to their friendship, which was already established, with Witness A.

The idea that Complainant would not have told her close friends if I had assaulted her is contradicted by others. For instance, Witness G (as set forth verbatim as to Witness G, below), states that she (and Witness A) were Complainant's "confidants" while they were all at Whitman.[23]

Witness A also confirmed that she too had been close friends with Complainant early on:

> Investigator: How long do you think it was before you were close friends? A month or a week, or?
> Witness A: I don't know. I would say probably two weeks. **I considered her pretty close at that point. My guess would be two weeks, but I don't know.**[24]

Witness H also confirmed that she too had expected that Complainant would have confided in Witnesses A and G if I had engaged in non-consensual sex with Complainant:

---

[21] Appendix N, p. 26.
[22] Appendix N, p. 10.
[23] Appendix Y, p. 7.
[24] Appendix BB, p. 5.

**RESPONDENT'S 10 BUSINESS DAYS RESPONSE TO
INVESTIGATOR'S 11/11/22 DRAFT REPORT TO WHITMAN UNIVERSITY**

Investigator: And do you think that Complainant confided in them that first fall semester?
Witness H: **Absolutely, really, yeah.**
Investigator: Telling them things similar to what she told you?
Witness H: **Yep. I would say as much or even more than myself.**[25]

Witness H also confirms that she also expects that Complainant would have confided in Witness I, a Whitman men's soccer player and fellow student:

> Yeah. So Respondent was on the soccer team and I think she became pretty close with a lot of the soccer boys through that experience and I think that is like also why Witness A and Witness G became close with those boys as well, because they all would hang out and stuff. **So I think Complainant, I think she would've maybe confided in like Witness I.**[26]

Indeed, Witness I confirmed that he, like Witness A, was also a close friend of Complainant during the relevant time period, and considered himself best friends with Complainant:

> Witness I: **Maybe her roommate, Witness A. Other than that, I feel like it would probably have been me. I definitely feel like I was her best friend that she had. I mean, she was my best friend, too.**[27]

Considering all of the above, the report should highlight all of this information because it very much calls into question why, if I had actually had non-consensual sex with Complainant, they did not tell any of their close friends about that in or around the time it purportedly happened.

## VII.    PARTIES' CLARIFICATIONS OF EARLIER STATEMENTS

I have nothing to add regarding the clarifications made by me and Complainant in this section of the report.

## VIII.    WITNESS INFORMATION
### a.  Summary

For the reasons noted below regarding Witness K's recollection about seeing a mark or bruise on Complainant, that should be omitted from the summary here.

Further, if the report is going to cite for the decisionmaker which of the witnesses did see such a bruise or mark or said that I allegedly engaged in nonconsensual sex with Complainant, then in fairness it should cite, for instance, to Witness A, who said she <u>did not</u> see any such mark/bruise.

### b.  Witness C

---

[25] Appendix Z, p. 13.
[26] Appendix Z, p. 18.
[27] Appendix EE, p. 7.

## RESPONDENT'S 10 BUSINESS DAYS RESPONSE TO
## INVESTIGATOR'S 11/11/22 DRAFT REPORT TO WHITMAN UNIVERSITY

As an initial matter, the report should reflect that Complainant told the Investigator that Witness C first told Complainant about Witness C's alleged sexual encounter with Respondent:

> I did. I think she told me hers first, and then I was like, "Oh my God, that's crazy. Same thing happened to me."[28]

This is relevant because it could lead the decisionmaker to conclude that Complainant, based on her erroneous view that Complainant could have reasonably had a way to determine that any of their own sex was non-consensual, ultimately determined that their sexual encounters with Complainant were actually non-consensual.

> ### i. Witness C Did Not State that She Saw Any Bruising on Complainant's Face, Notwithstanding that the Investigator Even Conducted Unnecessary Follow-Up Questioning in this Regard Although Witness C had been Very Clear on the Subject in Her First Interview and No Follow-Up was Warranted

I will hope and trust that when I raise issues at times about how and why the Investigator conducted her investigation, or crafted the report, she will retain her objectivity in considering my response. That said, although the Investigator twice questioned Witness C about the alleged bruising Witness C saw on Complainant's neck, and attempted to tease out whether what Witness C had seen was actually on Complainant's face, Witness C's statement remained consistent.[29]

> ### ii. Witness C Also Gave Conflicting Accounts About the Alleged Bruising She Saw on Complainant's Neck

Witness C, in her first interview, stated that the neck bruise she saw on Complainant was on the right side.[30] But then, in her second interview, she said that she saw it on Complainant's left side.[31] This is important to note in the report because Witness C's self-contradicting statements could lead the decisionmaker to question her credibility about the bruising specifically, as well as her general veracity.

> ### iii. Witness C, Who Claims That I Forced Her to Perform Oral Sex on Me, Did Not Tell Her Best Friend What Occurred Right After It Allegedly Happened, and also Quickly Communicated to Me that She Wanted to Continue Relations, Which Could (and Should) Impact Her Credibility with the Decisionmaker.

The report should also reflect that although Witness C alleges that I forced her to give me oral sex, which I deny, she did not hesitate to reach out to engage with me about potentially getting together again shortly after that encounter:

---

[28] Appendix O, p. 5.
[29] Appendix S, p. 3; Appendix T, p. 1.
[30] Appendix S, p. 3.
[31] Appendix T, p. 1.

**RESPONDENT'S 10 BUSINESS DAYS RESPONSE TO**
**INVESTIGATOR'S 11/11/22 DRAFT REPORT TO WHITMAN UNIVERSITY**

Investigator: Any subsequent encounters that you had with him?

Witness C: Not in person. **We texted and we had texted about potentially meeting up again and I had pushed a little bit for that, but we ended up not having contact again.**[32]

The foregoing should be noted in the report because it could reasonably lead the decisionmaker to question Witness C's credibility about not only her own alleged encounter with me (which did not happen in the way she says it did), but also about her own memory and/or motivation regarding Complainant's own allegations against me.

Further, as to Witness C's own alleged non-consensual encounter with me, she stated:

Investigator: **Did you see anybody right after?**
Witness C: **Yeah, my best friend**, whose name is [same first name as Witness C].
Investigator: Mention anything to her?
Witness C: **She knew that he was up in my room and kind of generally what happened, but I didn't say anything about being uncomfortable.** I think I was still like very much processing what was going on.[33]

The above should be referenced in the report because, similar to the fact that Witness C immediately reached out to me to try and reconnect again following the alleged non-consensual oral sex, the fact that she admits that she did not inform her best friend of what one would expect was a harrowing incident could lead the decisionmaker to question her credibility as to that connection between us, as well as her long-delayed decision to raise these allegations now only after she and Complainant had talked at length.

> **iv.  The Recollection of Complainant's Communications with Witness C Do Not Align, Which the Decisionmaker Could Reasonably Conclude Casts Doubt on Their Allegations Made Against Me**

The report should reflect that Complainant's and Witness C's recollection of their communications regarding my alleged non-consensual sexual encounters with them do not align. This could lead the decisionmaker to also reasonably conclude that either/both have questionable credibility.  For instance, as to who actually shared their story first with the other, Witness C contradicted herself because she first said that Complainant had shared first, but then stated that she did not remember who shared first, per the below:

No. Especially since Complainant no longer goes to Whitman. There was really no, what's the word, benefit. And also there were a lot of elements and aspects of Respondent's personality and persuasiveness that were exactly what I had experienced. **And Complainant shared their story before I shared mine.**[34]

---

[32] Appendix S, p. 8. And please also note the similar in Appendix S, p. 10.
[33] Appendix S, p. 8.
[34] Appendix S, p. 5.

## RESPONDENT'S 10 BUSINESS DAYS RESPONSE TO
## INVESTIGATOR'S 11/11/22 DRAFT REPORT TO WHITMAN UNIVERSITY

\*\*\*

> Investigator: So **do you remember who maybe talked first, you or Complainant about what had happened to you?**
> Witness C: **Honestly, no.**[35]

Further, Complainant's own recollection of their talk with Witness C is contradictory because while Witness C stated that first Complainant shared their story, but then Witness C could not remember, Complainant themselves said that Witness C shared her story first:

> Complainant: I did. **I think she told me hers first**, and then I was like, "Oh my God, that's crazy. Same thing happened to me."[36]

Also, the following point and evidence should be highlighted in the report because it shows that while Witness C told Complainant the specifics of what had allegedly happened between me and Witness C, Complainant did not share specifics with Witness C; Complainant essentially just said that what Witness C described had essentially "happened to" Complainant, too. This could support the decisionmaker in concluding that Complainant may have ended up simply incorporating Witness C's story into their own story as if it had happened to them.

> Investigator: Did she tell you anything about what Respondent said to her? Things he said when he was wanting some sexual activity that maybe she was not inclined to engage in.
> Witness C: **She more just talked about it in general about how he was very pushy or coercive, but she didn't say anything specific.**[37]

> Investigator: Did you share with Complainant anything that Respondent might have said to you in your room that day?
> Witness C: **I don't believe I shared with her any specifics of what he said, no.**[38]

Complainant themselves said, as to their talk with Witness C, in that regard:

> **I felt like maybe I was making everything up, right? I was like, "What if I just confused every interaction that we've ever had?" And after talking to her, everything that she said was something that he had said or done to me. And I was like, "Okay, so I'm not crazy. That was true."**[39]

Considering all of the above, as well as the below statement from Complainant, the decisionmaker could reasonably conclude that Complainant ultimately "adopted" what they were hearing from Witness C in pressing forward with these long-delayed allegations against me. Complainant stated:

---

[35] Appendix T, p. 2.
[36] Appendix O, p. 5.
[37] Appendix T, p. 3.
[38] Appendix T, p. 4.
[39] Appendix M, p. 8.

Yeah. Witness C remembered. **She also said she saw bruises on my neck. I don't recall that. But she was like, "I don't know. Maybe you forgot or something." I don't know.**[40]

### c.  Witness J

For the reasons stated about Witness C, Witness J's statements should also be excluded from the report and investigation. It is not relevant to the allegations made against me by Complainant.

### d.  Witness E

The evidence about Witness E remembering Complainant organizing a rally at Whitman to support me[41] should be noted in the report because it goes to the question of Complainant's credibility, where they are now accusing me of having non-consensual sex with them. In support of that, I submit as additional evidence Complainant's March 10, 2020 email entitled, "ARE YOU MAD? ITS TONIGHT!!." That email, which is included with this response, directly relates to the rally that Complainant organized in support of me at Whitman in 2020. As such, I request that it be incorporated into the investigation and report.

The above could, like Witness E's perception, be viewed as "weird" that a person I allegedly sexually assaulted would organize a rally to assist me with a previous issue with Whitman while all the conduct of which they now complain was taking place.

### e.  Witness F

Witness F's statement about me allegedly slapping Complainant is contradicted by Complainant themselves. While Complainant claims that I slapped them once, their ex-boyfriend told the Investigator that I "just kept doing it every time."[42] Witness F's information is completely contradicted by Complainant, and it should be excluded because of that and because it is much more prejudicial than probative. Or, at the very least, the report should reflect that Witness F completely overstates the alleged slapping/hitting, because it impacts his credibility.

This is especially necessary considering the following statement by Complainant:

The thing I do want to say though, is I didn't really listen to what... **So the cops have all the recordings, right? And so I listened to some of them, not all the way through, because I didn't want to, but I skimmed through them. And a lot of what they say is kind of extrapolated from what I remember, my version of events. So I feel like I should say that.** It seems like... I don't know, **Witness F, the boyfriend, was like, "Oh, he hit her a bunch." And I was like, "I told you one time." So stuff like that. I just wanted to say.** I know that my advisor said that it's fine. I don't know why I got worried about it though. So...[43]

---

[40] Appendix M, p. 17.
[41] Appendix W, p. 8.
[42] Appendix X, pp. 5, 8.
[43] Appendix M, p. 38.

## RESPONDENT'S 10 BUSINESS DAYS RESPONSE TO
## INVESTIGATOR'S 11/11/22 DRAFT REPORT TO WHITMAN UNIVERSITY

Complainant themselves notes the doubt that arises with anything their ex-boyfriend had to say about me allegedly hitting Complainant. Further, Complainant also recognizes and casts doubt on the veracity of what the police report reflects and attributes to numerous witnesses, most of whom the Investigator cites to as support for certain excerpts of statements made by witnesses in relation to this investigation. Since Complainant themselves has doubts about what is set forth in the police report, then the decisionmaker could certainly consider all of that, not to mention Witness F's own information in this proceeding, as very questionable/lacking credibility.

### f.  Witness G

The report should reflect, verbatim, that Witness G's statement that she, Witness A and Complainant were very close aligns with Complainant's own statement to that effect.  This is because the decisionmaker could find that it was more likely than not that if Complainant had experienced non-consensual sex with me a reasonable person would expect Complainant to tell her good friend(s) at the time about it, but did not. This, in turn, could impact her credibility.

Thus, Witness G stated:

> **I don't know why she would've told someone else and not Witness A and I. I think that Witness A and I were probably her largest confidants.[44]**

Further, Witness H also told the Investigator that if Complainant had issues with my approach to sex being in any way non-consensual, Witness H would have expected Complainant to tell Witness G and Witness A about it (which she did not, and which Complainant also denies doing):

> Investigator: **And do you think that Complainant confided in them that first fall semester?**
> Witness H: **Absolutely, really, yeah.**
> Investigator: **Telling them things similar to what she told you?**
> Witness H: **Yep. I would say as much or even more than myself.**

Witness H goes on to state that "… we [she, Complainant, Witness A and Witness G] were all each other's best friends."[45]

Other witnesses besides Witness H – namely, Witnesses A and I – also confirmed their close relationships with Complainant, as exhaustively detailed above in subsection b of Section VI of this response.

Therefore, all of this information could lead the decisionmaker to conclude that if I had engaged in non-consensual sex with Complainant, one would expect them to tell Witness A, Witness G and/or Witness I about it, but did not. That strains Complainant's credibility.

---

[44] Appendix Y, p. 7.
[45] Appendix Z, pp. 13-14.

**RESPONDENT'S 10 BUSINESS DAYS RESPONSE TO
INVESTIGATOR'S 11/11/22 DRAFT REPORT TO WHITMAN UNIVERSITY**

The following from Witness G should also be included in the final report because it speaks to Complainant's credibility, including as relates to them being known to change their mind and to rewrite the story:

> This story feels important to add because it felt like Complainant was choosing him over me, which shows how they seem to keep going back to him and keeping him at an arm's length, as they seem to be doing throughout this whole process**. It also shows how they have a tendency to change their mind to a completely opposite perspective- sometimes going as far as to rewrite the story in a way that benefits their objectives, despite how it may affect others.**[46]

> **g.   Witness H**

Per the above, Witness H's own statements to the Investigator about Complainant's close relationships with Witnesses A and G could reasonably lead the decisionmaker to conclude that Complainant's years-later claims against me are not credible, as she did not confide in them very serious allegations about me having non-consensual sex with Complainant.

Witness H also confirms, and this should be explicitly included in the report, that besides my alleged hitting of Complainant, she denied having any information that I forced Complainant to engage in any non-consensual sex with me, per the following:

> **I would say with the hitting, that was the only thing that I knew was not consensual."**[47]

> ***

> Investigator: So I don't know how granular Complainant may have gotten in their descriptions, so I'm just going to ask. **Did they ever talk to you about how they'd handle situations where they didn't want to consent with... when they were with Respondent?** Witness H: Yeah. There was never like really... **She would have sex with him because she felt pressured to, and she didn't know how to handle that situation. She was like, "If I say no, is he just going to get upset and leave?"**[48]

> Investigator: **Did they ever suggest that he might have used physical force to engage in some sexual activity with them?** Witness H: **I don't think like that. I don't think it was ever like, "I don't want to," and then he physically forced her to then have sex."**[49]

The final report should also reflect the following, as it goes to Complainant's credibility, including their penchant to "gaslight" others about events that actually did or did not occur with them. Witness H told the Investigator:

---

[46] Appendix Y, p. 17.
[47] Appendix Z, p. 9.
[48] Appendix Z, p. 15.
[49] Appendix Z, p. 15.

**RESPONDENT'S 10 BUSINESS DAYS RESPONSE TO
INVESTIGATOR'S 11/11/22 DRAFT REPORT TO WHITMAN UNIVERSITY**

Investigator: And can you tell me a little bit about why you had a perception that it was toxic and abusive?

Witness H: Yeah, I can. I think it's hard. **I would say both Complainant and Respondent. I think the maturity level of a freshman in college is not very high and I think they both are manipulative, but in really different ways.** I think Respondent is incredibly charming and has a way of manipulating people to do what he wants without it seeming like he's even asking, **and I think Complainant is emotionally manipulative and will be like, "You don't care about me," and stuff or like, "You said this," then like gas lighting.**[50]

### h.  Witness K

The Investigator's approach to the line of questioning regarding whether or not Witness K observed a bruise on Complainant is problematic and the responses, all of which are set forth in the draft report, should be excluded because it is completely speculative. Witness K first stated that she was not sure if her knowledge of a bruise came from Witness K herself having seen it, or if one of her friends had told her they had seen it. (Report, p. 53.) However, the Investigator (and the report) then jumps to the conclusion that Witness K did see a bruise, concluding with an odd, and baseless, percentage estimate of 70-30 that Witness K had seen it. (Report, p. 54.) This is all very unfair, especially because of how strongly the Investigator presents this speculative evidence as fact in the report.

In addition, the report should fairly detail that Witness K denied hearing from Complainant that I had engaged in non-consensual sex with Complainant.  This is detailed in the following, which the draft report failed to include or even mention, and it should be included:

Investigator: **And was there any point when you understood Complainant to have some concerns about their interactions with Respondent?**

Witness K: **Not really.**[51]

Investigator: **Did Complainant ever tell you about anything that happened with Respondent that they did not consent to?**

Witness K: **No, not to my knowledge.**

Investigator: **Do you think you'd probably remember if they did?**

Witness K: **Yeah.**[52]

\*\*\*

Investigator: **Did Complainant ever say or imply that Respondent might be pressuring them?**

Witness K: **Don't think so. I don't think I ever personally, directly from Complainant, got that impression**.[53]

---

[50] Appendix Z, p. 5.
[51] Appendix AA, p. 4.
[52] Appendix AA, p. 4.
[53] Appendix AA, p. 8.

**RESPONDENT'S 10 BUSINESS DAYS RESPONSE TO
INVESTIGATOR'S 11/11/22 DRAFT REPORT TO WHITMAN UNIVERSITY**

Investigator: **I think, well I wrote down the phrase, "She went along with it," that Complainant told
you Respondent really liked CNC and Complainant went along with it.**
Witness K: **Yeah.**
Investigator: And what does that phrase mean to you, went along with it?
Witness K: **I guess in that sense then there was a little bit of pressure that I was noticing, but I think
what I am trying to say by that is I think that there were times that Complainant seemed to be
enjoying it.**[54]

### i. Witness A

Witness A, Complainant's self-described good friend and roommate, issued the
following statement to the Investigator that she did not see any bruising on Complainant, should
be highlighted in the report, because it serves as evidence that no such bruising occurred and
contextualizes all of the statements Witness A made about any such alleged bruising to the
Investigator. I am not sure why this was not included in the draft report. Please put it in:

> Investigator: **Did you ever see any bruises or marks on Complainant?**
> Witness A: **I did not. No.**[55]

The following statement by Witness A also deserves note in the report because it speaks to how
Complainant misrepresented what she was told, which in turn could support the factfinder in
determining that her allegations against me are not credible:

> In this text, they said that ... which, I have other friends that have hooked up with
> Respondent. One of them expressed that he was really rough. I had told that to Complainant
> on our first phone call. **However, they misinterpreted it. In their text, they say, "To
> someone that he hurt slash made uncomfortable," which is not true. The girl was not
> uncomfortable by it.** She was just noting that it was very rough, but she never felt like
> Respondent made her uncomfortable. **That girl and Respondent are still very close
> friends to this day.**[56]

In addition, Witness A specifically stated that she was unaware of any issues around consent as to
my relations with Complainant, including as to any alleged "CNC kink," and this should be noted
in the report, as well:

> Investigator: How about during the time they were seeing each other, so fall of 2019 into
> that early winter of 2020? **Did you have any reason to think there was an issue around
> whether their sex was consensual?**
> Witness A: **I did not. No.**[57]

***

> Investigator: I know it was a long time ago. **Did Complainant ever say anything to you
> about Respondent being into CNC? Are you familiar with that?**

---

[54] Appendix AA, p. 8.
[55] Appendix BB, p. 5.
[56] Appendix BB, p. 14.
[57] Appendix BB, p. 4.

**Witness A: I am now familiar with it after last fall. However, at the time, no. I knew he was rough, but the way it was described to me did not seem to be anything extremely out of the ordinary, if that makes sense.**

Investigator: So you heard that from Complainant that he was rough?

Witness A: Yes.

Investigator: **When she shared that with you, was it as a complaint or a concern or just information?**

**Witness A: I would say it was just information. It definitely wasn't a concern. It never seemed to carry that heavy of a negative weight. It just felt like information at the time, I think.**[58]

### j.  Witness D

Information from Witness D regarding an alleged incident where I purportedly grabbed Complainant's arm outside of a party should be omitted. It has no relevance to the allegations that I engaged in any non-consensual sex with Complainant. It is completely and utterly prejudicial because it unfairly confuses the issues even further for the decisionmaker.

### k.  Witness B

I have no issues with the information included in the draft report as to Witness B.

### l.  Witness I

As the Investigator and report is presenting evidence on Complainant's behalf such that the decisionmaker might see a "pattern of conduct" with me, so too then should Complainant's pattern of conduct of making false allegations be presented to the decisionmaker. Witness I informed the Investigator of the following, but it was omitted from the draft report; it should be included in the draft report:

> Yeah. Going off that, **she accused another one of my friends I can think of, of assault as well. Of a different woman.** Not her. I think you might have his contact, too. I think his name's Person 14. I know his name's Person 14. Yeah. I think he had a similar experience with that. **Then I know, too ... I can't think of names, but she did this a lot, where she accused men of assault, whether it was true or not. Obviously, in this case, it's not, in my opinion. But it just seems like she has a pattern of doing this.**[59]

The following statement by Witness I should also be included in the report. It speaks to how Complainant actually spoke positively to others about our sexual relations, which could impact the decisionmaker's determination about the veracity of Complainant's recent allegations that I engaged in non-consensual sex with her. Witness I said:

> **She would rave about how good Respondent was in bed. It always seemed like she was the one who was ... At least, when I saw them out at parties and stuff, she was**

---

[58] Appendix BB, p. 5.
[59] Appendix EE, pp. 5-6.

**always the one who was grabbing onto him and being sexual with him.** Obviously, he would, too, but it always seemed like she was more aggressive, I guess, for lack of a better term, than he was.[60]

I must also highlight that the Investigator's failure to interview Person 14 – the person referenced by Witness I, above – is also prejudicial to me in this proceeding. Again, if evidence of a "pattern of conduct" is being allowed in as to me, then fairness requires evidence of a "pattern of conduct" about Complainant to come in. The fact that Person 14 was not even interviewed undercuts what fairness requires, and Person 14 should be interviewed.

## IX.    POSSIBLE MOTIVES ATTRIBUTED TO COMPLAINANT

I have addressed this at the outset, in Section II, subsections (ii) and (iii) of this response, due to its importance.

## X.    CREDIBILITY CONSIDERATIONS

This section should be entirely stricken from the report. First, it does not accurately reflect all of the evidence, and it also summarizes issues without context, including as to timing of events and when witnesses heard/learned of information from others. Second, it also appears to seek to lead the decisionmaker to a conclusion that I was and am in the wrong, when there is more than ample evidence – evidence that only the decisionmaker should consider in determining credibility – that Complainant's allegations are false. Third, it also unfairly makes reference, yet again, to Witness C and a purported "pattern of conduct" by me. In sum, this entire section is unnecessary and completely prejudicial to me receiving a fair determination by the decisionmaker.

In the alternative, if the Investigator still intends to include the foregoing in the report, then I would request that she note for the decisionmaker that other evidence counterbalances such due to inconsistencies and credibility concerns that weigh against Complainant's and other witnesses' accounts.

## XI.    CONCLUSION

Included with this response are the following:

- Witness G's November 29, 2022 emailed statement (and three April 2020 text message screenshots embedded in it) to the Investigator.
- Complainant's July 2022 tweets regarding a recent former (male) housemate.
- Witness I's supplemental information regarding Complainant's false accusations against others.
- Dr. Stacy Cecchet's Curriculum Vitae.
- Complainant's March 10, 2020 email entitled, "ARE YOU MAD? ITS TONIGHT!!"

---

[60] Appendix EE, p. 6.

### RESPONDENT'S 10 BUSINESS DAYS RESPONSE TO
### INVESTIGATOR'S 11/11/22 DRAFT REPORT TO WHITMAN UNIVERSITY

In closing, I respectfully ask that the Investigator employ her anticipated objectivity in evaluating this response and fairly consider all of the above as she continues her investigation and ultimately issues her final report.

I did a deep dive on my text exchanges with ███████ over the years and found the attached exchange from April 2020 that seems really on point for your investigation. As you can see, ███████ expressly states that her relationship with ███████ "wasn't healthy" but was not abusive. They also provide that they have "done that so many times where [they] completely change an entire scenario" after the fact due to insecurity.

This is aligned with my recollection of their relationship with ███████ as well as their characterization of that relationship until the instagram posts claiming he raped them every day until they developed Stockholm syndrome, and the allegations that have been made since that internet post. ███████ and ███████ had a very intense and mutually unhealthy partnership but neither of them abused or assaulted the other. But now ███████ has completely changed the entire scenario in retrospect - which they acknowledge as a pattern for them.

My apologies for not providing these earlier, but I understand you're still in the evidence gathering stage:



I also wanted to expound on my experiences of consent in sexual encounters with ███████ since it sounds like patterns of behavior and ███████ larger sexual history at Whitman are at issue for your investigation.

Exhibit 2 Page 23 of 37

I truly believe that ███████ is a respectful, virtuous, and trustworthy person, especially when it comes to sex. I want to also mention that throughout this whole situation, I have struggled with my adverse belief of the complainants accusations. As a survivor myself, I understand what it feels like to not be believed, and I really value the importance of hearing other people in their accusations. Ensuring I do not contribute to the harmful silencing of victims that is too common in cases of sexual assault is something I hold at high esteem. Therefore, I would not be fighting so hard for ██████ if I did not think it was absolutely necessary.

My numerous experiences of sex with ██████ during the time we lived together between August and December 2020 were ALWAYS consensual, and I never once felt unsafe, uncomfortable, or disrespected. We were always open and honest with each other about things we liked and didn't like, and those boundaries were respected throughout our relationship. Specifically, when we lived together during the Fall of 2020 and were having sex regularly, I was going through a phase of drinking too much, and would try to initiate sex with ██████ in my drunken state. He would never engage with me sexually if I was obviously drunk, or if he knew I had had a lot to drink. I remember one morning I asked him why he wouldn't have sex with me the night before, and he said that it was because I was too drunk to consent. To me, this signifies a notable regard for consent, and it also made me feel safe and respected.

Additionally, I have a retroverted uterus, meaning there are sex positions that do not feel good to me and can cause pain. I did not disclose this to ██████ before we had sex for the first time, and when we did, I found myself in one of these positions. I asked to stop, and he immediately stopped. He asked if I was okay, I told him what was going on, and he completely respected it- no judgements, no pushing to keep going, and most importantly, it was never an issue again. To me, this shows that he cared, and that he would never do anything that could potentially hurt me. This also shows that he did not find my pain or suffering to be a turn on or something that he pursued sexually. ██████ values consent in his sexual encounters and if he misunderstood an interaction that is now being characterized as nonconsensual, I am confident that it was in error and that he would have honored the desires of his partner had he explicitly known.

While I recognize that my experiences with ██████ do not automatically apply to everyone's experiences, I can say in full confidence that I cannot imagine ██████ being malicious, violent, or disrespectful during sex. Given my relationship with him, especially during the time we lived together, I am sure that if he did have unusual kinks or interests, that I would be aware of them. Our relationship gave space for admittance of such things, and nothing violent or harmful was ever in question.

Additionally, I understand that there are some reports of choking or hair pulling in the complainants' allegations, and I would like to touch on this. I mentioned this briefly in my interview, that actions such as light choking do not always constitute violence, and are often desired. Hair pulling and choking are commonplace in many sexual relationships, and just because someone enjoys doing these things does not make them violent. Further, many people enjoy these things being done to them- myself included. As I mentioned previously in this case, I recall the complainant telling me that they too, enjoyed these acts of light dominance. If the

Exhibit 2 Page 24 of 37

complainant had told me that these acts made them feel violated or unsafe during sex with ████ I most certainly would have been concerned. Even if the complainant had not explicitly said something, but vaguely alluded to being uncomfortable, I would have made note of it. But that was not the case, which is why I am surprised to hear it being recounted so far after the fact as violent and non-consensual. Most commonly, light acts of dominance during sex such as choking and hair pulling do not necessarily constitute malicious acts of abuse; especially in ████ case. In my experience, these acts were something we both enjoyed, and I know that if I had asked him to stop, he would have.

In summary, I believe that ████ is a consent-oriented sexual partner who is receptive to and responsive to the needs of his partner. I am sad to hear that the complainant does not remember their relationship that way anymore. As someone who interacted with the complainant during the time frame at issue, as well as being sexually involved with the respondant shortly after, I hope my perspective is useful in showing these allegations do not reflect the truth of the situation, or at least are contrary to the known truth and character of the respondent. I also want to make clear that the respondent and I are no longer involved, and I am providing this information as a third-party, speaking from what I feel to be a moral obligation towards truthful testimony in support of fact finding. Thank you for taking the time to review this additional information.

Exhibit 2 Page 25 of 37



Exhibit 2 Page 26 of 37

@Tim no rush

[ ] Keep your violence and abuse away from me. Keep your distance and generally leave me alone, and I will do the same. Leave my desk, and any other belongings of mine, here

Lmaooo

What is wrong with you freak

I'm coming Wednesday so get the fuck out of the house

I'm not gonna touch your shit I find you disgusting

Carlos

A prime example of the abuse I'm talking about

Go whine about to your next teenage girlfriend you sick freak

Carlos

Blocked

Text Message

Exhibit 2 Page 27 of 37

Exhibit 2 Page 28 of 37



## Investigation Follow-up

**Asher Bachtold** <bachtoldasher@gmail.com>                                    Tue, Nov 29, 2022 at 7:03 PM
To: "trish@nwworkplacelaw.com" <trish@nwworkplacelaw.com>

Hi Trish,

I understand this is the time for additional evidence, so I wanted to add some things to the investigation. Specifically, that
███████ has a history of accusing people of sexual assault which I think undermines the credibility of her allegations against
█████ In the time that ██████ and I were best friends from August-December of 2019, here are a few of them that I can
remember:

1. Accused their ex boyfriend Frankie of being abusive to her.
2. Claimed multiple times that players from the basketball team at Whitman were stalking or touching
   them unconsensually.
3. Accused Rolan Panza (an old teammate of mine) of sexually assaulting woman when they are drunk.
4. Accused me of kissing them unconsensually.
5. Accused █████ of rape allegations.

Once again, before █████ accused me of forcing myself onto her, we were best friends.

During that time, they constantly accused people of sexual assault. The ones that I listed above are the few that I still
remember. █████ seems to have a habit of accusing people of sexual assault or weaponizing sex assault allegations for a
specific reason.

For example, when █████ was angry with █████ they told █████ that I tried to force myself onto them to direct his anger
towards me. I just don't think that they are a credible complainant and I hope that you take that into consideration.

Take care,
Asher

Exhibit 2 Page 29 of 37

**Curriculum Vitae**
**Stacy Cecchet, Ph.D., A.B.P.P.**
**Clinical & Forensic Psychologist**
**Board Certified in Couple & Family Psychology**

| **Mailing Address** | **Contact Information** |
|---|---|
| 2132 N. 117th Street | Phone: 425-681-5003 |
| Seattle, WA 98133 | DrCecchet@ObsidianFS.com |

## EDUCATION

| Ph.D. | Seattle Pacific University, Seattle, WA | 2012 |
|---|---|---|
| | Program: Clinical Psychology | |
| | *Post-Doctoral Fellowship: Johns Hopkins University* | 2013 |
| | *School of Medicine & The Kennedy Krieger Institute* | |
| M.A. | Seattle Pacific University, Seattle, WA | 2010 |
| | Program: Clinical Psychology | |
| B.A. | University of Puget Sound, Tacoma, WA | 2006 |
| | Major: Psychology | |

## PUBLICATIONS

**Cecchet, S.** (2019). Victims of Trafficking and Violence Prevention Act (TVPA) and Reauthorization. In Bernat, F.P. & Frailing, K. (Eds.). *Women and Crime Encyclopedia.* Hoboken, NY: John Wiley & Sons Inc.

Thoburn, J., Mauseth, K., **Cecchet, S.,** McGuire, T., and Adams, K. (2017). Health Support Team: An indigenous volunteer training program in Haiti. Accepted for publication at the Journal of Family Psychotherapy.

**Cecchet, S.**, Thoburn, J. (2014). The Psychological Experience of Child and Adolescent Sex Trafficking in the United States: Trauma and Resilience in Survivors. *Psychological Trauma: Theory, Research, Practice, and Policy, 6*(5), 482-493. doi:10.1037/a0035763

**Cecchet, S.**, Calabrese, D. (2011). Interpreter-mediated therapy for refugees: A desperate need for awareness and training. *The Graduate Student Journal Psychology*, 13, 12-16.

**Cecchet, S.** (2011). Rebuilding and redefining family in Haiti. *The Family Psychologist, 27(1), 26-*27.

Thoburn, J.W., **Cecchet, S.**, Oliver, T., Jones, K.C., & Sanchez, O. (2011). Where do we go from here? The development of a family psychology identity. *The Family Psychologist, 27*(1), 6-10.

**Cecchet, S**. (2010). Student Research. *Trauma Psychology Newsletter*, 5(3), 26.

## PRESENTATIONS

**Cecchet, S.** & Graaff, J. (2019). The Benefit and Utilization of a Forensic Psychologist on an ICAC Task Force:  Resiliency and Case Consultation. Workshop symposium presented at the Northwest Regional ICAC Conference,  Redmond, Washington.

Exhibit 2 Page 30 000037

**Cecchet, S.** & Woodruff, M. (2018). *Trauma Informed Care in the Juvenile Justice System.* Workshop symposium presented at the National Center for Victims of Crime's 2018 National Training Institute, Orlando, Florida.

Ramsdell, J. & **Cecchet, S.** (2018). *The Case Against Anger: Working with Victims of Crime.* Workshop symposium presented at the National Center for Victims of Crime's 2018 National Training Institute, Orlando, Florida.

**Cecchet, S.** & Klein, S. (2017). *Secondary Trauma, Compassion Fatigue, and Suicide: Risks to Law Enforcement and Service Providers Working in Sex Crimes Against Children.* Workshop symposium presented at the National Center for Victims of Crime's 2017 National Training Institute, Portland, Oregon.

Martinez, S. & **Cecchet, S.** (2017). *The Impact of Education and Training: Law Enforcement's Ability to Correctly Identify Victims of Domestic Sex Trafficking.* Paper presentation accepted for the American Psychology-Law Society in Seattle, Washington.

**Cecchet, S.** & Klein, S. (2016). *Child Sex Trafficking and Child Pornography: Understanding the Overlap Between the Fastest Growing Crimes Against Children.* Workshop symposium presented at the National Center for Victims of Crime's 2015 National Training Institute, Philadelphia, Pennsylvania.

**Cecchet, S.** (2016). *Sex Trafficking: Understanding The Size, Scope, And Victimology Of The Second Largest Form Of Criminal Behavior In The World.* Workshop symposium presented at the National Center for Victims of Crime's 2015 National Training Institute, Philadelphia, Pennsylvania.

**Cecchet, S.** (2015) *Fight, Flight, or Freeze: The Physical and Mental State of Victims During, and Immediately Following a Traumatic Event.* Workshop symposium for the National Center for Victims of Crime's 2015 National Training Institute, Anaheim, California.

**Cecchet, S.** & Kappert, N. (2015). *An Evaluation Of College Student's Stereotyped Perceptions Of Prostitution.* Workshop symposium for the International Congress on Law and Mental Health, Vienna, Austria.

**Cecchet, S.** (2015). *Domestic and International Sex Trafficking: Identifying Survivors and Providing Culturally Competent Care.* Workshop symposium for the International Congress on Law and Mental Health, Vienna, Austria.

**Cecchet, S.** & Martinez, S. (2015). *Identifying Victims of Sex Trafficking in the United States: The Ability of Law Enforcement to Correctly Identify Victims and Refer to Culturally Appropriate Services.* Workshop symposium for the International Congress on Law and Mental Health, Vienna, Austria.

**Cecchet, S.** & Pease, E. (2014). *Domestic Sex Trafficking: Working with Survivors in the Criminal Justice System.* Workshop symposium for the annual convention of the National Center for Victims of Crime, Miami, FL.

Wang, C., Abraham, J., Benson, J. L., Perkins-Parks, S., Bader, S. H., & **Cecchet, S.** (2014). *Family and School Predictors of Premature Termination across Outpatient Clinics.* Presented at the annual convention of the National Association for School Psychologists, Washington D.C.

Exhibit 2 Page 300002

Thoburn, J., Mauseth, K., McGuire, T., Adams, K., & **Cecchet, S**. (2013). *Efficacy of the Health Support Team Curriculum in Post-Earthquake Hawaii.* Presented at the annual convention of the American Psychological Association, Honolulu, HI.

**Cecchet, S**., Calabrese, D., & Thoburn, J. (2010). *Identifying strategies for conducting interpreter mediated therapy with refugees.* Presented at the annual Western State Psychological Association convention, Lynwood, WA.

**Cecchet, S**. & Thoburn, J. (2010). *The psychological experience of child sex trafficking: trauma and resilience in survivors.* Presented at the annual Western State Psychological Association convention, Lynwood, WA.

Strozier, M., Jones, K.C., Oliver, T.C., **Cecchet, S**., & Thoburn, J.W. (2010). *A systems approach to medicine: Implications for training and practice.* Paper symposium presented at annual convention of the American Psychological Association, San Diego, CA.

Thoburn, J.W., Jones, K.C., Boutinen, M., **Cecchet, S.,** & Strozier, M. (2010). *Finding a common language: A multicultural approach to interdisciplinary teams.* Paper symposium presented at annual convention of the American Psychological Association, San Diego, CA.

**Cecchet, S**. & Lee, J. (2009). *Time Perspective as a Mediating Factor Between Parental Socioeconomic Status and Student's Academic Goal Setting Abilities.* Presented at the annual SPF&C Research Symposium, Seattle, Washington.

**Cecchet, S.** & Thoburn, J. (2009). *Investigating the Efficacy of Interpreter Mediated Cognitive-Behavioral Therapy for Refugees with Posttraumatic Stress Disorder.* Presented at the annual SPF&C Research Symposium, Seattle, Washington.

Thoburn, J.W., **Gilmore, S**., Oliver, T., Jones, K.C., & Sanchez, O. (2009). *Re-envisioning family psychology.* Paper symposium presented at annual convention of the American Psychological Association, Toronto, ON.

**Gilmore, S.** (2008). *A Theoretical Framework for Dissociative Identity Disorder.* Presented at the annual SPF&C Research Symposium, Seattle, Washington.

## WORK EXPERIENCE

Forensic Psychologist                                                                         2020 - Present
    Department of Homeland Security
    AOR: Alaska, Washington, Idaho, Oregon, Nevada, California, Hawaii, Guam, Saipan

    Services: Providing individual and group resilience support throughout the AOR, respond to critical incidents, work collaboratively to promote the continued development of the Peer Support Program, and provide case consultation, as well as tactical and operational support.

Behavioral Health Strike Team Member                                                2019 – Present
    Department of Health
    Seattle, Washington
    Specialty: Disaster Relief, Trauma

    The Washington State Department of Health has undertaken behavioral health preparedness work in the last year including developing a Behavioral Health Strike Team (BHST). BHST's mission is to decrease the behavioral health impacts of disasters by providing direct

Exhibit 2 Page 320 of 307

psychosocial support to impacted communities along a continuum of care, building capacity among the impacted community to support the long-term needs of survivors, and providing subject matter expertise on disaster behavioral health principles and tools to the community. Develop and establish interdisciplinary consultation, referral, and resource networks.

To date, the BHST is made up of eight doctoral level psychologists and one Board Certified Couple and Family Psychologist. Collectively, the BHST has provided more than 40 years of crisis and disaster consultation and more than 30 years of international disaster relief work. Team members have made more than 16 trips to Haiti post-earthquake, seven trips to Jordan to work with Syrian refugees and train NGO employees in behavioral health support, spent more than 12 months in Morocco providing direct services, provided trauma-focused relief work in Jamaica, and worked with the Clinton Global Initiative to support refugees on the Columbia and Venezuela border. The team has provided more then 30 trainings on crisis intervention and disaster behavioral health for first responders and health care workers, and responded to mass shooting and mass casualty events, including locally responding to the mass shooting at Seattle Pacific University.

Advisor to the National Center for Victims of Crime                           2017 - Present
    Washington, D.C.
    Specialty: Disaster Relief, Trauma, Mass Shootings

    Services: Consultative services regarding trauma-informed care, disaster relief, working with victims of crime, and vicarious trauma. Worked collaboratively with NCVC and Vegas Strong in response to the 2017 Las Vegas mass shooting at Mandalay Bay.

Clinical Psychologist & Managing Partner                           2013 - Present
    Snohomish Psychology Associates
    Everett, WA
    Specialty: Behavioral Pediatrics & Trauma

    Services: Conduct behavioral health assessment, counseling, and referral. Board Certified in Couple and Family Psychology. Specialization in working with children ages 18 months to 12 years with behavioral health diagnoses such as disruptive behavior disorders. Common behavioral issues and disorders she treats include: tantrums, aggression, noncompliance, sleep difficulties, school problems, feeding disorders, problems with attention/concentration, developmental delays, Autism, and Fetal Alcohol Spectrum Disorders. Behavioral orientation, utilization of behavioral parent training and Parent-Child Interaction Therapy. Specialization in working with survivors of severe trauma (all ages), extensive work both internationally and domestically. Interdisciplinary case consultation, mentorship of lower level specialists. Responsibilities also include triaging behavioral health needs and providing critical counseling and referral services. Develop and establish interdisciplinary consultation, referral, and resource networks.

Forensic Psychologist & Educational Consultant                           2013 - Present
    Obsidian Forensics
    Everett, WA

    Criminal Services: Conducting forensic evaluations for the Public Defender Association, military, law enforcement, private attorneys. Providing forensic case consultation, and conducting forensic evaluations regarding: risk and recidivism for violent crimes, serial offenses, sex crimes; psychosexual behavior; child sexual abuse; sex trafficking; torture; trauma/victimization; diminished capacity/competency. Educational consulting and residential

Exhibit 2 Page 300004

treatment placement.

Forensic psychologist for local law enforcement/Homeland Security taskforces on child pornography. Mission: Operating with high ethical standards to conduct behavioral health research and provide assessment, diagnostic, counseling, and referral services. Develop and establish interdisciplinary consultation, referral, and resource networks. Build alliances and collaborates across boundaries to build strategic relationships and achieve common goals. Facilitate the well-being of law enforcement officers and their family members, promote resilience, and provide support to peer support networks. Work on issues that may adversely affect job performance, personal well-being, family problems, health, and substance use disorders. Develop, foster, and maintain effective partnerships with stakeholders, professional groups, and interdisciplinary professionals such as diverse representatives from local community clergy, peer support, and other Federal, state, and local agencies, and community services.

Civil Services: Providing forensic case consultation, and conducting forensic evaluations regarding: diagnostic clarification/mental health; parenting; immigration; special education; civil rights matters; personal injury; medical malpractice; wrongful death; and rape and sexual assault. Case consultation and forensic evaluative services provided for the Washington State Psychology Ethics Board, school districts, the Department of Health, and private attorneys.

Executive Director                                                    2012 - 2019
    PsychMed International
    Seattle, WA

    Services: PsychMed International is a non-profit organization providing sustainable and evidence-based practices in a disaster relief setting.

Forensic Postdoctoral Fellow                                         2013 - 2014
    Parenting Evaluation Training Program
    Seattle, WA
    Supervisor: G. Andrew H. Benjamin, J.D., Ph.D., ABPP

    Responsibilities: Training and consultation on parenting evaluations, high-conflict family law and child custody cases.

Pediatric Postdoctoral Fellow                                        2012 - 2013
    Johns Hopkins University, School of Medicine
    Kennedy Krieger Institute: Behavioral Management Clinic
    Baltimore, MD
    Supervisor: Susan Perkins-Parks, Ph.D.

    Responsibilities: Manage case load of 60-80 clients in an outpatient setting ages 18 months-12 years. Clients have both commercial and medical assistance insurance coverage. Additional responsibilities include the creation and implementation of treatment plans, gathering empirical data, participating in national presentations, supervising practicum students, and presenting to schools and the community on mental health topics. Training and participation in Leadership Education in Neurodevelopmental and Related Disabilities (LEND) and Parent Child Interaction Therapy (PCIT). Responsibilities also include triaging behavioral health needs and providing critical counseling and referral services. Develop and establish interdisciplinary consultation, referral, and resource networks.

Exhibit 2 Page 300005

## TEACHING EXPERIENCE

Adjunct Faculty                                                          2013 - 2020
    Seattle University
    Department of Criminal Justice
    Undergraduate and Graduate Studies
    Seattle, WA


Adjunct Faculty                                                          2013 - 2014
    University of Puget Sound
    Department of Psychology and Neural Sciences
    Undergraduate Studies
    Tacoma, WA

## CLINICAL PLACEMENTS

Clinical Psychology Resident                                            2011 – 2012
    Southern Arizona Psychology Internship Center
    La Frontera, Children's South Clinic
    Tucson, AZ
    Supervisor: Ed Lovejoy, PhD

Responsibilities: Attend clinical meetings; manage a case load of 10-12 clients and their families, most of whom have a history of sexual trauma; interface with the legal system, child protective services, and juvenile courts. Additional responsibilities include conducting empirically supported treatments, therapy groups, and psychological assessments. Minor rotations were completed in adult outpatient services and an inpatient substance abuse treatment program. Evidence-based group curricula in grief and loss, anger management, and social skills were also developed and disseminated with in a community mental health clinic and a local school system.

Clinical Psychology Practicum                                          2010 – 2011
    Child Study and Treatment Center
    Steilacoom, WA
    Supervisor: Jeremy Norris, PsyD

Responsibilities: Attend clinical meetings, participating in treatment planning, lead psycho-educational and therapeutic groups, interact in the milieu, join clinical rounds, observe forensic interviews, and manage case load 8-10 patients.

Clinical Psychology Practicum                                          2010 – 2012
    Port-au-Prince, Haiti
    Supervisor: John Thoburn, PhD, ABPP

Responsibilities: Three trips to Haiti were completed in July and October, 2010, as well as September 2011. Trained indigenous psychological support teams of over 200 people, debriefed indigenous team trained on the May trip. Organized a children's mental health team to provide supportive therapy to children undergoing medical procedures without anesthesia at the Ana Zunuzi Clinic, implemented pediatric psychology therapy groups for 150 children both in the medical clinic and surrounding orphanages. Worked with orphanages to provide wound care for untreated children. Additional responsibilities included creating and implementing a training program for teachers in indigenous schools on assessing risk in children.

Exhibit 2 Page 39 of 106

Forensic Psychology Practicum                                          2010 – 2011
    Monroe Correctional Facility
    Monroe, WA
    Supervisor: Brendon Scholtz, PhD

    Responsibilities: Conducted forensic assessments for the Indeterminate Sentence Review Board (ISRB) to evaluate risk and recidivism in male sex offenders that committed violent crimes. Assessment measures used: PCL-R, HCR-20, VRAG, SORAG, MnSOST, RRASOR, Static-99, MMPI-2, PAI.

Clinical Psychology Practicum                                          2009 – 2010
    Monroe Correctional Facility
    Monroe, WA
    Supervisor: Elizabeth Irwin, PhD

    Responsibilities: Conduct clinical assessments. Work therapeutically with offenders in the Special Offenders Unit and the Washington State Reformatory Unit utilizing evidence-based practices.

## TRAINING & CERTIFICATIONS
Critical Incident Stress Management (CISM)
Flexible Psychological First Aid (FPFA)
Trauma Focused Cognitive-Behavioral Therapy (TF-CBT) Certification
Parent-Child Interaction Therapy
Developmental Therapy
Violence Risk Assessment Guide (VRAG)
Red Cross First Aid
Human Participants Protection Certification:  CITI Program, FERPA Certified
Leadership Education in Neurodevelopmental and Related Disabilities (LEND)
Parenting Evaluation Training Program (PETP)

## CURRENT PROFESSIONAL AFFILIATIONS
American Psychological Association
American Board of Professional Psychology
APA Society of Clinical Child and Adolescent Psychology
APA Society for Couple and Family Psychology
International Academy of Family Psychology
APA Psychologists in Public Service, Police and Public Safety
Association of Threat Assessment Professionals

Exhibit 2 Page 300007

## Fwd: [jewett] Fwd: ARE YOU MAD? ITS TONIGHT!!

From: ████ ████ <lussiese@whitman.edu>
Date: Wed, Mar 11, 2020 at 11:33 AM
Subject: [jewett] Fwd: ARE YOU MAD? ITS TONIGHT!!
To: <jewett@lists.whitman.edu>

---------- Forwarded message ----------
From: ████ ████ <lussiese@whitman.edu>
Date: Tuesday, March 10, 2020
Subject: ARE YOU MAD?
To: jewett@lists.whitman.edu, lyman@lists.whitman.edu

**Are you mad about ████████ unnecessary suspension? About Jourdan and Mccoy being BANNED from Jewett? Didn't know them but have seen the administration make other problematic decisions?**

**ALL YOU HAVE TO DO IS SHOW UP!**

Now is your chance to speak out! Come to the **Jewett main lounge tomorrow at 9pm** to express your concerns to the people responsible!

We need your support! *Let's show them we care!*

Exhibit 2 Page 37 of 37

Exhibit 3

**Statement of Finding, Final Determination, and Rationale Form**

**Respondent:** ████████                    [RecipientID]:

**Complainant:** ████████                   [RecipientID]:

**Incident Date(s):** Fall 2019 semester          **Hearing Date:** January 20, 2023

**Introduction**

The Whitman College Hearing Panel (comprised of Joseph Vincent, Melissa Clearfield, and Noah Leavitt, hereinafter referred to as "the Hearing Panel") met on January 20, 2023, to hear a sexual harassment complaint filed by ████████ (hereinafter referred to as "Complainant") against ████████ (hereinafter referred to as "Respondent"). Complainant and Respondent attended the hearing and answered all questions asked of them, both in direct examination by the Hearing Panel and their respective Advisors, and in cross-examination conducted by the opposing parties' Advisors.

The Hearing Panel's findings come after reviewing all available evidence, including interviews, witness statements and evidence provided to the investigator and presented in the investigation report and related appendices, and all evidence and testimony presented at the hearing. In considering the allegations, the Hearing Panel applied the presumption of innocence, and then relied upon the preponderance of the evidence in making all findings. The Hearing Panel did not and does not have a bias toward or against either party, or toward or against complainants or respondents, generally. The Hearing Panel also considered the relative credibility of the parties in making the findings. The Hearing Panel unanimously determined that Respondent is <u>responsible</u> for violating the Whitman College Sexual Harassment, Discrimination and Sexual Misconduct Policy, specifically related to the prohibitions against Sexual Assault (Forcible Rape) and Dating Violence.

**The Hearing**

The Hearing Panel provided each party with a full and fair opportunity to introduce evidence, make opening and closing statements, and respond to questions. The hearing was held via the online platform Zoom and was recorded.

Of the witnesses interviewed as part of the investigation, the following **were present** at the hearing and submitted to cross-examination: Respondent, Complainant, and Witness G (████████).

The parties mutually agreed prior to the hearing that they did not have any additional questions regarding the testimony provided by Witness A (████████), Witness B (████████), Witness C (████████), Witness D (████████), Witness E (████████), Witness F (████████), Witness J (████████), and Witness K (████████). The panel originally intended, upon request of the parties, to call Witness I (████████), but the parties mutually agreed during the hearing that they no longer had any questions regarding Backtold's testimony. Therefore, these witnesses interviewed during the investigation **were not present** at the hearing and did not submit to cross-examination. The panel relied on their testimony as provided in the investigation report.

**The Allegations[1]**

---

[1] The order of allegations as enumerated in the investigation report is different than the order outlined here, to streamline and synthesize the analysis of the allegations and findings of fact.

Exhibit 3 Page 1 of 14

Per the investigation report dated December 14, 2022, Complainant alleged Respondent engaged in the following nonconsensual sexual and physical conduct during the Fall 2019 semester at Whitman College:

1. Slapping Complainant
2. Grabbing Complainant's Face, Leaving A Bruise
3. Choking Complainant[2]
4. Using Physical Power, Including Shoving Complainant Against A Wall
5. Grabbing Complainant's Hair
6. Using Threats
7. Using Verbal Pressure
8. Putting His Hands Inside Complainant[3]
9. Subjecting Complainant To Nonconsensual Oral Sex
10. Engaging In Nonconsensual Sex With Complainant

**Implicated Policy Provisions**

If true, the alleged conduct could violate the following provisions of the Whitman College Sexual Harassment, Discrimination and Sexual Misconduct Policy and Procedure:

**Part II Prohibited Conduct (A) Sexual Harassment:** "unwelcome conduct, determined by a reasonable person, to be so severe, and pervasive, and objectively offensive, that it effectively denies a person equal access to the College's education program or activity."

**Part II Prohibited Conduct (A) Sexual Harassment (3) Sexual Assault(a) Sex Offenses, Forcible; Forcible Rape:** "penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration without the consent of the complainant."

**Part II Prohibited Conduct (A) Sexual Harassment (3) Sexual Assault(a) Sex Offenses, Forcible; Forcible Fondling:** "the touching of the private body parts of another person (buttocks, groin, breasts) for the purpose of sexual gratification, forcibly, and/or against that person's will(non-consensually) or not forcibly or against the person's will in instances in which the complainant is incapable of giving consent because of age or because of temporary or permanent mental or physical incapacity."

**Part II Prohibited Conduct (A) Sexual Harassment (4) Dating Violence:** "violence, on the basis of sex, committed by a person, who is in or has been in a social relationship of romantic or intimate nature with the complainant. The existence of such a relationship will be determined based on the complainant's statement and with consideration of the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship. For the purposes of this definition-Dating violence includes, but is not limited to, sexual or physical abuse or the threat of such abuse. Dating violence does not include acts covered under the definition of domestic violence."

**Relevant Policy Definitions**

---

[2] The report uses the term "choking" to refer to strangulation, defined as constricting an individual's airway by squeezing the individual's neck. For the purposes of this document, the term "choke" and its derivatives are used interchangeably with the more accurate term, "strangle," and its derivatives, to describe the conduct at issue.

[3] The report uses the phrase "put his hands inside Complainant" to describe Respondent digitally penetrating Complainant's vagina.

The implicated policy provisions related to Forcible Rape and Forcible Fondling include elements related to the consent of the Complainant. The Whitman College Sexual Harassment, Discrimination and Sexual Misconduct Policy and Procedure defines "Consent" as:

- knowing, and
- voluntary, and
- clear permission
- by word or action
- to engage in sexual activity.

Individuals may experience the same interaction in different ways. Therefore, it is the responsibility of each party to determine that the other has consented before engaging in the activity.

If consent is not clearly provided prior to engaging in the activity, consent maybe ratified by word or action at some point during the interaction or thereafter, but clear communication from the outset is strongly encouraged.

For consent to be valid, there must be a clear expression in words or actions that the other individual consented to that specific sexual conduct. Reasonable reciprocation can be implied. For example, if someone kisses you, you can kiss them back (if you want to) without the need to explicitly obtain their consent to being kissed back.

Consent can also be withdrawn once given, as long as the withdrawal is reasonably and clearly communicated. If consent is withdrawn, that sexual activity should cease within a reasonable time.

Consent to some sexual contact (such as kissing or fondling) cannot be presumed to be consent for other sexual activity (such as intercourse). A current or previous intimate relationship is not sufficient to constitute consent.

Proof of consent or non-consent is not a burden placed on either party involved in an incident. Instead, the burden remains on the college to determine whether its policy has been violated. The existence of consent is based on the totality of the circumstances evaluated from the perspective of a reasonable person in the same or similar circumstances, including the context in which the alleged incident occurred and any similar, previous patterns that may be evidenced.

Consent in relationships must also be considered in context. When parties consent to BDSM or other forms of kink, non-consent may be shown by the use of a safe word. Resistance, force, violence, or even saying "no" may be part of the kink and thus consensual, so the college's evaluation of communication in kink situations should be guided by reasonableness, rather than strict adherence to policy that assumes non-kink relationships as a default.

(B) "Force" is the use of physical violence and/or physical imposition to gain sexual access. Force also includes threats, intimidation (implied threats), and coercion that is intended to overcome resistance or produce consent.

(D) "Coercion" is unreasonable pressure for sexual activity. Coercive conduct differs from seductive conduct based on factors such as the type and/or extent of the pressure used to obtain consent. When someone makes clear that they do not want to engage in certain sexual activity, that they

want to stop, or that they do not want to go past a certain point of sexual interaction, continued pressure beyond that point can be coercive.

**Charge 1 - Slapping Complainant**
Complainant alleged that, while "making out" with Respondent in Respondent's residence hall room, Respondent slapped Complainant's face. Complainant also said that after they told Respondent they were not okay with Respondent slapping Complainant, Respondent stopped. Respondent denied slapping Complainant's face. He said, "I could see myself at some point my hand going on their face during sex, but it definitely would not be a slap or trying to hit their face with force or anything like that." Respondent stated that he had slapped Complainant's butt but no other body parts.

If sustained, the allegation could implicate the College's prohibition of Dating Violence.

The allegation is analyzed below.

**Finding - Not Sustained**
Aside from the parties' opposing statements, there was very little evidence to support or refute the allegation. Witnesses who were generally corroborative of Complainant's description of their experiences with Respondent were less likely to corroborate Complainant's description of Respondent slapping Complainant. For instance, Witness E, who confirmed discussing several of Complainant's more egregious allegations, could not corroborate this detail, and Witness H conflated a question about Respondent slapping Complainant with a description Complainant provided of Respondent grabbing and bruising Complainant's face. The panel concluded that the evidence was insufficient to sustain Complainant's allegation that Respondent slapped Complainant in the face.

**Charge 2 - Grabbing Complainant's Face, Leaving A Bruise**
Complainant alleged that, while making out with Respondent in Respondent's residence hall room, Respondent became "even more aggressive" and "left a bruise on my face when he grabbed it." Complainant said the bruise was blue in color and the size of a penny. Complainant said it was on the right side of their face, near their chin. Complainant said they discussed their discomfort with Respondent's level of aggression and the bruise on their face, but Respondent continued to aggressively grab them when the parties were intimate. Respondent said they did not remember grabbing Complainant's face or causing a bruise and did not remember ever seeing a bruise or mark on Complainant's face.

If sustained, the allegation could implicate the College's prohibition of Dating Violence.

The allegation is analyzed below.

**Finding - Sustained**
Complainant's allegation was corroborated, through direct observation of the bruise and contemporaneous conversations about the source of the bruise, by testimony from five witnesses (Witnesses C, E, G, H, and K). The corroborative quality of the witness testimony was enhanced by the generally adversarial disposition of Witness G toward Complainant's claims and the fact that Witness H had a falling out with Complainant and testified that their friendship never recovered.

The panel determined that the preponderance of the evidence was sufficient to sustain Complainant's allegation that Respondent bruised Complainant's face by aggressively grabbing it while the parties were engaged in sexual activity.

The panel concluded that, based on the findings of fact, Respondent committed an act of violence against Complainant on the basis of Complainant's sex. The panel's conclusion that Respondent's act, and the resulting injury to Complainant, were the result of intentional or foreseeable harm and not accidental or incidental -- thereby satisfying the "violence" element of Whitman College's prohibition of Dating Violence -- was primarily the result of the fact that the parties had already discussed Respondent's excessive physicality while engaged in sexual activity on two prior occasions, and Respondent had apologized to Complainant and said it wouldn't continue.

Respondent rebutted Complainant's allegation by saying he did not recall having any conversations with Complainant about Complainant not liking Respondent's excessive use of physical force. Respondent also said he never noticed a bruise or mark on Complainant's face. The panel found this explanation implausible, because several witnesses noticed the bruise, including witnesses whose testimony was supportive of Respondent's. Respondent's credibility was diminished as a result, and the panel concluded it is more likely than not that Complainant did address Respondent's aggressive physicality with Complainant during sexual activity. Despite two conversations, and two apologies, Respondent continued to engage in aggressive physical behavior when engaged in sexual activity with Complainant, and physically injured Complainant as a result. Therefore, the preponderance of the evidence supports a conclusion that Respondent violated Whitman College's prohibition of Dating Violence.

### Charge 3 - Choking Complainant
Complainant alleged that, while engaged in intimate activity with Respondent, Respondent would "choke" Complainant. Complainant said they were okay with "a normal amount" of choking," but always felt like they would black out when Respondent choked Complainant. Complainant said they might have told Respondent that the choking was too hard, but they did not remember.

Respondent did not recall specifically discussing choking with Complainant, and said the parties rarely engaged in choking behavior. Respondent said the choking was "light."

lf sustained, the allegation could implicate the College's prohibition of Dating Violence.

The allegation is analyzed below.

### Finding - Not Sustained
The parties and multiple witnesses discussed choking as a feature of the parties' intimate interactions. The panel considered the testimony of the parties as it related to the communication between the parties regarding engaging in any choking at all and whether there were limits or thresholds that were mutually understood between the parties. There is no evidence the parties discussed a safe word or other measures to allow Complainant to communicate with Respondent regarding choking. Given the communication between Complainant and witnesses, as contained in the investigation report and related evidence, the panel determined the preponderance of the evidence supports a conclusion that the parties engaged in choking as part of intimate interactions, and that Complainant at least initially indicated to Respondent that he was "doing things [Complainant] liked," referencing the choking behavior.

The panel further determined that there was insufficient evidence, based on Complainant's positive comments to Respondent and Complainant's uncertainty that they ever contradicted those comments in subsequent communication with Respondent, to sustain Complainant's allegation that the choking behavior was a violent act and not a mutually agreed-upon kink. This distinguishes the panel's finding regarding the allegation of choking from the panel's finding in Charge 2 regarding Respondent aggressively grabbing Complainant's face and causing a physical injury. In the determination regarding Charge 2, the panel determined that Complainant reminded Respondent twice that his general level of physicality was excessive. Respondent apologized and, in one instance, said it would not continue. Nevertheless, Respondent continued to aggressively interact with Complainant during sexual activity in ways that were likely to cause injury without any further advanced communication.

The choking behavior did not follow the same pattern as the behavior subject to Charge 2. Complainant initially conveyed to Respondent that they enjoyed engaging in choking during sexual activity. Complainant shared during the investigation that the choking became excessive and alarming, but Complainant never communicated further with Respondent about how he could choke Complainant during sex without it becoming excessive. As a result, Respondent reasonably believed he was doing something Complainant enjoyed, which further distinguishes this allegation from Charge 2. Complainant consented to choking during sexual activity with Respondent, and never withdrew that consent, nor did they convey to Respondent that the choking could reach a threshold beyond which Complainant was no longer comfortable. Therefore, there is insufficient evidence to conclude that Respondent violated Whitman College's prohibition of Dating Violence.

## Charge 4 - Using Physical Power, Including Shoving Complainant Against A Wall

Complainant alleged that on several occasions, while being intimate with Respondent, Respondent would become "incredibly aggressive," including grabbing Complainant's face and hair, shoving Complainant against the wall, and generally physically overpowering Complainant despite Complainant's protests. In addition, Complainant alleged that twice on the same night, Respondent grabbed Complainant's arm while the parties were at a nighttime social gathering and physically restrained Complainant.

Respondent said he was not "excessively" aggressive with Complainant while the parties were intimate. Respondent could not recall ever grabbing Complainant's arm and restraining Complainant and denied that he ever did so.

If sustained, the allegations could implicate the College's prohibition of Dating Violence.

The allegations are analyzed below.

### Finding - Sustained

Multiple witnesses corroborated, via contemporaneous conversations with Complainant, that Complainant discussed or described Respondent's degree of aggressiveness and physicality when engaged in sexual activity with Complainant. Similar to the analysis of Charge 2, some of these witnesses testified in general opposition to Complainant's position. The panel determined that the consistency with contemporaneous witness testimony enhanced the credibility of Complainant's allegation. The panel's finding that Respondent bruised Complainant's face by gripping it with force also added credibility to this allegation.

In addition to Complainant's more general description of Respondent physically imposing himself upon Complainant and overpowering Complainant during sexual activity, Complainant said Respondent physically restrained Complainant at a party because Respondent only wanted Complainant to talk to Respondent. Complainant said the context of the interaction went back to the first night she met Respondent at a party, and Respondent said he didn't like it when Complainant talked to other people and was getting jealous. The following evening, Complainant said Respondent pulled Complainant away from a crowd of people outside and only wanted to be with Complainant. Respondent said he wanted Complainant to stop talking to other people. Complainant said she tried to leave but Respondent physically restrained them. A fellow partygoer was able to draw Complainant away for a minute by explaining he needed to talk to Complainant, but Respondent did not relent and "tr[ied].to convince [Complainant] to be with [Respondent]." Complainant said Respondent was grabbing Complainant's arm and would not let go. Complainant's description of Respondent physically restraining Complainant at the party was corroborated by Witness D, who stepped in during the altercation to determine if Complainant was okay. Witness D did not have a relationship with either party, enhancing his credibility in the eyes of the panel. Witness D described Respondent's restraint of Complainant as "aggressive and sustained" and said Respondent grabbed Complainant's arm and "shook it."

The panel determined that, based on the available evidence and testimony, Complainant's allegation that Respondent used physical force to control and overpower Complainant was sustained by a preponderance of the evidence. Therefore, Respondent committed an act of violence against Complainant. The panel determined that the context of both interactions – sexual activity in the first instance and attempting to get Complainant to "be" with Respondent when Complainant talked to other people and Respondent became "jealous" in the second instance, showing his desire to be in a relationship with her as a woman – was sufficient to conclude that Respondent engaged in the conduct based on Complainant's sex. The preponderance of the evidence supports a conclusion that Respondent violated Whitman College's prohibition of Dating Violence.

### Charge 5 - Grabbing Complainant's Hair
Complainant alleged that on several occasions, while being intimate with Respondent, Respondent would grab and pull Complainant's hair and use it to control and restrain their head and movement.

Respondent said he had no memory of grabbing or pulling Complainant's hair, but that he may have had his hand on their head when the parties were engaged in intimate activity.

If sustained, the allegations could implicate the College's prohibition of Dating Violence.

The allegations are analyzed below.

### Finding - Sustained
Complainant described at least two specific occasions in the first few days of the parties' intimate interactions where Respondent grabbed and pulled Complainant's hair in an aggressive manner. Complainant indicated that she enjoyed Respondent's dominant tendencies during their initial romantic interaction but became alarmed by the intensity and aggressiveness Respondent displayed during their romantic encounters. Complainant said she spoke to Respondent about his excessive aggressiveness, and he apologized.

Respondent did not recall grabbing or pulling Complainant's hair and did not recall a conversation about his aggressiveness. Respondent was not able to provide any other relevant evidence regarding the allegation.

Witness C described a similar interaction with Respondent in which Respondent grabbed and pulled Witness C's hair while engaged in a romantic interaction with Witness C. Witness C's credibility is bolstered by the fact that, despite the experience Witness C described to the investigator, Witness C also expressed a desire to engage romantically with Respondent again after the experience.

Complainant's credibility is bolstered by Witness C's description of a similar interaction with Respondent and is further bolstered by the context in which Complainant described the hair pulling – that it occurred in the same scope of interactions with Respondent that included Respondent grabbing Complainant's face and using excessive force when choking Complainant. Complainant's sustained allegation that Respondent used force to restrain Complainant by grabbing and shaking Complainant's arm also adds credibility to Complainant's allegation that Respondent grabbed and pulled Complainant's hair in order to control Complainant's head and movement. In sum, the corroboration of Complainant's allegation was stronger than Respondent's denial that such actions occurred.

The panel determined that, based on the available evidence and testimony, Complainant's allegation that Respondent grabbed and pulled Complainant's hair was sustained by a preponderance of the evidence. Therefore, Respondent committed an act of violence against Complainant, on the basis of Complainant's sex – which the panel concluded was exhibited by the fact that the context of the behavior was sexual activity between the parties – and the preponderance of the evidence supports a conclusion that Respondent violated Whitman College's prohibition of Dating Violence.

### Charge 6 - Using Threats
Complainant said Respondent never threatened Complainant physically. Complainant said Respondent said, "If you don't have sex with me, I will find someone else," which Complainant perceived as a threat.

Respondent acknowledged communicating to Complainant that if Complainant was not interested in having a sexual relationship with Respondent, then Respondent would find someone who was interested in having sex with Respondent.

If sustained, the allegations could implicate the College's prohibition of Dating Violence and Forcible Rape.

The allegations are analyzed below.

### Finding - Not Sustained
Whitman College policy identifies threats as prohibited conduct when they are "threats of abuse" (Dating Violence) or when threats are used to gain sexual access in violation of the Complainant's consent (Forcible Rape). Complainant described feeling "threatened" by Respondent's statement that he would find someone else to have sex with if Complainant didn't have sex with him, but this form of ultimatum is not sufficient to constitute a threat under either of these policies. Complainant affirmatively indicated Respondent did not verbally threaten physical abuse, and Complainant did not describe any conduct that could constitute a threat to Complainant's physical safety for failure to acquiesce to unwelcome sexual conduct.

Complainant indicated the fear of social ostracization, or loss of friend/support groups enhanced the threatening quality of the ultimatum, but this is no more than a potential reality any two people face when one ends a romantic relationship with the other.

Finally, Complainant indicated that when Respondent made the comment, the parties were at a social gathering. Complainant responded, "okay," and left Respondent to go back to the party. This final piece of evidence confirmed the panel's conclusion that Complainant did not feel physically threatened by Respondent's comment. The panel therefore concluded that the evidence was insufficient to sustain Complainant's allegation that Respondent threatened Complainant.

### Charge 7 - Using Verbal Pressure

Complainant alleged that Respondent used verbal pressure, including asking for sex at least once a day, indicating that Respondent's arousal was Complainant's fault and therefore Complainant was obligated to sexually satisfy Respondent, and giving Complainant an ultimatum as described in Charge 6.

At the hearing, Respondent acknowledged consistently asking Complainant for sex, although his estimation of the total number of requests was slightly lower than Complainant's. Respondent also acknowledged giving Complainant an ultimatum as described in Charge 6. Respondent denied saying that his arousal was Complainant's responsibility to resolve by sexually satisfying Respondent.

This allegation, in and of itself, does not implicate a Whitman College policy. However, the panel determined that establishing a finding of fact related to the allegations could impact the evaluation of subsequent charges. Respondent acknowledged much of the conduct alleged by Complainant. Regarding the statement Respondent refuted, the panel determined that Complainant's credibility was superior due to Respondent's lack of memory and the alignment of Complainant's description with that of Witness C's experience with Respondent. Witness C described that Respondent indicated that it was Witness C's fault that Respondent was aroused and Witness C "need[ed] to deal with it."

The panel determined that this evidence was sufficient to sustain a finding of fact that Respondent used verbal pressure when sexually interacting with Complainant, and that Whitman College policy was implicated by virtue of the College's prohibition of Forcible Rape. Because "force" can include coercive conduct, including excessive verbal pressure, this allegation is analyzed further under Charge 10.

### Charge 8 - Putting His Hands Inside Complainant[4]

Complainant said that Respondent digitally penetrated Complainant's vagina without consent.

Respondent acknowledged digitally penetrating Complainant's vagina, but denied it was nonconsensual.

If sustained, the allegation could implicate the College's prohibition of Forcible Rape.

The allegation is analyzed below.

### Finding - Not Sustained

Complainant said Respondent "put [his] fingers inside me without asking." Respondent did not deny digitally penetrating Complainant, but believed it was consensual. Complainant described their earliest

---

[4] The report uses the phrase "put his hands inside Complainant" to describe Respondent digitally penetrating Complainant's vagina.

impression of Respondent's physical behavior as "dominant," which Complainant said they initially enjoyed, but became alarmed as the behavior became more physical and aggressive. Further, Complainant said that for the times that activity between the parties was consensual, Complainant "just did not say no." Complainant indicated that they spoke to Respondent afterward about behavior that was not okay. Complainant described several acts for which she confronted Respondent, indicating that he was too rough or too aggressive, but digital penetration was not among these topics.

Testimony from Complainant indicated Complainant enjoyed sexually interacting with Respondent but did not want to engage in penetrative sex with Respondent (penis-to-vagina). There is no evidence to indicate that Complainant withdrew consent to digital penetration, expressed concern or anger about Respondent's digital penetration of Complainant, or spoke to any witness about nonconsensual digital penetration. Complainant did speak about other acts, both in confronting Respondent and in discussing Respondent's behavior with witnesses, and nonconsensual digital penetration was not one of these acts. There is, however, evidence that Complainant continued to engage in sexual activity with Respondent, which presumably included digital penetration, even in instances where Respondent digitally penetrated Complainant, thereby ratifying Respondent's consensual digital penetration of Complainant.

The panel determined that, based on this evidence, the allegation could not be sustained by a preponderance of the evidence.

### Charge 9 - Subjecting Complainant To Nonconsensual Oral Sex
Complainant alleged that Respondent forced Complainant to perform oral sex on Respondent in one instance, and forced Complainant to allow Respondent to ejaculate in Complainant's mouth in a second instance after Complainant had expressed to Respondent that they did not want Respondent to ejaculate in their mouth. Complainant said that during the second incident, Respondent held Complainant's head down so that Complainant could not pull away and Respondent ejaculated in Complainant's mouth.

Respondent denied ever forcing Complainant to perform oral sex on him. Respondent acknowledged having a conversation with Complainant after Complainant performed oral sex on Respondent, where Complainant indicated to Respondent that he was holding Complainant's head down with too much pressure and that Complainant did not want Respondent to ejaculate in Complainant's mouth, which Respondent had done. Respondent said that despite the conversation with Complainant regarding Respondent's ejaculation during oral sex, he accidentally ejaculated in Complainant's mouth.

If sustained, the allegation could implicate the College's prohibition of Forcible Rape.

The allegation is analyzed below.

### Finding - Sustained
Complainant said they told Respondent they were not comfortable "sucking [Respondent's] dick." Complainant said they said "Listen, I don't want to do that. Not comfortable doing that. It takes me a long time to get comfortable doing that. I don't want to." Complainant said Respondent said "okay" and subsequently "shoved [Complainant] onto [their] knees" and forced Complainant to perform oral sex on Respondent. Complainant said after this interaction, Complainant told Respondent that the experience was "uncomfortable" and that "I told you I didn't want to and you did anyway." Complainant said Respondent apologized. After this experience, Complainant said they stopped resisting Respondent's requests for oral sex.

Exhibit 3 Page 10 of 14

Complainant also indicated that they told Respondent they did not want Respondent to ejaculate in Complainant's mouth, but Respondent pushed Complainant's head down so they could not pull away. Complainant said the first time it happened was not consensual because Complainant explicitly told Respondent not to ejaculate in their mouth. Complainant said Respondent apologized, and Complainant consented to allowing Respondent to ejaculate in their mouth in subsequent sexual interactions.

The parties agree that they discussed Complainant's displeasure with Respondent holding Complainant's head down with "too much pressure" while Complainant performed oral sex on Respondent. The parties also agree that they discussed the fact that Respondent ejaculated in Complainant's mouth against Complainant's will. The parties disagree that Complainant explicitly denied consent to performing oral sex on Respondent, and that Respondent intentionally forced Complainant to perform oral sex or forcibly ejaculated in Complainant's mouth by holding Complainant's head in place.

Complainant's allegation is generally corroborated by Complainant's description of Respondent's use of physical force to restrain and control Complainant against their will, which the panel determined was sustained by a preponderance of the evidence. The allegation is further corroborated, generally, by testimony from multiple witnesses who recalled contemporaneous conversations with Complainant regarding Respondent's nonconsensual sexual acts with Complainant, although forced oral sex was not specifically mentioned by any witness.

Additional corroboration of the allegation came from the alignment between Complainant's description and that of Witness C, who credibly described a similar interaction with Respondent. Witness C said Respondent pushed Witness C's head onto Respondent's penis and told Witness C, "You're the one that got me so turned on. This is your fault. You need to deal with it." As discussed above, Witness C's credibility is bolstered by the fact that Witness C desired to continue to romantically engage with Respondent, making her description of the experience of being forced to perform oral sex credible because the conduct was not unwelcome and Witness C did not report Respondent. Finally, Respondent acknowledged discussing Complainant's displeasure with Respondent's behavior, further corroborating Complainant's description.

The panel concluded that the relevant available evidence, including some statements made by Respondent, tended to corroborate Complainant's description of the allegations. The panel subsequently determined that the preponderance of the evidence supported a conclusion that Respondent forced Complainant to perform oral sex on Respondent despite Complainant's express desire not to perform oral sex on Respondent.

The panel further concluded that Respondent forcibly ejaculated in Complainant's mouth, despite Complainant's express objections and without Complainant's consent. These findings of fact align with the elements of Whitman College's prohibition of Forcible Rape, and Respondent is therefore responsible for violating the policy prohibiting Forcible Rape.

### Charge 10 - Engaging In Nonconsensual Sex With Complainant

Complainant alleged that the first time Complainant and Respondent engaged in sexual intercourse it was not consensual. Complainant said that she relented to Respondent's frequent advances due to "coercion, physical, and verbal pressure."

Respondent denied the allegation and said that he believed the interaction was "completely consensual."

If sustained, the allegation could implicate the College's prohibition of Forcible Rape.

The allegation is analyzed below.

**Finding - Sustained**

At the hearing, Respondent described being engaged in kissing and touching behaviors with Complainant when Respondent asked Complainant if the parties could have sexual intercourse. Respondent said Complainant said "yes." Complainant agreed that they gave a verbal affirmative response to Respondent's question, but said they said "okay" or "fine." The investigation report indicated that Complainant recalled saying "Okay, fine. I'll do it."

Complainant believed their verbalized affirmative response was not consent and argued during the investigation and the hearing that Respondent's coercive behavior, including verbal pressure and physical aggression, caused Complainant to believe they had no choice but to agree to Respondent's request for sexual intercourse. The panel found, consistent with Charge 7, that Complainant's allegation that Respondent used verbal pressure when sexually interacting with Complainant was supported by a preponderance of the evidence. The panel also found that the preponderance of the evidence supported a conclusion, consistent with Charge 2 and Charge 4, that Respondent was physically violent and aggressive, such that Respondent displayed a willingness and ability to use physical force to restrain, control, and abuse Complainant.

As discussed in the analysis of Charge 9, multiple witnesses testified to contemporaneous conversations with Complainant regarding the generally nonconsensual nature of Complainant's sexual experiences with Respondent. The most persuasive testimony was that of Witness G, who was Respondent's former sexual partner and testified at the hearing that they believed Complainant was lying. Nevertheless, when speaking to the investigator, Witness G indicated that, in conversation with Respondent, Respondent expressed to Witness G that, "he sort of realized that maybe there were things that he didn't know were non-consensual." Witness G reviewed and approved the transcript of her conversation with the investigator, and one month later, emailed to request a revision and retraction of her previous statements regarding Respondent acknowledging the potentially nonconsensual state of his interactions with Complainant. During the hearing, Witness G acknowledged that Respondent's advisor recommended she clarify statements made to the investigator. Witness G testified at the hearing that Respondent's advisor spoke with Witness G about how to revise her statement and reviewed the revisions via email before Witness G emailed them to the investigator. The panel determined that Witness G's original statements were credible and relevant, and that Witness G's revised and retracted statement was not credible due to the extended period of time between the two statements, Witness G's original approval of her statement, and Respondent's Advisor's role in revising and retracting Witness G's statement.

The panel further determined that there was sufficient evidence as described in the analysis of Charge 7 to demonstrate, by a preponderance, that Respondent's verbal pressure constituted coercion as defined by Whitman College policy. The policy indicates that "[w]hen someone makes clear that they do not want to engage in certain sexual activity, that they want to stop, or that they do not want to go past a certain point of sexual interaction, continued pressure beyond that point **can** be coercive [emphasis added]." Complainant credibly described their interactions with Respondent as a "constant conversation" that Complainant had to "continually come up with excuses on why I didn't want to have sex." Complainant described that, in the two days prior to the day Respondent penetrated

Complainant's vagina with his penis, Complainant was able to come up with excuses related to school activities to convince Respondent to physically and verbally disengage. Complainant said they became "tired" of Respondent's constant requests, which they characterized as "do it, do it, do it, do it" and "what's the difference between later and now," and ultimately gave in.

Complainant credibly described Respondent's forceful physical interactions with Complainant as the other reason Complainant ultimately gave in to Respondent's overtures. Complainant said that they felt like they "physically couldn't get him away from me or get him off of me." Complainant said, and the panel agreed, that Respondent had already demonstrated a willingness and ability to force his will upon Complainant, and Complainant feared that continuing to deny sexual access to Respondent would result in him physically, and perhaps violently, forcing himself upon Complainant. Respondent's proclivity for physical aggression and violence, as demonstrated by the panel's findings in analysis of Charges 2, 4, 5, and 9, supported Complainant's assertion.

The panel considered Complainant's credible description of Respondent's verbal pressure, as well as Respondent's tendency to engage Complainant with excessive physical force, when evaluating whether the pressure Respondent put on Complainant for sexual access was sufficient to meet the policy definition. The panel also considered the frequency and intensity of Respondent's requests for sexual access, as acknowledged by the parties.

The panel concluded that the preponderance of the evidence supported a conclusion that Complainant did not consent to sexual intercourse of their own volition but instead relented to Respondent's request as a result of unreasonably frequent and intense verbal pressure, combined with Respondent's demonstrated willingness to physically and aggressively interact with and control Complainant. Consent is invalidated by the application of force, and Respondent used coercive force to engage in sexual penetration of Complainant. Therefore, the panel concluded that Respondent violated Whitman College's policy prohibiting Forcible Rape.

### Sanctions Assigned

The panel determined that Respondent was responsible for multiple violations of Whitman College's prohibition of Dating Violence and Forcible Rape.

When considering appropriate sanctions, the panel reviewed the sanctioning statement submitted by Respondent, and considered Respondent's statements that Respondent had grown and matured since the time frame in which the alleged conduct occurred. The panel also considered Complainant's statements at the hearing, including Complainant's inability to continue a successful academic career and ultimate decision to withdraw from college.

The sustained policy violations relate to some of the most egregious forms of conduct prohibited by Whitman College. Therefore, the panel determined that Respondent should be expelled from Whitman College. Further, the panel encourages Whitman College to evaluate Complainant's ability to return to Whitman to continue their academic pursuits, and to address appropriate remedies that will pave a path for their potential return.

**Hearing Panel Members:** Joseph Vincent, Melissa Clearfield, Noah Leavitt

**Date:** Feb 13, 2023

**Chairperson Signature:** _____

# Exhibit 4



Solutions for Schools
& Families

February 23, 2023

***Sent via email (pdf attachment) to beccaic@whitman.edu***

Cassandre Beccai
Title IX Coordinator
Whitman College
345 Boyer Ave
Walla Walla, WA 99362

      **Re:** ▮▮▮▮▮▮▮▮▮ **Notice of Appeal of 2/13/2023 Title IX Statement of Finding**

Dear Ms. Beccai:

As the legal counsel and Title IX advisor for ▮▮▮▮▮▮▮ ("Respondent"), we hereby submit this Notice of Appeal of the February 13, 2023 Whitman College Title IX Statement of Finding ("Title IX Finding"). This appeal is submitted pursuant to the instructions and deadline set forth in Ms. Beccai's related February 13th Notice of Hearing Outcome, as well as the Whitman College Title IX Policy she emailed to Respondent's Advisor on February 13th after I requested same.

## I.    <u>INTRODUCTION</u>

Respondent, as the party to the Title IX Finding, may appeal said finding based on the following grounds:

> 1. Procedural irregularity that affected the outcome of the matter;
> 2. New evidence that was not reasonably available at the time the determination regarding responsibility or dismissal was made, that could affect the outcome of the matter; and
> 3. The Title IX Coordinator, investigator(s), or decision-maker(s) had a conflict of interest or bias for or against complainants or respondents generally or the specific complainant or respondent that affected the outcome of the matter.[1]

The Title IX hearing, not to mention the underlying investigation, is replete with errors that require the Title IX finding be reversed, with a finding that all of Complainant's allegations are "not sustained." The readily apparent grounds for this appeal arise from the hearing panel (1)

---

[1] *See* Whitman College Title IX Policy (eff. 08/14/2020), unnumbered p. 8, emailed by Ms. Beccai to Respondent's Advisor 02/13/2023.

Cedar Law PLLC
113 Cherry St   PMB 96563
Seatt e  WA 98104-2205
ara@cedar awp  c com
206 607 8277 (off ce)
206 237 9101 (fax)

Exhibit 4 Page 1 of 29

Page 2 of 10
February 23, 2023
█████ Appeal re 2/13/23 Whitman Title IX Finding

prohibiting Respondent from introducing evidence of and asking questions of Complainant's mental health during the relevant time period even though their self-described unmedicated bipolar disorder informs the credibility of the allegations; (2) relying upon Witness G's recanted statements while rejecting Witness G's corrective and clarifying statement and information; (3) relying upon Witness C's alleged negative sexual encounter with Respondent while barring from consideration Witness G's evidence of past positive sexual encounters with Respondent; and (4) accepting and adopting the investigator's procedurally improper conclusions and recommendations in arriving at their Title IX Finding.[2]

Moreover, Witness A has provided new testimony not previously available because she was intimidated by the Complainant, which chilled her participation in the process.[3] As set forth in her attached sworn testimony, Witness A has first-hand observations as to how Complainant's mental health condition contributed to their failing out of Whitman – not because of Respondent, as Complainant testified – and how the Complainant completely and incredibly changed their position regarding their relationship with Respondent between October to November 2021.

Finally, the sanction currently recommended – expulsion from Whitman College within weeks of graduation for contested allegations that took place in a consensual relationship from freshman year – is entirely disproportionate to the allegations and unaligned with the rehabilitative (not punitive) purpose of Title IX and should thus be vacated.

## II.    APPEALABLE ISSUE NO. 1: PROCEDURAL IRREGULARITY & NEW EVIDENCE (PROHIBITION AND EXCLUSION OF EVIDENCE REGARDING COMPLAINANT'S MENTAL HEALTH AND INQUIRY RELATED THERETO)

On November 30, 2022, Respondent submitted to the Investigator, Trish Murphy, his Response to the Investigator's draft Report. Included in Respondent's Response, he cited Complainant's interview statement in which they put their mental health at issue. This went and goes to Complainant's credibility regarding the various allegations they asserted against Respondent.

During Complainant's interview, they stated:

> **I am bipolar. I'm also on medication and I wasn't on medication at the time. So I did have manias and depressions.** But I'm on medication now and I've been on medication for a year and I feel like I should say that.[4]

---

[2] Further to the foregoing, as well as to this appellate proceeding, it is critically important that the Title IX appeal panel/personnel have a clear understanding of the underlying matter and, as Respondent's Nov. 30, 2022 Response to the Investigator's Draft Report, directly speaks to those errors, we enclose same herewith.

[3] Respondent submits the Declaration of █████ (identified in the Title IX proceedings, as well as further in this appeal, as Witness A), which is enclosed herewith.

[4] Appendix M, p. 39.

Cedar Law PLLC
113 Cherry St   PMB 96563
Seatt e  WA 98104-2205
ara@cedar awp  c com
206 607 8277 (off ce)
206 237 9101 (fax)
Exh bit 4 Page 2 of 29

Page 3 of 10
February 23, 2023
█████ Appeal re 2/13/23 Whitman Title IX Finding

Considering that Complainant admitted that they were bipolar and were not on medication at the time of the alleged – and patently false – events with Respondent, consideration by the hearing panel of such evidence was warranted. However, Respondent was not allowed to introduce evidence about or otherwise question Complainant about their mental health at the hearing. The Chair of the underlying hearing, Joseph Vincent, prohibited any such evidence or questioning, as detailed below. Furthermore, according to the new testimony of Witness A - Complainant's roommate from the time period during which they dated Respondent – it was Complainant's mental health condition, and not their consensual relationship with Respondent, that resulted in their failing out of Whitman. Moreover, as recently as October 2021, Complainant told Witness A that they did not believe that Respondent had abused them in any way. This perspective shifted and changed during a period when Complainant told witness A they were off their bipolar medication.

On January 10, 2023, Ms. Beccai emailed Respondent and his advisor, among others. Ms. Beccai stated in part:

> While the Title IX Hearing Procedure Summary & General Order of Hearing document serves to provide guidance regarding the proceedings, it does not supersede the Chair's preferences and guidance. During the pre-hearing meeting with Joseph Vincent, the Hearing Chair, he will review the agenda with specifics about the actual procedure that will apply to the hearing.

(Declaration of Respondent, enclosed herewith.)

On January 17, 2023, Mr. Vincent and Ms. Beccai held a virtual prehearing meeting with the Respondent and his advisor. (*Id.*) During that meeting, Respondent's advocate asked Mr. Vincent if the panel would allow evidence of Complainant's mental health to be raised and discussed during the impending hearing, as that squarely impacted Complainant's credibility. (*Id.*) However, Mr. Vincent said he was prohibiting any introduction, questioning and/or discussion of Complainant's mental health as irrelevant, including Complainant's very own admission that they were bipolar and unmedicated at the time of the incidents of which they accuse Respondent. (*Id.*) Accordingly, Respondent was disallowed in advance of the hearing from raising that issue or introducing such evidence during the proceedings. (*Id.*)

The Hearing Chair's prehearing prohibition of questioning surrounding Complainant's unmedicated bipolar condition during the time of the alleged events is a procedural irregularity as it deprived Respondent of the full due process to which he was and is entitled. Further and relatedly, it also automatically made evidence unavailable that Respondent could have otherwise introduced at the hearing due to the Hearing Chair's prehearing order; thus, there is new evidence available that was simply not available at the hearing because of that.

Witness A, who was previously intimidated from fully participating in the process and has material information related to how Complainant's mental health condition informed their allegations,

Cedar Law PLLC
113 Cherry St   PMB 96563
Seatt e  WA 98104-2205
ara@cedar awp  c com
206 607 8277 (off ce)
206 237 9101 (fax)
Exh bit 4 Page 3 of 29

Page 4 of 10
February 23, 2023
███████ Appeal re 2/13/23 Whitman Title IX Finding

states under penalty of perjury, among other things, that:

- Although Complainant asked Witness A to wake them up every morning because their phone was broken and they didn't have an alarm, Complainant eventually revealed to Witness A during freshman year that they simply were not attending class and were going back to bed after she left the dorm. Looking back, it appeared they were having a depressive episode related to their mental health, and Complainant would talk about being depressed but they were not diagnosed or medicated at that time.
- Complainant was often erratic and unreliable and would dramatically change their feelings and perspective about an event months after it happened.
- Witness A is shocked to hear that Complainant is now blaming Respondent for why they dropped out of Whitman because they simply did not attend class and that is why they failed. Respondent and Witness A had even brainstormed strategies to help Complainant because they were clearly going to fail out of school.
- Witness A first heard of the allegations against Respondent after Complainant heard about the email to the Whitman College men's soccer team. In the fall of 2021, Complainant called Witness A and – like she did in texts to Respondent – denied that Respondent had abused them in any way.
- In mid-October 2021, right before they posted on Instagram saying that Respondent raped them, Complainant called Witness A and stated they were not taking their bipolar medication; they did not want to wait in line at the busy Walgreens to get more; and that Complainant had changed their mind and decided that they had in fact been abused by Respondent. During that call Complainant was speaking quickly and erratically and Witness A was concerned they were experiencing a manic episode especially since they were making such outrageous allegations that departed from their position over the last two years about Respondent.
- Witness A feels very strongly that Complainant has rewritten history and made false allegations about Respondent and asks the school to look at these allegations through a mental health lens and realize that Complainant is simply not telling the truth.

Had Respondent, as well as the hearing panel, been allowed to question Complainant (and others) regarding Complainant's past and current recollection of, and even the ability to recollect, their relations with Respondent, evidence would have been developed and been considered surrounding their credibility.

This prejudicial prehearing ruling is made even more egregious because Complainant themselves made mental health part and parcel of the actual hearing. For instance, Complainant stated during the closing, "It's true that I've always struggled with mental health." ((███████████ Hearing.(10:38 am) recording; starting at approximate running time mark 2:45:10.) In other words, while the hearing panel could empathize with and be swayed by Complainant's mental health in arriving at their findings, Respondent was denied the ability to substantively raise or discuss Complainant's mental health at the hearing. Quite simply, the Hearing Chair's prehearing decision to disallow questioning and the development of evidence regarding Complainant's mental health

Cedar Law PLLC
113 Cherry St  PMB 96563
Seatt e  WA 98104-2205
ara@cedar awp  c com
206 607 8277 (off ce)
206 237 9101 (fax)
Exh bit 4 Page 4 of 29

Page 5 of 10
February 23, 2023
█████ Appeal re 2/13/23 Whitman Title IX Finding

prejudiced Respondent from a full and fair hearing.

During the course of the investigation, consequently and relatedly, Respondent was also denied by the Investigator and at the hearing the inclusion of psychological expert Dr. Stacy Cecchet, which also amounts to new evidence that was not available at hearing.[5] Dr. Cecchet's anticipated expert opinion would have been used to examine, among other things, the impact of Complainant's unmedicated bipolar disorder on the credibility of their allegations. But since Complainant's mental health is/would have been a foundational issue for the expert's opinion, and it was prohibited from being considered as such an issue, including as to credibility, at the hearing, then Respondent was precluded from having Dr. Cecchet participate in the proceedings.

Accordingly, based on the foregoing alone, the Title IX Finding must be reversed, with a finding that none of Complainant's claims are sustained, due to procedural irregularity and the failure during both the investigation and the hearing to allow this new evidence.

### III. APPEALABLE ISSUE NO. 2: PROCEDURAL IRREGULARITY (IMPROPER RELIANCE ON WITNESS G'S RECANTED INTERVIEW STATEMENT AND RELATED EXCLUSION OF WITNESS G'S CLARIFYING EVIDENTIARY STATEMENT AND INFORMATION)

The hearing panel committed clear procedural error/irregularity when it improperly relied upon Witness G's recanted interview statements and relatedly disregarded Witness G's subsequent clarifying evidentiary statement and related information. The Title IX Finding reads:

> The most persuasive testimony was that of Witness G, who was Respondent's former sexual partner and testified at the hearing that they believed Complainant was lying. Nevertheless, when speaking to the investigator, Witness G indicated that, in conversation with Respondent, Respondent expressed to Witness G that, "he sort of realized that maybe there were things that he didn't know were non-consensual." Witness G reviewed and approved the transcript of her conversation with the investigator, and one month later, emailed to request a revision and retraction of her previous statements regarding Respondent acknowledging the potentially nonconsensual state of his interactions with Complainant. During the hearing, Witness G acknowledged that Respondent's advisor recommended she clarify statements made to the investigator. Witness G testified at the hearing that Respondent's advisor spoke with Witness G about how to revise her statement and reviewed the revisions via email before Witness G emailed them to the investigator. The panel determined that Witness G's original statements were credible and relevant, and that Witness G's revised and retracted statement was not credible due to the extended period of time between the two statements, Witness G's original approval of her statement,

---

[5] Dr. Cecchet's CV was included with Respondent's Nov. 30, 2022 Response to the Investigator's draft Report, and it is identified as a document entitled "CV Person 24 Redacted," in the subfolder "11-30-22 Items," in the folder "Other Evidence," all of which were compiled and provided to the parties and the hearing panel by the investigator.

Cedar Law PLLC
113 Cherry St   PMB 96563
Seatt e  WA 98104-2205
ara@cedar awp  c com
206 607 8277 (off ce)
206 237 9101 (fax)
Exh bit 4 Page 5 of 29

and Respondent's Advisor's role in revising and retracting Witness G's statement. [Title IX Finding, p. 12.]

Besides being substantively inaccurate as to what Witness G actually stated during the Title IX hearing, the hearing panel's decision to discount Witness G's subsequent clarifying statement and information while giving credibility to statements she actually recanted is procedurally improper.

On September 29, 2022, Witness G emailed the investigator regarding her prior interview and transcript.[6] Witness G's email stated quite clearly in its opening:

> I apologize for this delayed follow up, but I wanted to clear up a couple of things from my interview. After having ample time to reflect on all of this, and after reviewing my interview transcript, there are two things I want to clarify, and one thing I would like to add.

In her September 29, 2022 third party witness statement email, Witness G clearly states that she wanted to "retract" and have removed from the transcript her prior statement that she suggested a bruise on Complainant may been the result of violence on Respondent's part; she wanted to "refine" her statement in the transcript regarding choking; and that she wanted to add a further explanation regarding the end of her relationship with Complainant. (*Id.*)

However, contrary to this, the hearing panel disregarded Witness G's repudiation of "… her previous statements regarding Respondent acknowledging the potentially nonconsensual state of his interactions with Complainant." The hearing panel instead decided that Witness G's prior statements were the "most persuasive testimony" in finding Respondent responsible for Engaging in Nonconsensual Sex with Complainant. Compounding that is the fact that the hearing panel claims that Respondent's Advisor recommended Witness G clarify statements made to the investigator and advised her on how to revise her statement. That is inaccurate.

In fact, and if one reviews the hearing recording, Witness G stated that after some time thinking about the transcript, she re-read it and was unhappy with how it looked (in other words, not satisfied with its accuracy) and wanted to clarify some things but was unsure if it was too late to do so, so she contacted Respondent's Advisor. (████████ Hearing.(10:38 am) recording; starting at approximate running time mark 2:13:17.) Witness G reiterated to the hearing panel that she herself reached out to Respondent's Advisor as she had been going over her own statement and was unhappy with it (*Id.*, starting at approximate running time mark 2:14:34; see also approximate running time mark 2:15:12.), and also that she had done so because she was not sure if she was allowed to follow up with the investigator. (*Id.*, starting at approximate running time mark 2:36:15.) Witness G specifically informed the hearing panel that Respondent's Advisor did not help write her September 29, 2022 statement and that, "It's entirely my own." (*Id.*, starting at approximate running time mark 2:14:34.)

---

[6] Appendix Y, pp. 15-17.

Cedar Law PLLC
113 Cherry St  PMB 96563
Seatt e  WA 98104-2205
ara@cedar awp  c com
206 607 8277 (off ce)
206 237 9101 (fax)
Exh bit 4 Page 6 of 29

Considering the foregoing, and so that there remains no confusion as to how and why Witness G recanted and clarified her prior statement to the investigator, enclosed is a Declaration from Witness G submitted under penalty of perjury addressing that issue. However, the actual investigative record and hearing recording themselves demonstrate that although Witness G recanted and clarified her original statement to the investigator, the hearing panel improperly accepted her prior statements as credible and gave no credibility to Witness G's subsequent September 29, 2022 emailed statement. This is complete and utter procedural irregularity that also requires the Title IX Finding be reversed, with findings that Complainant's allegations are not sustained.

Should there be any doubt about how Witness G's testimony should be construed, she provides unequivocally and under oath:

> I sincerely hope that the University will allow me to recant any part of my interview that implicated Respondent as guilty. I feel that my statement was misconstrued and it is entirely inaccurate to rely on my testimony for any purpose but to exonerate Respondent from these false allegations.

## IV.    APPEALABLE ISSUE NO. 3: PROCEDURAL IRREGULARITY (IMPROPER ADMISSION OF AND RELIANCE UPON WITNESS C'S INTERVIEW STATEMENT)

Yet another procedural irregularity that requires the Title IX Finding be reversed and not sustained is the improper inclusion and consideration of Witness C's evidentiary statement, as well as any information in these proceedings from any other source – Complainant, witnesses and documents – regarding Respondent's alleged non-consensual encounter with Witness C unrelated to the allegations by Complainant.

The hearing panel sustained Charges 5, 7, and 9, as well as Charge 10 (which incorporates the evidence and reasoning from Charge 9), against Respondent based, in large part, on Respondent's purported similar sexual interaction with Witness C. Accordingly, Respondent is essentially being held responsible for allegedly engaging in nonconsensual sex with two people: (1) the actual Complainant, where there has been a formal, yet procedurally flawed, investigation and hearing and (2) Witness C, where there has not been any actual investigatory process conducted as required under Whitman policy, not to mention the law. This is compounded by the fact that the hearing panel relied upon Witness C's own statement to essentially find a course of conduct by Respondent, which leads to the unsupported findings of Charges 5, 7, 9 and 10 arising from the one and only complaint under consideration in this matter – that of Complainant. This is procedurally improper and fundamentally unfair.

Compounding the hearing panel's reliance on Witness C's statement as acceptable, relevant information is the fact that the Hearing Chair interrupted and prohibited Witness G during the

Cedar Law PLLC
113 Cherry St  PMB 96563
Seatt e  WA 98104-2205
ara@cedar awp  c com
206 607 8277 (off ce)
206 237 9101 (fax)
Exh bit 4 Page 7 of 29

hearing from continuing to speak on her prior positive sexual interactions with Respondent based on irrelevance. (████████ Hearing.(10:38 am) recording; starting at approximate running time mark 2:39:15.) The Hearing Chair interrupted Witness G and specifically stated, "It's [Witness G's statements regarding her prior positive sexual interactions with Respondent] not particularly relevant to this inquiry." (*Id.*) This barred Witness G from being able to expound on her prior positive interactions with Respondent.[7]

Accordingly, not only did the hearing panel improperly admit, consider and rely upon Witness C's alleged <u>negative</u> sexual interaction with Respondent to support the Title IX Finding, but the panel also denied Respondent the fundamentally fair ability to introduce and allow questioning regarding Witness G's <u>positive</u> sexual interactions with Respondent. This is yet another example of demonstrable procedural irregularities in how the hearing was conducted, and therefore the Title IX Finding must be reversed, with findings of not sustained.

## V.    APPEALABLE ISSUE NO. 4: PROCEDURAL IRREGULARITY (THE INVESTIGATOR'S IMPROPER CONCLUSIONS AND RECOMMENDATIONS WERE ADOPTED BY THE HEARING PANEL)

A final procedural irregularity is that the investigator engaged in providing conclusions and recommendations, essentially engaging in confirmation bias – which she couched as "credibility considerations" – that are prohibited from consideration according to policy, but which in turn the hearing panel adopted regardless. Whitman's Title IX Policy states in relevant part,

- The investigator(s) gather, assess, and synthesize evidence, but make no conclusions, engage in no policy analysis, and render no recommendations as part of their report.

(Whitman College Title IX Policy, unnumbered p. 23.)

In both the draft and final investigation report, the investigator made, among others, the following conclusions and recommendations as she attempted to confirm Complainant's allegations so that they would be sustained by the hearing panel:

- As detailed in Section VIII above, witnesses corroborated: (a) seeing a bruise or mark on Complainant's face or neck[8]; (b) Complainant talking to them about a bruise or mark; and (c) Complainant telling them about nonconsensual activity with Respondent.
- Like Complainant, Witness C contended that Respondent subjected her to nonconsensual sexual activity. If the decision maker finds Witness C's testimony to be credible, then it

---

[7] *See also* "Witness G info emailed to investigator 11-29-22," in the subfolder "11-30-22 Items," in the folder "Other Evidence," all of which were compiled and provided to the parties and the hearing panel by the investigator.

[8] For example, it should be noted that the Investigator's conclusion and recommendation that "witnesses corroborated … seeing a bruise or mark on Complainant's face or neck," which is and was her subjective opinion, is undercut by the fact that Witnesses C and K provided conflicting and uncertain statements about that very issue. This was pointed out in Respondent's 11/30/22 Response to the Investigator's Draft Report which, again, is included herewith.

Cedar Law PLLC
113 Cherry St  PMB 96563
Seatt e  WA 98104-2205
ara@cedar awp  c com
206 607 8277 (off ce)
206 237 9101 (fax)
Exh bit 4 Page 8 of 29

may lend credibility to Complainant's testimony due to the similarities in the conduct described.

This issue was raised, and the investigator's improper conclusions and recommendations discussed, at page 21 of Respondent's Nov. 30, 2022 Response to the draft investigation report, which is included. As is evident, Respondent's objections were clearly stated but ignored by the Investigator.

Consequently, the Title IX Finding demonstrates that the hearing panel adopted the investigator's conclusions and recommendations as to the foregoing. First, as to witnesses corroborating Complainant's accounts, the hearing panel "… found this [Respondent's] explanation [regarding grabbing Complainant's face and leaving a bruise] implausible, because several witnesses noticed the bruise, including witnesses whose testimony was supportive of Respondent's." (Title IX Finding, p. 5.)

Second, the hearing panel – as regards Charge Nos. 5 and 9 (as well as those Charges which the hearing panel relied upon in sustaining these specific ones) – specifically relied upon the investigator's conclusions and recommendations regarding Witness C's purported interaction with Respondent to demonstrate "similarities in [Respondent's] conduct." For instance, the Title IX Finding reads with respect to Charge No. 5, "Complainant's credibility is bolstered by Witness C's description of a similar interaction with Respondent and is further bolstered by the context in which Complainant described the hair pulling…." (Title IX Finding, p. 8.) It also states regarding Charge No. 9, "Additional corroboration of the allegation [of nonconsensual oral sex] came from the alignment between Complainant's description and that of Witness C, who credibly described a similar interaction with Respondent." (Title IX Finding, p. 10.)

It was and is contrary to the Title IX Policy for the investigator to set forth conclusions and recommendations, especially in an effort to confirm Complainant's claims; label them as "credibility determinations;" and then have the hearing panel adopt the investigator's conclusions and recommendations. It is evident that the investigator's "credibility considerations" were an attempt to lead the hearing panel to certain conclusions/findings, which it did. Accordingly, this procedural irregularity – a clear violation of the Title IX Policy – requires reversal of the Title IX Finding.

## VI.    CONCLUSION

The Title IX Finding cannot stand because it rests upon a hearing that included myriad procedural irregularities, as well as the need to allow for the new evidence that was summarily prohibited from being introduced. Due to the seriousness of this matter, and especially considering the hearing panel found Respondent responsible for, among other things, the very serious Charge No. 10 (Engaging in Nonconsensual Sex with Complainant), and in turn determined that Respondent – with only about three (3) months left of his senior year at Whitman College – should be expelled, Whitman College's Title IX Policies and the foregoing fundamental procedural and evidentiary

Cedar Law PLLC
113 Cherry St   PMB 96563
Seatt e  WA 98104-2205
ara@cedar awp  c com
206 607 8277 (off ce)
206 237 9101 (fax)
Exh bit 4 Page 9 of 29

Page 10 of 10
February 23, 2023
███████ Appeal re 2/13/23 Whitman Title IX Finding

irregularities require that the charges that were sustained in the Title IX Finding be reversed and found as not sustained.[9]

Sincerely,

CEDAR LAW PLLC

Lara Hruska, WSBA No. 46531

encls. – 2/21/2023 Declaration of Respondent
2/20/2023 Declaration of Witness A
2/20/2023 Declaration of Witness G
Respondent's 11/30/2022 Response to Investigator's Draft Report

---

[9] At the very least, the very serious and significant procedural errors, as well as exclusion of evidence, requires that the Title IX Finding be vacated and the matter remanded for a new hearing before a completely different hearing panel pursuant to Whitman College's Title IX Policy. The hearing recording itself demonstrates quite clearly that the panel was motivated to support Complainant's version of events and that Respondent, if for some reason the Title IX Finding is only vacated and remanded for further hearing, would simply not receive a fair and impartial hearing before the same panel.

Cedar Law PLLC
113 Cherry St   PMB 96563
Seatt e  WA 98104-2205
ara@cedar awp  c com
206 607 8277 (off ce)
206 237 9101 (fax)
Exhibit 4 Page 10 of 29

I, ████ ████ am over the age of eighteen years, competent to testify, and declare that the following statements are based on my personal knowledge and true under the penalty of perjury under the laws of the State of Washington.

On January 10, 2023, Cassandre Beccai, Whitman College Title IX Coordinator, emailed me and my advisor, among others. Ms. Beccai stated in part:

> While the Title IX Hearing Procedure Summary & General Order of Hearing document serves to provide guidance regarding the proceedings, it does not supersede the Chair's preferences and guidance.  During the pre-hearing meeting with Joseph Vincent, the Hearing Chair, he will review the agenda with specifics about the actual procedure that will apply to the hearing.

On January 17, 2023, Joseph Vincent, the Whitman College Title IX Hearing Chair at my hearing, and Ms. Beccai, held a virtual prehearing meeting with me and my advisor, Lara Hruska. During that meeting, my advisor asked Mr. Vincent if the panel would allow evidence of Complainant's mental health to be raised and discussed during the impending hearing, as that squarely impacted Complainant's credibility. However, Mr. Vincent said he was prohibiting the introduction, questioning and/or discussion of Complainant's mental health as irrelevant, including Complainant's very own admission that they were bipolar and unmedicated at the time of the incidents of which they accuse me. Accordingly, I, through my Advisor, was disallowed in advance of the hearing from raising that issue or introducing such evidence during the proceedings.

I declare this 22nd day of February 2023 in Walla Walla, Washington that the foregoing is true under penalty of perjury under the laws of the State of Washington.

_____

████ ████

Exhibit 4 Page 11 of 29

I, Thalia Anastos, am over the age of eighteen years, competent to testify, and declare that the following statements are based on my personal knowledge and true under the penalty of perjury under the laws of the State of Washington.

I am a Whitman College student and was S███████████s roommate freshman year while they were dating ████████.

Because of my significant background and experiences with ████ and ████ at Whitman, I agreed to be interviewed on September 16, 2022 as part of an investigation that Whitman was conducting because of S████'s allegations against ████ of nonconsensual sex. Although I agreed to be interviewed, I was anxious to be more involved because of the accusations S████ posted against R████ on social media, and also because of S████s indirect post which was pretty clearly threatening me and anyone who spoke out against her false accusations against R████

So I limited my involvement in the Title IX process because of that. I also didn't want to speak badly about S████ since the investigator told me they would be able to see the transcript. After my interview, I felt that the investigator asked me somewhat biased questions that seems to have the goal of trying to find Rowan responsible for what Sophia accused him of but didn't ask some really crucial quesitons that could show he was innocent.

I did not want to testify at the hearing, but now that I've heard how the Title IX hearing played out, I feel that I have new information that the panel should consider and feel compelled to provide that information about my experiences and observations with S████

During my and S████s Freshman year there was no mention by them of sexual assault or abuse by R████; S████ would only complain about typical college relationship ups and downs.

Although they asked me to wake them up every morning because their phone was broken and they didn't have an alarm, S████ eventually revealed to me during freshman year that they simply were not attending class and were going back to bed after I left the dorm. Looking back, it appeared they were having a depressive episode related to their mental health, and S████ would talk about being depressed but they were not diagnosed or medicated at that time.

S████ was open about their diagnosis as unmedicated bipolar in their sophomore year and this was honestly aligned with their behavior the whole time I knew them. They would get very aggrivated by seemingly insignicant things and would cut people out of their life for things that seemed disproprotionate to the circumstance; S████ was often erratic and unreliable and would dramatically change their feelings and perspective about an event months after it happened.

For example in spring of sophomore year when I was still off-campus because of COVID rules, Sophia called me and told me to say she was ending her friendship with Alice because S████ still had feelings for R████ and was angry that R████ and Alice had hooked up. This followed

Exhibit 4 Page 12 of 29

S██████ telling Alice the previous fall that they were totally fine with them being together but S██████ had completely changed their mind and gotten enraged at what they decided after the fact was a betrayal bby Alice. This was shocking for me and Alice because S██████ was very mean and had so dramatically changed their position over just a period of months.

I am shocked to hear that S█████ is now blaming R█████ for why they dropped out of Whitman because S█████ simply did not attend class and that is why they failed. R█████ and I had even brainstormed straetgies to help them because they were clearly going to fail out of school.

I first heard of the allegations against R█████ after S█████ heard about the email to the Whitman College men's soccer team. In the fall of 2021, S█████ called me and expressed mostly curiousity and annoyance that someone was speaking on their behalf. They said that they never thought of their relationship with R█████ as abusive or nonconsensual but then had started wondering if maybe it actually had been worse than they remembered.

In mid-October 2021, right before they posted on Instagram saying that R█████raped them, S█████ called me and stated they were not taking their bipolar medication; they did not want to wait in line at the busy Walgreens to get more; and that S█████ had changed their mind and decided that they had in fact been abused by R█████ During that call S█████ was speaking quickly and erratically and I was concerned they were experiencing a manic episode especially since they were making such outrageous allegations that departed from their position over the last two years about R█████

I feel very strongly that S██████ has rewritten history and made false allegations about R█████ It's devastating that he is facing expulsion because of this. Even if S█████ seems to believe what they are saying, I think it's important for the school to look at these allegations through a mental health lens and realize that this person is simply not telling the truth.

I declare this 20th day of February 2023 in Walla Walla, Washington that the foregoing is true under penalty of perjury under the laws of the State of Washington.

Thalia Anastos

Exhibit 4 Page 13 of 29

I, ████████████, am over the age of eighteen years, competent to testify, and declare that the following statements are based on my personal knowledge and true under the penalty of perjury under the laws of the State of Washington.

On August 23, 2022 I was interviewed by an investigator for Whitman College who was investigating ████ ██████ claims that ██████ engaged in non consensual sex with them. As I told the Whitman Title IX hearing panel, although I had initially briefly reviewed the interview transcript and approved it, after some time thinking about the transcript, I re-read it and was unhappy with how it looked. I wanted to clarify some things but was unsure if it was too late to do so or not, so I spoke to ██████ Advisor, Lara Hruska, who told me it was important for the investigator to hear the whole truth from me and it wasn't too late to reach out to the investigator to revise my statement, which was not accurate as written.

On September 29, 2022, I emailed the Whitman investigator about my prior interview and transcript, and stated at the beginning of my email, "I apologize for this delayed follow up, but I wanted to clear up a couple of things from my interview. After having ample time to reflect on all of this, and after reviewing my interview transcript, there are two things I want to clarify, and one thing I would like to add." My entire September 29, 2022 email to the Whitman Investigator is set forth at pages 15-17 of Appendix Y (my transcript) of the Title IX record. I confirm that everything I stated in my September 29, 2022 email, which included me recanting statements made during my interview, is true and correct.

Finally, and as I also told the Title IX hearing panel, ██████ Advisor did not write my September 29, 2022 emailed statement – It is entirely my own.

I was very frustrated to learn that the investigator did not let me recant the part of my interview that made it sound like ██████ was somehow accepting blame for ██████ allegations. He was just trying to be thoughtful and reflective because he is a good person who has been accused of some terrible things.

I really cannot overstate how strongly I feel that these allegations are not true, that ██████ did not engage in the behavior he's been accused of, and that ██████ has recently made up these allegations after years of saying ██████ did not do anything of this kind.

I sincerely hope that the University will allow me to recant any part of my interview that implicated ██████ as guilty. I feel that my statement was misconstrued and it is entirely inaccurate to rely on my testimony for any purpose but to exonerate ██████ from these false allegations.

I declare this 20th day of February 2023 in Denver, Colorado that the foregoing is true under penalty of perjury under the laws of the State of Washington.

DocuSigned by:

████████████

796321BBC483419...

Exhibit 4 Page 14 of 29

Exhibit 5

March 22, 2023

Dear Mr. ████████████

Following a formal hearing on January 20, 2022, the Hearing Panel, using the preponderance of the evidence standard, found you, the Respondent, **responsible** for violating the following section(s) of the Whitman College Sexual Harassment, Discrimination and Sexual Misconduct Policy and Procedure:

**Part II Prohibited Conduct (A) Sexual Harassment (4) Dating Violence:** "violence, on the basis of sex, committed by a person, who is in or has been in a social relationship of romantic or intimate nature with the complainant. The existence of such a relationship will be determined based on the complainant's statement and with consideration of the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship. For the purposes of this definition    Dating violence includes, but is not limited to, sexual or physical abuse or the threat of such abuse. Dating violence does not include acts covered under the definition of domestic violence."

**Part II Prohibited Conduct (A) Sexual Harassment (3) Sexual Assault(a) Sex Offenses, Forcible; Forcible Rape:** "penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration without the consent of the complainant."

As a result of the finding, the Hearing Panel determined that the Respondent should be expelled from Whitman College as the sustained policy violations relate to some of the most egregious forms of conduct prohibited by Whitman College.

On February 23, 2023, you requested an appeal of the outcome. This appeal request was submitted within the specified timeframe.  You offered four reasons for this appeal on the grounds of procedural irregularities.

Those reasons listed were:

1. **Appealable Issue No. 1:** The Respondent contends that the Hearing Chair prohibited the Respondent from introducing "evidence about or otherwise question Complaint about their mental health" and that this prohibition constituted a procedural irregularity that prevented the Respondent from bringing forth relevant evidence.
2. **Appealable issue No 2:**  The Respondent contends that the "inclusion and consideration of Witness C's evidentiary statement" constituted a procedural irregularity as the Respondent was being held responsible for "allegedly engaging in nonconsensual sex with two people."
3. **Appealable issue No 3:** The Respondent contends that the Hearing Panel relied too heavily on Witness G's original statement and did not weigh properly Witness  G's second statement in which Witness G recanted some of their initial statements.
4. **Appealable issue No. 4:**  The Respondent contends that the investigator offered conclusions in the section of her report entitled "Credibility Considerations."

As part of my Review for Standing, I determined that neither Appealable issue No. 1 nor Appealable Issue No. 3 warranted further consideration.

Exhibit 5 Page 1 of 3

In regards to Appealable Issue No. 1:  It is the Hearing Chair's job to determine what evidence is admissible and not allowing the Complaint's mental health history to be introduced as evidence is consistent with the law. Thus, Appealable Issue No. 1 did not identify a procedural irregularity.

In regards to Appealable Issue No. 3:  Again, it is the Hearing Chair's job to determine what evidence is admissible and including testimony from a witness to identify a possible pattern in the Respondent's behavior is considered admissible evidence.  Thus, Appealable Issue No. 3 did not identify a procedural Irregularity.

But in my Review for Standing, I also determined that Appealable issue No. 2 and No. 4 did identify issues that might be considered procedural irregularities.  So, I convened an Appeal Panel to consider Appealable Issue No. 2 and Appealable Issue No. 4 on the grounds of procedural irregularity. The Appeal Panel consisted of me,  Rebecca Hanrahan (Appeal Chair), John Johnson and Andrew Johnson, all of whom have been designated by the Title IX Coordinator to complete an objective, impartial review of the appeal.  I notified the Complainant, their advisor, the Hearing Panel, and the Investigator of your request for an appeal and I invited them to comment on the Notice of Appeal. I received responses from the Chair of the Hearing Panel, the Investigator, the Complainant, and you, the Respondent, all of which I have included in the file attached to this letter.

After a thorough and objective review of the Notice of Appeal, the responses from the parties listed above, your response to these documents, Whitman College Sexual Harassment, Discrimination and Sexual Misconduct Policy and Procedure, and associated documentation and the records used to render the original decision, using again the preponderance of evidence standard, the Appeal Panel has decided to deny your appeal.

In regards to Appealable Issue No. 2: This is not a violation of any specific procedure within Whitman College Sexual Harassment, Discrimmination, and Sexual Miscondut Policy and Procedure.  It is the obligation of the Hearing Panel to decide on the relative credibility of the statements and evidence presented to them.  And it is not in the purview of the Appeals Panel to assess or overturn their judgements on such matters.

In regards to Appealable Issue No. 4:  Whitman's policy does prohibit the Investigator from drawing conclusions or making recommendations, but it does allow the Investigator "to gather, assess, and synthesize evidence." (See Part 1, section H of Whitman College's Grievance Resolution Process Sex/Gender Harassment, Discrimination and Sexual Misconduct.)  Attending specifically to the sections of the Investigator's report identified by the Respondent, the Appeals Panel can not identify anything that would be considered a conclusion, as opposed to an assessment and synthesis of the evidence. Moreover, while the Hearing Panel attended to the Investigator's report, their conclusion was made on a holistic consideration of the evidence presented to them and was not based solely on the Investigator's report.

For these reasons, we, the Appeals Panel, uphold the findings and the sanctions of the Hearing Panel.

This decision constitutes final institutional action regarding this matter. This matter is considered resolved.

If you have any questions or concerns, please feel free to contact me via email at hanrahrr@whitman.edu.

Exhibit 5 Page 2 of 3

Sincerely,

Rebecca Hanran

Appeals Chair

Whitman College

Cc: File

Exhibit 5 Page 3 of 3

# Exhibit 6

Home

# Student Rights and Responsibilities

⌄ MENU

## Office Information

 Memorial Building 325
345 Boyer Ave.

🕐 Summer Hours: 8 a.m. - 4 p.m.

📞 509-527-5158

All procedures and regulations are subject to change or revision from time to time. All updates to this policy will be posted in the online version with the change highlighted for three months and the date of modification noted. The online version is the most up to date one and will supersede all published versions with differing language. Students are responsible for knowing and following all regulations and procedures contained in this publication, as well as changes that occur and are published during the year.

## Shared Aspirations and Expectations

As written in its mission statement, "Whitman provides a rigorous liberal arts education of the highest quality to passionate and engaged students from diverse backgrounds." The policies and procedures related to student conduct exist to support this mission.

Policies listed in this section of the planner set the foundation of expectations of behavior for all students; however, consistent with the values of the college, and as members of the Whitman College community, students are expected to adhere to a higher standard of conduct than citizens at large. The

college assumes that students will demonstrate honesty and integrity in both academic and personal endeavors, and will act responsibly in ways that reflect consideration and respect for the rights of others.

## Statement of Rights

Every student has a right to conditions that are conducive to learning and favorable to the pursuit of higher education. These rights include freedom of speech, expression, and association; the right to study; the right to a safe and healthy environment; the right to pursue grievances; reasonable and fair processes in cases of student discipline; and the right to privacy.

Students have the right to inspect and review their education records according to certain prescribed procedures set forth by the Family Educational Rights and Privacy Act. Except in special cases proscribed by law, the college will not permit access to, or release of, education records containing personally identifiable information, without the student's written consent as stipulated by the Family Educational Rights and Privacy Act of 1974 (FERPA or Buckley Amendment).

The college publishes an online directory with students' names, addresses, email addresses, pictures, and phone numbers. A student has the right to have their preferred name reflected in the directory (see Name Change policy below for further information). A student has the right to withhold their information from these directories and can do so by notifying Bridget Jacobson in the Dean of Students Office, Memorial Building 325, 509-527-5158.

## Student Right To Know

Whitman College has included information that you need to know concerning the campus and its policies on its website. This information includes institutional information, alcohol policies, graduation dates, Family Educational Rights and Privacy Act (FERPA), services available to students with disabilities, institutional security policies, crime statistics and other information that you might find helpful. A printed copy of this information is available upon request from Bridget Jacobson in the Dean of Students Office, Memorial Building 325.

## Nondiscrimination Statement

Exhibit 6 Page 2 of 38

Whitman College has a strong commitment to the principle of nondiscrimination in all its forms. In its admission, educational and employment practices, programs and activities, Whitman College does not discriminate on the basis of race, color, sex (including pregnancy and parenting status), gender, gender identity or expression, genetic information, sexual orientation, religion, age, marital status, national origin, disability, veteran status or any other basis prohibited by the Civil Rights Act of 1964, Title IX of the Educational Amendments of 1972, Section 504 of the Rehabilitation Act of 1973 and applicable federal, state or local laws.

Inquiries regarding sex- or gender-based discrimination and disability discrimination may be directed to the Title IX Administrator (509-524-2049; titleix@whitman.edu). Inquiries regarding disability discrimination may be directed to the 504 Coordinator (509-522-4314, beccaic@whitman.edu). Inquiries regarding sex, gender or disability discrimination may also be directed to the Department of Education Office for Civil Rights (951 Second Avenue, Room 3310, Seattle, WA 98174; 206-607-1600).

All other inquiries can be directed to the Director of Human Resources (509-527-5172; hrdirector@whitman.edu).

## Title IX: A Short and Simple Law

*"No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance."*

Any person who believes that a member of the Whitman College community has been subjected to discrimination or harassment based on one's sex or gender or is engaging in behaviors that would constitute sex- or gender-based discrimination or harassment should discuss their concerns with the Title IX coordinator. For further information contact Thomas Witherspoon, vice president for Diversity and Inclusion, Title IX coordinator, Memorial Building 301, 509-524-2049, withertl@whitman.edu, or go to the Title IX website. See also the Sexual Harassment, Discrimination and Sexual Misconduct Policy.

## Name Change Policy

Whitman College recognizes that some members of its community use a name other than their legal name to identify themselves. As long as the use of this different name is not for the purpose of misrepresentation, the college allows students, faculty and staff to use a first name different than their legal name on certain college records. Students can submit a name change request in MyWhitman under the My Profile tab. Additional information about this policy is available online.

## Restroom and Gendered-Facility Usage Policy

All individuals are welcome to use the gender-neutral restrooms on campus. The Washington Law Against Discrimination (WLAD) specifically protects against discrimination in employment and places of public accommodation, based on one's gender expression or identity. The Washington State Human Rights Commission (HRC)—the state agency responsible for enforcing the WLAD—issued regulations in 2015 clarifying that the WLAD protects the right of trans* and gender non-conforming individuals to use restrooms and other gender-segregated facilities consistent with their gender identity. The college is in full support of all persons using gendered facilities such as locker rooms, showers and toilet facilities consistent with their gender identity. Further, persons needing additional support, such as private changing areas, etc., should contact the Dean of Students Office, Memorial Building 325, 509-527-5158 or the Human Resources Office, Memorial Building 104, 509-527-5172. Additional information about the Rights of Transgender Persons in the State of Washington can be found online. For additional information, see the Inclusion of Trans* Persons Policy.

## Disability Policy

Whitman College will not exclude otherwise qualified applicants or students with disabilities from participation in, or access to, its academics, housing or extracurricular programs. "Otherwise qualified" refers to students who without consideration of disability are admissible to the college. Program participation will not be denied to a student with a disability where that person, with or without accommodation, can perform the essential functions required of that program.

Students who need an accommodation because of a disability must provide documentation of their disability from a physician, learning specialist or other qualified professional. Students seeking accommodations for a disability must contact Antonia Keithahn, assistant director of Academic Resources:

Exhibit 6 Page 4 of 38

Access and Disability Support, Memorial Building 326, 509-527-5767, keithaam@whitman.edu. She will work with the student, faculty member and the appropriate department to arrive at a reasonable accommodation. Accommodation requests are reviewed on a case-by-case basis. Academic and behavioral standards and expectations will not be lowered in the process of accommodation.

Students who believe they have been denied program access or services must contact Cassandre Beccai, Director of Equity and Compliance, Title IX Coordinator, Memorial Building 301, 509-522-4314, beccaic@whitman.edu.

## Statement of Responsibility

All members of the campus community share the responsibility for maintaining a campus atmosphere that is conducive to teaching, studying, learning and working. Furthermore, all guests of the college must also comply with all rules and regulations. Each student shall be held individually responsible for conduct that adversely and seriously affects their suitability as a member of the Whitman community. Guests, like enrolled students, are responsible for their behavior within the expectations described within this handbook. Students who are hosting guests on campus are expected to ensure that their guests follow the college's rules and policies. Social regulations, of whatever origin, should ensure adequate consideration for the rights of individual students to privacy, and the preservation of their individual dignity and comfort, and should promote an atmosphere consistent with and in furtherance of the basic educational purpose of the college.

## Scope of the College's Discipline Process

Application of the college's disciplinary process extends to conduct that occurs on Whitman College premises or at any college-sponsored activities, and conduct that occurs away from campus if the conduct adversely and seriously affects the student's suitability as a member of the Whitman College community. Additionally, all students have the responsibility to obey federal, state, and local laws.

When an incident occurs away from campus, the Dean of Students, after consultation with the appropriate college officials, will determine whether the student will be subject to the discipline process outlined in this handbook. When a student is charged with a violation of federal, state, or local law, and

college disciplinary action is also taken, campus proceedings may be carried out prior to, simultaneously with, or following civil or criminal proceedings.

Although many people regard the college as a sanctuary because it is a private institution, police officers and other representatives of law enforcement agencies may come onto the Whitman College campus in pursuance of their duties. The college does not shield students from the customary enforcement of the law, nor does it prohibit law enforcement officers from conducting investigations and making arrests on campus. When possible, the college will rely on its internal resources to maintain order on campus and deal with campus problems.

In making determinations regarding application of this policy to the conduct of a student, the college will apply a reasonable person standard, that is, a reasonable person, is a neutral, rational individual without significant eccentricities who adheres to societal norms. Generally when applying a reasonable person standard the person is considered to be roughly the same age, sex and gender identity in the same or similar circumstances as the individual alleged to have engaged in conduct that may violate this policy.

All assessments of violation of this policy will be based on a Preponderance of the Evidence standard. That is, assessing all the available, reliable, relevant evidence and making a determination if it is more likely than not the evidence supports a violation of the policy. Other descriptors of preponderance of the evidence include "greater weight of the evidence" and "50+%."

345 Boyer Ave.
Walla Walla, WA 99362

General: 509-527-5111
Admission: 509-527-5176

APPLY

VISIT

REQUEST INFO

Bias Reporting

Grievance Policy

Nondiscrimination Policy

Right to Know

Title IX & Sexual Misconduct

© 2023 Whitman College. All Rights Reserved.

Privacy Policy        Whitman Online Terms of Service

Exhibit 6 Page 7 of 38



College Policy 1.0

---

**SEXUAL HARASSMENT, DISCRIMINATION, AND SEXUAL MISCONDUCT POLICY AND PROCEDURE**
**Applies to: Faculty, Staff and Students**

**PART I POLICY**

**(A) NON-DISCRIMINATION AND COLLEGE STANDARDS**

Whitman College is committed to providing a workplace and educational environment, as well as other benefits, programs, and activities, that are free from sexual harassment, discrimination, sexual misconduct and retaliation. To ensure compliance with federal and state civil rights laws and regulations, and to affirm its commitment to promoting the goals of fairness and equity in all aspects of the educational program or activity, the college has developed internal policies and procedures that provide a prompt, fair, and impartial process for those involved in an allegation of sexual harassment, sexual misconduct or retaliation that reflect college policy and are in compliance with the 2020 Title IX Regulations. Whitman values and upholds the equal dignity of all members of its community and strives to balance the rights of the parties in the grievance process during what is often a difficult time for all those involved.

Whitman College adheres to all federal, state and local civil rights laws prohibiting discrimination in employment and education. The college does not discriminate in its admissions practices, in its employment practices, or in its educational programs or activities on the basis of sex/gender. As a recipient of federal financial assistance for education activities, Whitman College is required by Title IX of the Education Amendments of 1972 to ensure that all of its education programs and activities do not discriminate on the basis of sex/gender. Sexual harassment, sexual assault, dating and domestic violence, stalking and sexual exploitation are prohibited under Title IX and by college policy. The law and college policy prohibit discrimination and harassment of employees or discrimination and harassment between members of the college community: for example, between an instructor and a student, between two students, or between a student and an applicant or campus guest.

Whitman College also prohibits retaliation against any person participating in good faith in any discrimination investigation or complaint process internal or external to the institution; for bringing a complaint of discrimination or harassment; for assisting someone with such a complaint; for attempting to stop discrimination or harassment.

Any member of the campus community, guest or visitor who acts to deny, deprive or limit the educational, employment, or social access opportunities and/or benefits of any member of the

Exhibit 6 Page 8 of 38

Whitman College community on the basis of sex is in violation of this policy.

Any person may report sex harassment, discrimination or other forms of sexual misconduct, whether or not the person reporting is the person alleged to have experienced the conduct. Reports may be made by telephone or email using the contact information listed below for the Title IX Coordinator. Reports can be made any time, including during non-business hours online at Access the Sexual Misconduct Reporting Form here or by calling campus security: (509) 527-5777.

This policy applies in all college programs and activities, including, but not limited to, discrimination in athletics, instruction, grading, and college employment. It is central to the values of the college that any individual who believes they may have been the target of unlawful discrimination or harassment feel free to report their concerns for appropriate investigation and response, without fear of retaliation or retribution.

Questions regarding Title IX or this policy, including its application and/or concerns about noncompliance, should be directed to the Title IX Coordinator. All complaints or any concerns about conduct that may violate this policy and retaliation should be filed with the college's Title IX Coordinator:

Title IX Coordinator
Whitman College
345 Boyer Ave
Walla Walla, WA 99362
(509) 524-2049
titleix@whitman.edu


**(B) SCOPE OF POLICY**

The purpose of this policy is the prohibition of sexual harassment, sexual misconduct and retaliation. When an alleged violation of this policy is reported, those allegations are subject to review and resolution using the college's grievance process related to this policy. When the respondent is a member of the Whitman community this grievance process will be available regardless of the status of the complainant, who may or may not be a member of the Whitman community. The Whitman community includes students (including dual enrolled students), student organizations, faculty, administrators, staff and third parties such as guests, visitors, volunteers, invitees and campers.

The grievance procedures may be applied to incidents, patterns of behavior and/or to the campus climate, all of which may be addressed and investigated in accordance with this policy.

**(C) DEFINITIONS**

- ***Actual Knowledge:*** Official notice of sexual harassment or misconduct allegations to the college's Title IX Coordinator or any other college official who has authority to institute corrective measures on behalf of the college.

- ***Advisor:*** A person chosen by a party or appointed by the institution to accompany the party to meetings related to the resolution process, to advise the party on that process, and to conduct cross-examination for the party at the hearing, if any.

Exhibit 6 Page 9 of 38

- **Complainant:** An individual who is alleged to be the victim of conduct that could constitute sexual harassment based on a protected class or retaliation for engaging in a protected activity.

- **Confidential Resource**: An employee who is not a mandated reporter of notice of harassment and/or retaliation.

- **Day:** A business day when the college is in normal operation.

- **Discrimination:** Conduct on the basis of sex/gender that excludes an individual from participation, denies the individual the benefits of, treats the individual differently or otherwise adversely affects a term or condition of an individual's employment, education, living environment or participation in a college program or activity.

- **Education program or activity:** Locations, events, or circumstances where the college exercises substantial control over both the respondent and the context in which the sexual harassment occurs and also includes any building owned or controlled by a student organization that is officially recognized by the college.

- **Final Determination**: A conclusion by a preponderance of the evidence that the alleged conduct did or did not violate policy.

- **Finding:** A conclusion by preponderance of the evidence that the conduct did or did not occur as alleged (as in a "finding of fact").

- **Formal Complaint:** A document submitted or signed by a complainant or signed by the Title IX Coordinator alleging sexual harassment or retaliation for engaging in a protected activity against a respondent and requesting that the college investigate the allegation.

- **Formal Grievance Process:** A method of formal resolution designated by the college to address conduct that falls within the policies included below, and which complies with the requirements of the Title IX regulations (34 CFR §106.45) and with Sixth Circuit rulings.

- **Hearing Decision-maker or Panel**: Refers to those who have decision-making and sanctioning authority within the college's formal grievance process.

- **Investigator**: The person or persons charged by the college with gathering facts about an alleged violation of this policy, assessing relevance and credibility, synthesizing the evidence, and compiling this information into an investigation report and file of directly related evidence

- **Mandated Reporter**:  An employee of the college who is obligated by policy to share knowledge, notice, and/or reports of harassment and/or retaliation with the Title IX Coordinator.

- **Notice**: An employee, student, or third-party who informs the Title IX Coordinator or other official with authority of the alleged occurrence of harassing, discriminatory, and/or retaliatory conduct.

- **Official with Authority (OWA)**: An employee of the college explicitly vested with the responsibility to implement corrective measures for sexual harassment and/or retaliation on behalf of the college.

- **Preponderance of the Evidence:**  The standard of evidence applied in determining a violation of this policy. Generally considered to be "more likely than not" or "the greater weight of the evidence."

- **Remedies:** Post-finding actions following a determination of a violation of this policy, provided to the complainant and/or the community as mechanisms to address safety, prevent recurrence, and restore access to the college's educational program.

- **Respondent**: An individual who has been reported to be the perpetrator of conduct that could constitute sexual harassment, sexual exploitation or retaliation for engaging in a protected activity.

Exhibit 6 Page 10 of 38

- **Resolution**:  The result of an informal or formal grievance process.

- **Sanction**: A consequence imposed by the college on a respondent who is found to have violated this policy.

- **Sexual Exploitation:**  When a person takes non-consensual or abusive sexual advantage of another for anyone's advantage or benefit other than the person being exploited, and that behavior does not otherwise constitute one of the preceding sexual misconduct offenses.

- **Sexual Harassment**: The umbrella category including the offenses of sexual harassment, sexual assault, stalking, and dating violence and domestic violence as set forth in Title IX regulations (34 CFR §106.30) and identified in detail in this policy.

- **Title IX Coordinator:** The official designated by the college to ensure compliance with Title IX and the college's Title IX program. References to the coordinator throughout this policy may also encompass a designee of the coordinator for specific tasks.

- **Title IX Team:** The Title IX Coordinator, any deputy coordinators, and investigators responsible for overseeing designated elements of Title IX.

**(D)    TITLE IX COORDINATOR**

The Title IX Coordinator is charged with coordinating the college's compliance with federal civil rights laws. The Title IX Coordinator is not an advocate for either the complainant or the respondent. The Title IX Coordinator will explain to both parties the informal and formal processes outlined below and the confidentiality provisions. Where appropriate, the Title IX Coordinator will provide both parties information about supportive measures including options for obtaining no contact orders, medical and counseling services; information about making a criminal report; information regarding academic support;  information about receiving advocacy services; and information about other helpful campus and community resources and safety measures.

The Title IX Coordinator will offer to coordinate with other campus officials, when appropriate, to implement interim measures such as no-contact orders, rearrangement of living arrangements, or academic accommodations. The Title IX Coordinator will describe the process of a fair and impartial investigation. The Title IX Coordinator will explain to both parties their rights to have a support person of their choice with them during their interviews and during the hearing stage of these procedures to conduct cross-examination. If a party does not have an adviser, the college will provide one to accompany them to all meetings or interviews. If a party does not have an adviser for the hearing to conduct cross-examination the college must provide one. A party may not conduct cross examination personally.

If an individual does not want to pursue a complaint, the Title IX Coordinator will inform the individual that the college is limited in the actions it can take without the cooperation of the individual and will explain the full scope of supportive measures available. The individual making the report ("Reporter") is encouraged to provide as much detailed information as possible to allow the Title IX Coordinator to investigate and respond as appropriate. The Title IX Coordinator may be limited in the ability to investigate an anonymous report unless sufficient information is furnished to enable the Title IX Coordinator to conduct a meaningful and fair investigation.

 A complainant will not be denied supportive measure simply because they choose not to file a formal complaint. The Title IX Coordinator will also explain to parties and witnesses that retaliation for reporting alleged violations of the policy, or participating in an investigation of an alleged violation, is strictly prohibited and that any retaliation should be immediately reported and will be promptly addressed.

Exhibit 6 Page 11 of 38

The Title IX Coordinator accepts anonymous and third-party reports of conduct alleged to violate this policy and will follow up on such reports.

**(E)  INDEPENDENCE AND CONFLICT OF INTEREST**

The Title IX Coordinator and members of the Title IX Team act with independence and authority free from bias and conflicts of interest. The Title IX Coordinator oversees all resolutions under this policy and these procedures.

The members of the Title IX Team are vetted and trained to ensure they are not biased for or against any party in a specific case, or for or against complainants and/or respondents, generally.

To raise any concern involving bias or conflict of interest by the Title IX Coordinator, contact the college President Kathleen Murray at 509.527.5132 or kmurray@whitman.edu. Concerns of bias or a potential conflict of interest by any other Title IX Team member should be raised with the Title IX Coordinator.

Reports of misconduct committed by the Title IX Coordinator should be reported to the college President Kathleen Murray at 509.527.5132 or kmurray@whitman.edu or designee. Reports of misconduct committed by any other Title IX Team member should be reported to the Title IX Coordinator.

**(F)  SUPPORTIVE MEASURES**

The college will offer and implement appropriate and reasonable supportive measures to the parties upon notice of alleged sexual harassment and/or retaliation.

Supportive measures are non-disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without fee or charge to the parties to restore or preserve access to the college's education program or activity, including measures designed to protect the safety of all parties or the college's educational environment, and/or deter sexual harassment and/or retaliation.

The Title IX Coordinator promptly makes supportive measures available to the parties upon receiving notice or a complaint. At the time that supportive measures are offered, the college will inform the complainant, in writing, that they may file a formal complaint with the college either at that time or in the future, if they have not done so already.

The Title IX Coordinator works with the complainant to ensure that their wishes are taken into account with respect to the supportive measures that are planned and implemented.

The college will maintain the privacy of the supportive measures, provided that privacy does not impair the college's ability to provide the supportive measures. The college will act to ensure as minimal an academic or occupational impact on the parties as possible.

The college will implement measures in a way that does not unreasonably burden the other party. These actions may include, but are not limited to:
- Referral to counseling, medical, and/or other healthcare services
- Referral to the Employee Assistance Program
- Referral to community-based service providers
- Student financial aid counseling
- Altering work arrangements for employees or student-employees
- Safety planning

Exhibit 6 Page 12 of 38

- Providing campus safety escorts
- Implementing contact limitations (no contact orders) between the parties
- Academic support, extensions of deadlines, or other course/program-related adjustments
- Timely warnings
- Class schedule modifications, withdrawals, or leaves of absence
- Increased security and monitoring of certain areas of the campus
- Any other actions deemed appropriate by the Title IX Coordinator

Violations of no contact orders will be referred to appropriate student or employee conduct processes for enforcement.

**(G)  EMERGENCY REMOVAL**

The college can act to remove a student respondent entirely or partially from its education program or activities on an emergency basis when an individualized safety and risk analysis has determined that an immediate threat to the physical health or safety of any student or other individual justifies removal.

This risk analysis is performed by the Title IX Coordinator in conjunction with the Care Team using its standard objective violence risk assessment procedures.

In all cases in which an emergency removal is imposed, the student will be given notice of the action and the option to request to meet with the Title IX Coordinator prior to such action/removal being imposed, or as soon thereafter as reasonably possible, to show cause why the action/removal should not be implemented or should be modified.

This meeting is not a hearing on the merits of the allegation(s), but rather is an administrative process intended to determine solely whether the emergency removal is appropriate.

When this meeting is not requested in a timely manner, objections to the emergency removal will be deemed waived.

A complainant and their advisor may be permitted to participate in this meeting if the Title IX Coordinator determines it is equitable to do so.

This section also applies to any restrictions that a coach or athletic administrator may place on a student-athlete arising from allegations related to Title IX.

There is no appeal process for emergency removal decisions.

A respondent may be accompanied by an advisor of their choice when meeting with the Title IX Coordinator. The respondent will be given access to a written summary of the basis for the emergency removal prior to the meeting to allow for adequate preparation.

The Title IX Coordinator has sole discretion under this policy to implement or stay an emergency removal and to determine the conditions and duration. Violation of an emergency removal under this policy will be grounds for discipline, which may include expulsion.

The college will implement the least restrictive emergency actions possible in light of the circumstances and safety concerns. As determined by the Title IX Coordinator, these actions could include, but are not

Exhibit 6 Page 13 of 38

limited to: temporarily re-assigning an employee, restricting a student's or employee's access to or use of facilities or equipment, allowing a student to withdraw or take grades of incomplete without financial penalty, authorizing an administrative leave, and suspending a student's participation in extracurricular activities, student employment, student organizational leadership, or intercollegiate/intramural athletics.

At the discretion of the Title IX Coordinator, alternative coursework options may be pursued to ensure as minimal an academic impact as possible on the parties.

Where the respondent is an employee, existing provisions for interim action are applicable.

**(G)  PROMPTNESS**

All allegations are acted upon promptly by the college once it has received notice or a formal complaint. Complaints can take 60-90 business days to resolve, typically. There are always exceptions and extenuating circumstances that can cause a resolution to take longer, but the college will avoid all undue delays within its control.

Any time the general time frames for resolution outlined in college procedures will be delayed, the college will provide written notice to the parties of the delay, the cause of the delay, and an estimate of the anticipated additional time that will be needed as a result of the delay.

**(H)  PRIVACY**

Every effort is made by the college to preserve the privacy of reports. The college will not share the identity of any individual who has made a report or complaint of harassment or retaliation; any complainant, any individual who has been reported to be the perpetrator of sexual harassment or retaliation, any respondent, or any witness, except as permitted by the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. 1232g; FERPA regulations, 34 CFR part 99; or as required by law; or to carry out the purposes of 34 CFR Part 106, including the conducting of any investigation, hearing, or grievance proceeding arising under these policies and procedures.

The college reserves the right to determine which college officials have a legitimate educational interest in being informed about incidents that fall within this policy, pursuant to the Family Educational Rights and Privacy Act (FERPA).

Information will be shared as necessary with investigators, hearing panel members/decision-makers, witnesses, and the parties. The circle of people with this knowledge will be kept as tight as possible to preserve the parties' rights and privacy.

The college may contact parents/guardians to inform them of situations in which there is a significant and articulable health and/or safety risk but will usually consult with the student first before doing so.

**(I)  JURISDICTION**

This policy applies to the education program and activities of the college, to conduct that takes place on the campus or on property owned or controlled by the college, at college-sponsored events, or in buildings owned or controlled by the college's recognized student organizations. The respondent must be a member of the college's community in order for its policies to apply.

This policy can also be applicable to the effects of off-campus misconduct that effectively deprive someone of access to the college's educational program. The college may also extend jurisdiction to off-campus and/or to online conduct when the Title IX Coordinator determines that the conduct affects a

Exhibit 6 Page 14 of 38

substantial college interest.

Regardless of where the conduct occurred, the college will address notice/complaints to determine whether the conduct occurred in the context of its employment or educational program or activity and/or has continuing effects on campus or in an off-campus sponsored program or activity. A substantial college interest includes:

   a. Any action that constitutes a criminal offense as defined by law. This includes, but is not limited to, single or repeat violations of any local, state, or federal law;
   b. Any situation in which it is determined that the respondent poses an immediate threat to the physical health or safety of any student or other individual;
   c. Any situation that significantly impinges upon the rights, property, or achievements of oneself or others or significantly breaches the peace and/or causes social disorder; and/or
   d. Any situation that is detrimental to the educational interests or mission of the college.

If the respondent is unknown or is not a member of the college community, the Title IX Coordinator will assist the complainant in identifying appropriate campus and local resources and support options and/or, when criminal conduct is alleged, in contacting local or campus law enforcement if the individual would like to file a police report. Further, even when the respondent is not a member of the college's community, supportive measures, remedies, and resources may be accessible to the complainant by contacting the Title IX Coordinator.

In addition, the college may take other actions as appropriate to protect the complainant against third parties, such as barring individuals from college property and/or events.

All vendors serving the college through third-party contracts are subject to the policies and procedures of their employers.

When the respondent is enrolled in or employed by another institution, the Title IX Coordinator can assist the complainant in liaising with the appropriate individual at that institution, as it may be possible to allege violations through that institution's policies.

Similarly, the Title IX Coordinator may be able to assist and support a student or employee complainant who experiences sexual harassment or retaliation in an externship, study abroad program, or other environment external to the college where sexual harassment policies and procedures of the facilitating or host organization may give recourse to the complainant.

**(J)    TIME LIMITS ON REPORTING**

There is no time limitation on providing notice/complaints to the Title IX Coordinator. However, if the respondent is no longer subject to the college's jurisdiction and/or significant time has passed, the ability to investigate, respond, and provide remedies may be more limited or impossible.

Acting on notice/complaints significantly impacted by the passage of time (including, but not limited to, the rescission or revision of policy) is at the discretion of the Title IX Coordinator, who may document allegations for future reference, offer supportive measures and/or remedies, and/or engage in informal or formal action, as appropriate.

When notice/complaint is affected by significant time delay, the college will typically apply the policy in place at the time of the alleged misconduct and the procedures in place at the time of notice/complaint.

Exhibit 6 Page 15 of 38

**(K)    ONLINE SEXUAL HARASSMENT AND/OR RETALIATION**

The college's policy is written and interpreted broadly to include online manifestations of any of the behaviors prohibited below, when those behaviors occur in or have an effect on the college's education program and activities or use college networks, technology, or equipment.

Although the college may not control websites, social media, and other venues in which harassing communications are made, when such communications are reported to the college, it will engage in a variety of means to address and mitigate the effects.

Any online posting or other electronic communication by students, including cyber-bullying, cyber-stalking, cyber-harassment, etc., occurring completely outside of the college's control (e.g., not on college networks, websites, or between college email accounts) will only be subject to this policy when such online conduct can be shown to cause a substantial in-program disruption or infringement on the rights of others.

Otherwise, such communications are considered speech protected by the First Amendment. Supportive measures for complainants will be provided, but protected speech cannot legally be subjected to discipline.

Off-campus harassing speech by employees, whether online or in person, may be regulated by the college only when such speech is made in an employee's role with the college or impacts the employee's ability to perform their role.

## PART II. PROHIBITED CONDUCT

**(A)    SEXUAL HARASSMENT**

The Department of Education's Office for Civil Rights (OCR), the Equal Employment Opportunity Commission (EEOC), and the State of Washington regard sexual harassment as an unlawful discriminatory practice.

Whitman College has adopted the following definition of sexual harassment in order to address the unique environment of an academic community and in compliance with Title IX regulations (34 CFR §106.30). Acts of sexual harassment may be committed by any person upon any other person, regardless of the sex, sexual orientation, and/or gender identity of those involved.

Sexual harassment, as an umbrella category, includes the actual or attempted offenses of sexual harassment, sexual assault, domestic violence, dating violence, and stalking, and is defined as:

Conduct on the basis of sex or that is sexual that satisfies one or more of the following:

1) **Quid Pro Quo:**
   a.  an employee of the college,
   b.  conditions the provision of an aid, benefit, or service of the college,
   c.  on an individual's participation in unwelcome sexual conduct.

2) **Sexual Harassment:**
   a.  unwelcome conduct,
   b.  determined by a reasonable person,
   c.  to be so severe, and
   d.  pervasive, and,

Exhibit 6 Page 16 of 38

    e.   objectively offensive,

    f.   that it effectively denies a person equal access to the college's education program or activity.

**3) Sexual Assault, defined as:**

    **a)  <u>Sex Offenses, Forcible:</u>**

- Any sexual act directed against another person
- without the consent of the complainant,
- including instances in which the complainant is incapable of giving consent.

    **Forcible Sexual acts include:**

      **Forcible Rape:**

- Penetration,
- no matter how slight,
- of the vagina or anus with any body part or object, or
- oral penetration by a sex organ of another person,
- without the consent of the complainant.

      **Forcible Sodomy:**

- Oral or anal sexual intercourse with another person,
- forcibly,
- and/or against that person's will (non-consensually), or
- not forcibly or against the person's will in instances in which the complainant is incapable of giving consent because of age# or because of temporary or permanent mental or physical incapacity.

      **Sexual Assault with an Object:**

- The use of an object or instrument to penetrate,
- however slightly,
- the genital or anal opening of the body of another person,
- forcibly,
- and/or against that person's will (non-consensually),
- or not forcibly or against the person's will in instances in which the complainant is incapable of giving consent because of age or because of temporary or permanent mental or physical incapacity.

      **Forcible Fondling:**

- The touching of the private body parts of another person (buttocks, groin, breasts),
- for the purpose of sexual gratification,
- forcibly,
- and/or against that person's will (non-consensually),
- or not forcibly or against the person's will in instances in which the complainant is incapable of giving consent because of age or because of temporary or permanent mental or physical incapacity.

    **b)  <u>Sex Offenses:  Non-forcible:</u>**

      **Incest:**

- Non-forcible sexual intercourse
- between persons who are related to each other
- within the degrees wherein marriage is prohibited by Washington law.

Exhibit 6 Page 17 of 38

**Statutory Rape:**
- o Non-forcible intercourse
- o with a person who is under the statutory age of consent in Washington

**4) Dating Violence, defined as:**
- a. violence,
- b. on the basis of sex,
- c. committed by a person,
- d. who is in or has been in a social relationship of a romantic or intimate nature with the complainant.
    - i. The existence of such a relationship shall be determined based on the complainant's statement and with consideration of the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship. For the purposes of this definition—
    - ii. Dating violence includes, but is not limited to, sexual or physical abuse or the threat of such abuse.
    - iii. Dating violence does not include acts covered under the definition of domestic violence.

**5) Domestic Violence, defined as:**
- a. violence,
- b. on the basis of sex,
- c. committed by a current or former spouse or intimate partner of the complainant,
- d. by a person with whom the complainant shares a child in common, or
- e. by a person who is cohabitating with, or has cohabitated with, the complainant as a spouse or intimate partner, or
- f. by a person similarly situated to a spouse of the complainant under the domestic or family violence laws of Washington, or
- g. by any other person against an adult or youth complainant who is protected from that person's acts under the domestic or family violence laws of Washington.

*To categorize an incident as domestic violence, the relationship between the respondent and the complainant must be more than just two people living together as roommates. The people cohabitating must be current or former spouses or have an intimate relationship.

**6) Stalking, defined as:**
- a. Engaging in a course of conduct,
- b. on the basis of sex,
- c. directed at a specific person, that
    - i. would cause a reasonable person to fear for the person's safety, or
    - ii. the safety of others; or
    - iii. suffer substantial emotional distress.
  
  For the purposes of this definition—
  - (i) Course of conduct means two or more acts, including, but not limited to, acts in which the respondent directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property.
  - (ii) Reasonable person means a reasonable person under similar circumstances and with similar identities to the complainant.

Exhibit 6 Page 18 of 38

(iii)    Substantial emotional distress means significant mental suffering or anguish that may but does not necessarily require medical or other professional treatment or counseling.

**(B)    SEXUAL EXPLOITATION**

Occurs when a person takes non-consensual or abusive sexual advantage of another for anyone's advantage or benefit other than the person being exploited, and that behavior does not otherwise constitute one of the preceding sexual misconduct offenses. Examples of behavior that could rise to the level of sexual exploitation include:

1.    Prostituting another person;

2.    Non-consensual visual (e.g., video, photograph) or audio-recording of sexual activity;

3.    Non-consensual distribution of photos, other images, or information of an individual's sexual activity, intimate body parts, or nakedness, with the intent to or having the effect of embarrassing an individual who is the subject of such images or information;

4.    Going beyond the bounds of consent (such as letting your friends hide in the closet to watch you having consensual sex);

5.    Engaging in non-consensual voyeurism;

6.    Knowingly transmitting an STI, such as HIV, to another without disclosing your STI status;

7.    Exposing one's genitals in non-consensual circumstances, or inducing another to expose his or her genitals;

8.    Possessing, distributing, viewing or forcing others to view illegal pornography.

**(C)    TITLE IX REGULATORY DISMISSAL STANDARDS**

Under 34 CFR §106.45 (B)(3) the college must dismiss the formal complaints if they do not meet the following standards:

1.    if the conduct does not constitute sexual harassment as defined above (34 CFR §106.30)

2.    if the college does not have control over the harasser

3.    if the incident did not occur in a program or activity of the college

4.    if the incident did not occur in the United States

5.    if the complainant is not a member or seeking to become a member of the college community

**(D)    GRIEVANCE RESPONSE PROTOCOL**

(a)    Allegations of sexual harassment that meet the five elements identified in Part II (C) of this policy will be addressed under the grievance resolution Part I, **"Title IX Regulatory Grievance Standards."**

(b)    Allegations of sexual harassment and/or sexual exploitation that must be dismissed for failure to meet the five requirements in Part II (C) will be addressed under the grievance resolution Part II, **"Title**

Exhibit 6 Page 19 of 38

IX Institutional Grievance Standards."

**PART III. STANDARDS FOR ASSESSING CONDUCT:** As used in the offenses above, the following definitions and understandings apply:

**(A)  CONSENT**
   **Consent is:**
   ● knowing, and
   ● voluntary, and
   ● clear permission
   ● by word or action
   ● to engage in sexual activity.

Individuals may experience the same interaction in different ways. Therefore, it is the responsibility of each party to determine that the other has consented before engaging in the activity.

If consent is not clearly provided prior to engaging in the activity, consent may be ratified by word or action at some point during the interaction or thereafter, but clear communication from the outset is strongly encouraged.

For consent to be valid, there must be a clear expression in words or actions that the other individual consented to that specific sexual conduct. Reasonable reciprocation can be implied. For example, if someone kisses you, you can kiss them back (if you want to) without the need to explicitly obtain *their* consent to being kissed back.

Consent can also be withdrawn once given, as long as the withdrawal is reasonably and clearly communicated. If consent is withdrawn, that sexual activity should cease within a reasonable time.

Consent to some sexual contact (such as kissing or fondling) cannot be presumed to be consent for other sexual activity (such as intercourse). A current or previous intimate relationship is not sufficient to constitute consent.

Proof of consent or non-consent is not a burden placed on either party involved in an incident. Instead, the burden remains on the college to determine whether its policy has been violated. The existence of consent is based on the totality of the circumstances evaluated from the perspective of a reasonable person in the same or similar circumstances, including the context in which the alleged incident occurred and any similar, previous patterns that may be evidenced.

Consent in relationships must also be considered in context. When parties consent to BDSM[1] or other forms of kink, non-consent may be shown by the use of a safe word. Resistance, force, violence, or even saying "no" may be part of the kink and thus consensual, so the college's evaluation of communication in kink situations should be guided by reasonableness, rather than strict adherence to policy that assumes non-kink relationships as a default.

**(B)  FORCE**

_____

[1] Bondage, discipline/dominance, submission/sadism, and masochism.

Exhibit 6 Page 20 of 38

Force is the use of physical violence and/or physical imposition to gain sexual access. Force also includes threats, intimidation (implied threats), and coercion that is intended to overcome resistance or produce consent.

**(C)   INCAPACITATION**

A person cannot consent if they are unable to understand what is happening or are disoriented, helpless, asleep, or unconscious, for any reason, including by alcohol or other drugs. As stated above, a respondent violates this policy if they engage in sexual activity with someone who is incapable of giving consent.

It is a defense to a sexual assault policy violation that the respondent neither knew nor should have known the complainant to be physically or mentally incapacitated. "Should have known" is an objective, reasonable person standard that assumes that a reasonable person is both sober and exercising sound judgment.

Incapacitation occurs when someone cannot make rational, reasonable decisions because they lack the capacity to give knowing/informed consent (e.g., to understand the "who, what, when, where, why, or how" of their sexual interaction).

Incapacitation is determined through consideration of all relevant indicators of an individual's state and is not synonymous with intoxication, impairment, blackout, and/or being drunk.

This policy also covers a person whose incapacity results from a temporary or permanent physical or mental health condition, involuntary physical restraint, and/or the consumption of incapacitating drugs.

**(D)  COERCION**

Coercion is <u>unreasonable</u> pressure for sexual activity. Coercive conduct differs from seductive conduct based on factors such as the type and/or extent of the pressure used to obtain consent. When someone makes clear that they do not want to engage in certain sexual activity, that they want to stop, or that they do not want to go past a certain point of sexual interaction, continued pressure beyond that point can be coercive.

**PART IV. COLLEGE STANDARDS**

**(A)   MANDATED REPORTING**

- o  All college employees (faculty, staff, administrators) are expected to report actual or suspected sexual harassment or retaliation to appropriate officials immediately.

- o  In order to make informed choices, it is important to be aware of confidentiality and mandatory reporting requirements when consulting campus resources. On campus, some resources may maintain confidentiality and are not required to report actual or suspected sexual harassment or retaliation. They may offer options and resources without any obligation to inform an outside agency or campus official unless a complainant has requested the information be shared.

- o  If a complainant expects formal action in response to their allegations, reporting to any mandated reporter can connect them with resources to report crimes and/or policy violations, and these employees will immediately pass reports to the Title IX Coordinator (and/or police, if desired by the complainant), who will take action when an incident is reported to them.

Exhibit 6 Page 21 of 38

**(B)  CONFIDENTIALITY OF COMPLAINTS AND REPORTS**

Parties in these processes, including the complainant, the individual accused of a policy violation ("Respondent"), and witnesses, have privacy rights and reasonable expectations of confidentiality in the investigation of matters subject to this procedure.

In addition, the integrity of the process depends on ensuring reasonable expectations of confidentiality. The Title IX Coordinator will keep confidential the complaint, report, witness statements, and any other information provided by the complainant, respondent, or witnesses and will disclose this information only to the complainant, respondent, or witnesses, as necessary to give fair notice of the allegations and to conduct the investigation; to law enforcement consistent with state and federal law; to other college officials as necessary for coordinating interim measures or for health, welfare, and safety reasons, and to government agencies who review the college's compliance with federal law. The investigation report will be disclosed only to the complainant, respondent, Title IX Coordinator, disciplinary authority as necessary, and college officials as necessary to prepare for subsequent proceedings (e.g., college president and college legal counsel). Information about complaints and reports, absent personally identifiable information, may be reported to college officials and external entities for statistical and analysis purposes pursuant to federal and state law and college policy.

**(C)  FEDERAL TIMELY WARNING OBLIGATIONS**

Parties reporting sexual assault, domestic violence, dating violence, and/or stalking should be aware that under the Clery Act, the college must issue Timely Warnings for incidents reported to them that pose a serious or continuing threat of bodily harm or danger to members of the campus community.

The college will ensure that a complainant's name and other identifying information is not disclosed, while still providing enough information for community members to make safety decisions in light of the potential danger.

**(D)  FALSE ALLEGATIONS AND EVIDENCE**

Deliberately false and/or malicious accusations under this policy are a serious offense and will be subject to appropriate disciplinary action. This does not include allegations that are made in good faith but are ultimately shown to be erroneous or do not result in a policy violation determination.

Additionally, witnesses and parties knowingly providing false evidence, tampering with or destroying evidence, or deliberately misleading an official conducting an investigation can be subject to discipline under college policy.

**(E)  AMNESTY FOR DRUG OR ALCOHOL POSSESSION AND CONSUMPTION VIOLATIONS**

The college strongly encourages students to report instances of sex-based discrimination, sexual harassment, and sexual misconduct involving students. Therefore, students who report information about sex-based discrimination, sexual harassment, or sexual misconduct involving students will not be disciplined by the college for any violation of the college's drug or alcohol possession or consumption policies in which they might have engaged in connection with the reported incident.

**(F)  FREE SPEECH AND ACADEMIC FREEDOM**

This policy shall not be construed or applied to restrict academic freedom at the college, nor shall it be construed to restrict constitutionally protected expression, even though such expression may be offensive, unpleasant, or even hateful.

The college recognizes and protects full freedom of inquiry, teaching, research, discussion, study,

Exhibit 6 Page 22 of 38

publication, and for artists, the creation and exhibition of works of art, without hindrance, restriction, equivocation, or reprisal. This right extends to other facets of campus life to include the right of a faculty member or student to speak on general educational questions or about the college. In addressing all complaints and reports under this policy, the college will take all permissible actions to ensure the safety of students and employees while complying with free speech requirements for students and employees. While the college will protect students' and employees' rights against sex discrimination under this policy, this policy does not apply to curriculum or in any way prohibit or abridge the use of particular textbooks or curricular materials.

**(G)  EXTERNAL COMPLAINTS**

If a person filed a complaint with the Title IX Coordinator and believes the college's response was inadequate, or otherwise believes the college has discriminated on the basis of sex, including sexual harassment, or retaliation, the individual may file a complaint with the:

U.S. Department of Education
Office for Civil Rights (OCR)
Lyndon Baines Johnson Department of Education Bldg
400 Maryland Avenue, SW
Washington, D.C. 20202-1100
Customer Service Hotline #: (800) 421-3481
FAX: (202) 453-6012
TDD#: (800) 877-8339
Email: OCR@ed.gov
Web: http://www.ed.gov/ocr

**Seattle Office**
Office for Civil Rights
U.S. Department of Education
915 Second Avenue Room 3310
Seattle, WA 98174-1099
Telephone: 206-607-1600
FAX: 206-607-1601;
TDD: 800-877-8339
Email: OCR.Seattle@ed.gov

**(H) RESOURCES**

The college's Safety and Security Annual Report of on-campus crime statistics includes forcible and non-forcible sex offenses, in lieu of the single category of rape used on previous reports, as well as statistics on dating violence, domestic violence, and stalking, in compliance with the Campus Security Act.

Copies of the Safety and Security Annual Report (required by the Student Right-to-Know and Campus Security Act of 1990) which details on-campus crime statistics for the three previous calendar years may be obtained at the following locations:

- Diversity, Equity & Inclusion Office, Memorial Building, 301 & 303
- Human Resources Department, Memorial Building 104-107
- Student Activities Office, Reid Campus Center, Room 202
- Campus Security Office, Whitman College Technology Services, Room 130

Exhibit 6 Page 23 of 38

Crime prevention materials concerning personal safety on campus, rape and date or acquaintance rape are available at the Office of Diversity, Equity & Inclusion, Memorial Building 301 & 303 or Security Office, Whitman College Technology Services 130.

During the academic year, the Office of Diversity, Equity and Inclusion may provide sex crime prevention information through campus publications and by direct presentations to student groups on request.

The college does offer counseling services to its students. Those students needing counseling can contact the Counseling Center at (509) 527-5195. Additional counseling services are also available through the Victim's Advocate, Hunter 406, (509) 526-3032, sava@ywcaww.org.

(I) **CRIMINAL REPORTING**

Please remember that if someone is in immediate danger or needs immediate medical attention, the first place to report is 911. You may also report to the college's Campus Security (dial 5777 from a campus phone or (509) 527-5777) or to the Walla Walla Police Department. Some forms of discrimination and harassment may also be crimes. For example, sexual assault, stalking and rape are crimes. Criminal reports should be made to law enforcement, even if it is uncertain whether the particular conduct is a crime. Calling local law enforcement can help you: obtain emergency and nonemergency medical care; get immediate law enforcement response for your protection; understand how to provide assistance in a situation that may escalate to more severe criminal behavior; arrange a meeting with victim advocate services; find counseling and support; initiate a criminal investigation; and answer questions about the criminal process.

In order to preserve any physical evidence of a sexual offense, victims of sexual assault are urged not to bathe, shower, use any feminine douche or change clothing. Such victims should go immediately to a medical facility of their choice to receive medical treatment if needed and to insure that the appropriate examinations are conducted to collect the necessary physical evidence of the assault.

# GRIEVANCE RESOLUTION PROCESS
# SEX/GENDER HARASSMENT, DISCRIMINATION AND SEXUAL MISCONDUCT
_____

**PART I. TITLE IX REGULATORY GRIEVANCE PROCESS STANDARDS**

**(A) NOTICE/FORMAL COMPLAINT**

Upon receipt of a notice or complaint to the Title IX Coordinator of an alleged violation of the policy, the Title IX Coordinator initiates a prompt initial assessment to determine the next steps the college needs to take.

The Title IX Coordinator will initiate at least one of three responses:
  1) Offering supportive measures because the complainant does not want to file a formal complaint;

Exhibit 6 Page 24 of 38

and/or

2)  An informal resolution (upon submission of a formal complaint); and/or

3)  A formal grievance process including an investigation and a hearing (upon submission of a formal complaint).

The college uses the formal grievance process to determine whether or not the policy has been violated. If so, the college will promptly implement effective remedies designed to ensure that it is not deliberately indifferent to sexual harassment or retaliation, their potential recurrence, or their effects.


**(B)    INITIAL ASSESSMENT**

o  Following receipt of a formal complaint of an alleged violation of this policy, the Title IX Coordinator or designee engages in an initial assessment, typically within one to five business days. The steps in an initial assessment can include:

- o  The Title IX Coordinator reaches out to the complainant to offer supportive measures.

- o  The Title IX Coordinator seeks to determine if the person impacted wishes to make a formal complaint, and will assist them to do so, if desired.

- o  If they do not wish to do so, the Title IX Coordinator determines whether to initiate a complaint because a violence risk assessment indicates a compelling threat to health and/or safety.

- o  The Title IX Coordinator works with the complainant to determine whether the complainant prefers a supportive and remedial response, an informal resolution option, or a formal investigation and grievance process.

- o  If a formal complaint is made (requiring the signature of the complainant), the Title IX Coordinator assesses its sufficiency and works with the complainant to make sure it is correctly completed.

- o  If an informal resolution option is preferred, the Title IX Coordinator assesses whether the complaint is suitable for informal resolution, and may seek to determine if the respondent is also willing to engage in informal resolution.

- o  If a formal grievance process is preferred, the Title IX Coordinator determines if the misconduct alleged falls within the scope of Title IX or this policy.

- o  If it does, the Title IX Coordinator will initiate the formal investigation and grievance process.

o  Once the decision to commence a formal investigation is made, the Title IX Coordinator appoints trained individuals to conduct the investigation , usually within two business days of determining that an investigation should proceed.


**(C) DISCRETIONARY DISMISSAL**

The college <u>may</u> dismiss a formal complaint or any allegations therein if, at any time during the investigation or hearing:

Exhibit 6 Page 25 of 38

1)  A complainant notifies the Title IX Coordinator in writing that the complainant would like to withdraw the formal complaint or any allegations therein; or

2)  The respondent is no longer enrolled in or employed by the college; or

3)  Specific circumstances prevent the college from gathering evidence sufficient to reach a determination as to the formal complaint or allegations therein.

Upon any dismissal, the college will promptly send written notice of the dismissal and the rationale for doing so simultaneously to the parties.

This dismissal decision is appealable by any party.

## (D)  COUNTERCLAIMS

o  The college is obligated to ensure that the grievance process is not abused for retaliatory purposes. The college permits the filing of counterclaims but uses an initial assessment, described above, to assess whether the allegations in the counterclaim are made in good faith. Counterclaims by a respondent may be made in good faith, but are, on occasion, also made for purposes of retaliation. Counterclaims made with retaliatory intent will not be permitted.

o  Counterclaims determined to have been reported in good faith will be processed using the grievance procedures below. Investigation of such claims may take place after resolution of the underlying initial allegation, in which case a delay may occur.

o  Counterclaims may also be resolved through the same investigation as the underlying allegation, at the discretion of the Title IX Coordinator. When counterclaims are not made in good faith, they will be considered retaliatory and may constitute a violation of this policy.

## (E)  RESOLUTION PROCESSES

### a.  INFORMAL RESOLUTION

Informal resolution can include three different approaches:
o  When the Title IX Coordinator can resolve the matter informally by providing supportive measures (only) to remedy the situation.

o  When the parties agree to resolve the matter through an alternate resolution mechanism usually before a formal investigation takes place.

o  When the respondent accepts responsibility for violating policy, and desires to accept a sanction and end the resolution process

o  To initiate informal resolution, a complainant needs to submit a formal complaint, as defined above. A respondent who wishes to initiate informal resolution should contact the Title IX Coordinator.

o  It is not necessary to pursue informal resolution first in order to pursue a formal grievance process, and any party participating in informal resolution can stop the process at any time and begin or resume the formal grievance process.

o  Prior to implementing informal resolution, the college will provide the parties with written notice of the reported misconduct and any sanctions or measures that may result from participating in

Exhibit 6 Page 26 of 38

such a process, including information regarding any records that will be maintained or shared by the college.

o  The college will obtain voluntary, written confirmation that all parties wish to resolve the matter through informal resolution before proceeding and will not pressure the parties to participate in informal resolution.

b.  **FORMAL GRIEVANCE RESOLUTION  PROCESS**

The Title IX Coordinator will provide written notice of the investigation and allegations (the "NOIA") to the respondent upon commencement of the formal grievance process. This facilitates the respondent's ability to prepare for the interview and to identify and choose an advisor to accompany them. The NOIA is also copied to the complainant, who is to be given advance notice of when the NOIA will be delivered to the respondent.

The NOIA will include:

- A meaningful summary of all of allegations,

- The identity of the involved parties (if known),

- The precise misconduct being alleged,

- The date and location of the alleged incident(s) (if known),

- The specific policies implicated,

- A description of the applicable procedures,

- A statement of the potential sanctions/responsive actions that could result,

- A statement that the college presumes the respondent is not responsible for the reported misconduct unless and until the evidence supports a different determination,

- A statement that determinations of responsibility are made at the conclusion of the process and that the parties will be given an opportunity to inspect and review all directly related and/or relevant evidence obtained during the review and comment period,

- A statement about the college's policy on retaliation,

- Information about the privacy of the process,

- Information on the need for each party to have an advisor of their choosing and suggestions for ways to identify an advisor,

- A statement informing the parties that the college's policy prohibits knowingly making false statements, including knowingly submitting false information during the resolution process,

- Detail on how the party may request disability accommodations during the interview process,

- A link to the college's VAWA Brochure,

- The name(s) of the investigator(s), along with a process to identify, in advance of the interview process, to the Title IX Coordinator any conflict of interest that the investigator(s) may have, and

- An instruction to preserve any evidence that is directly related to the allegations.

Notice will be made in writing and may be delivered by one or more of the following methods: in

Exhibit 6 Page 27 of 38

person, mailed to the local or permanent address of the parties as indicated in official college records or emailed to the parties' college-issued email or designated accounts. Once mailed, emailed, and/or received in-person, notice will be presumptively delivered.

**(F)    RIGHT TO AN ADVISOR**

The parties may each have an advisor of their choice present with them for all meetings, interviews, and hearings within the resolution process, if they so choose. The parties may select whoever they wish to serve as their advisor as long as the advisor is eligible and available.

Choosing an advisor who is also a witness in the process creates potential for bias and conflict-of-interest. A party who chooses an advisor who is also a witness can anticipate that issues of potential bias will be explored by the hearing decision-maker(s).

Parties may request to have more than one advisor upon special request to the Title IX Coordinator. The decision to grant this request is at the sole discretion of the Title IX Coordinator and will be granted equitably to all parties.

The advisor may be a friend, mentor, family member, attorney, or any other individual a party chooses to advise, support, and/or consult with them throughout the resolution process. The parties may choose advisors from inside or outside of the college community. The Title IX Coordinator will also assign an advisor for any party if the party requests.

**(G)    ADVISOR'S ROLE IN MEETINGS AND HEARING**

The parties may be accompanied by their advisor in all meetings and interviews at which the party is entitled to be present, including intake and interviews. Advisors should help the parties prepare for each meeting and are expected to advise ethically, with integrity, and in good faith.

The college cannot guarantee equal advisory rights, meaning that if one party selects an advisor who is an attorney, but the other party does not or cannot afford an attorney, the college is not obligated to provide an attorney.

Under U.S. Department of Education regulations under Title IX, cross examination is required during the hearing, but must be conducted by the parties' advisors. The parties are not permitted to directly question each other or any witnesses. If a party does not have an advisor for a hearing, the college will appoint an advisor for the limited purpose of conducting any questioning of the other party and witnesses.

A party may reject this appointment and choose their own advisor, but they may not proceed without an advisor. If the party's advisor will not conduct questioning, the college will appoint an advisor who will do so thoroughly, regardless of the participation or non-participation of the advised party in the hearing itself.

A party may elect to change advisors during the process and is not obligated to use the same advisor throughout. The parties are expected to inform the investigator(s) of the identity of their advisor at least two (2) business days before the date of their first meeting with investigators (or as soon as possible if a more expeditious meeting is necessary or desired).

Exhibit 6 Page 28 of 38

The parties are expected to provide timely notice to the Title IX Coordinator if they change advisors at any time. It is assumed that if a party changes advisors, consent to share information with the previous advisor is terminated, and a release for the new advisor must be secured. Parties are expected to inform the Title IX Coordinator of the identity of their hearing advisor at least two (2) business days before the hearing.

All advisors are subject to the same college policies and procedures, whether they are attorneys or not. Advisors are expected to advise their advisee's without disrupting proceedings. The parties are expected to ask and respond to questions on their own behalf throughout the investigation phase of the resolution process. Although the advisor generally may not speak on behalf of their advisee, the advisor may consult with their advisee, either privately as needed, or by conferring or passing notes during any resolution process meeting or interview. For longer or more involved discussions, the parties and their advisors should ask for breaks to allow for private consultation.

Any advisor who oversteps their role as defined by this policy will be warned only once. If the advisor continues to disrupt or otherwise fails to respect the limits of the advisor role, the meeting will be ended, or other appropriate measures implemented. Subsequently, the Title IX Coordinator will determine how to address the advisor's non-compliance and future role.

## (H)    INVESTIGATION PROCESS

All investigations are thorough, reliable, impartial, prompt, and fair. Investigations involve interviews with all relevant parties and witnesses; obtaining available, relevant evidence; and identifying sources of expert information, as necessary.

All parties have a full and fair opportunity, through the investigation process, to suggest witnesses and questions, to provide evidence and expert witnesses, and to fully review and respond to all evidence on the record.

The investigator(s) typically take(s) the following steps, if not already completed (not necessarily in this order):

● Determine the identity and contact information of the complainant.

● In coordination with campus partners (e.g., the Title IX Coordinator), initiate or assist with any necessary supportive measures.

● Identify all policies implicated by the alleged misconduct and notify the complainant  and respondent of all of the specific policies implicated.

● Assist the Title IX Coordinator with conducting a prompt initial assessment to determine if the allegations indicate a potential policy violation.

● Commence a thorough, reliable, and impartial investigation by identifying issues and developing a strategic investigation plan, including a witness list, evidence list, intended investigation timeframe, and order of interviews for all witnesses and the parties.

● Meet with the complainant to finalize their interview/statement, if necessary.

● Make good faith efforts to notify the parties of any meeting or interview involving the other party, in advance when possible.

● When participation of a party is expected, provide that party with written notice of the date, time, and location of the meeting, as well as the expected participants and purpose.

Exhibit 6 Page 29 of 38

● Interview all available, relevant witnesses and conduct follow-up interviews as necessary.

● Allow each party the opportunity to suggest witnesses and questions they wish the investigator(s) to ask of the other party and witnesses, and document in the report which questions were asked, with a rationale for any changes or omissions.

● Complete the investigation promptly and without unreasonable deviation from the intended timeline.

● Provide regular status updates to the parties throughout the investigation.

● Prior to the conclusion of the investigation, provide the parties and their respective advisors (if so desired by the parties) with a list of witnesses whose information will be used to render a finding.

● Provide each interviewed party and witness an opportunity to review and verify the investigator's summary notes (or transcript) of the relevant evidence/testimony from their respective interviews and meetings.

● The investigator(s) gather, assess, and synthesize evidence, but make no conclusions, engage in no policy analysis, and render no recommendations as part of their report.

● Prior to the conclusion of the investigation, provide the parties and their respective advisors (if so desired by the parties) a secured electronic or hard copy of the draft investigation report as well as an opportunity to inspect and review all of the evidence obtained as part of the investigation that is directly related to the reported misconduct, including evidence upon which the college does not intend to rely in reaching a determination, for a ten (10) business day review and comment period so that each party may meaningfully respond to the evidence. The parties may elect to waive the full ten days. Each copy of the materials shared will be watermarked on each page with the role of the person receiving it (e.g., complainant, respondent, complainant's advisor, respondent's advisor).

● The investigator(s) may elect to respond in writing in the investigation report to the parties' submitted responses and/or to share the responses between the parties for additional responses.

● The investigator(s) will incorporate relevant elements of the parties' written responses into the final investigation report, include any additional relevant evidence, make any necessary revisions, and finalize the report. The investigator(s) should document all rationales for any changes made after the review and comment period.

● The investigator shares the report with the Title IX Coordinator for feedback.

● The investigator will incorporate any relevant feedback, and the final report is then shared with all parties and their advisors through secure electronic transmission or hard copy at least ten (10) business days prior to a hearing. The parties are also provided with a file of any directly related evidence that was not included in the report.

● Write a comprehensive investigation report fully summarizing the investigation, all witness interviews, and addressing all relevant evidence. Appendices including relevant physical or documentary evidence will be included.


**(I)    ROLE OF WITNESSES IN THE INVESTIGATION**

Witnesses (as distinguished from the parties) may be students, employees or others identified by the

Exhibit 6 Page 30 of 38

investigator or by the parties. Student witnesses are strongly encouraged to participate in good faith with the investigation process. Witnesses who are employees of the college are expected to cooperate with and participate in the college's investigation and resolution process. Failure of employee witnesses to cooperate with and/or participate in the investigation or resolution process constitutes a violation of policy and may warrant discipline.

Although in-person interviews for parties and all potential witnesses are ideal, circumstances (e.g., study abroad, summer break) may require individuals to be interviewed remotely. Skype, Zoom, FaceTime, WebEx, or similar technologies may be used for interviews if the investigator(s) determine that timeliness or efficiency dictate a need for remote interviewing. The college will take appropriate steps to reasonably ensure the security/privacy of remote interviews.

### (J)  RESOLUTION TIMELINE

The college will make a good faith effort to complete the resolution process within a 60-90 business day time period, including appeal, which can be extended as necessary for appropriate cause by the Title IX Coordinator, who will provide notice and rationale for any extensions or delays to the parties as appropriate, as well as a estimate of how much additional time will be needed to complete the process.

### (K)  NOTICE OF HEARING

Notice will be made in writing and may be delivered by one or more of the following methods: in person, or emailed to the parties' college-issued email or designated accounts. Once mailed, emailed, and/or received in-person, notice will be presumptively delivered.

No less than ten (10) business days prior to the hearing, the Title IX Coordinator or the chair will send notice of the hearing to the parties. Once mailed, emailed, and/or received in-person, notice will be presumptively delivered.

The hearing notice will contain:
- A description of the alleged violation(s), a list of all policies allegedly violated, a description of the applicable procedures, and a statement of the potential sanctions/responsive actions that could result.

- The time, date, and location of the hearing and a reminder that attendance is mandatory, superseding all other campus activities.

- Any technology that will be used to facilitate the hearing.

- Information about the option for the live hearing to occur with the parties located in separate rooms using technology that enables the decision-maker(s) and parties to see and hear a party or witness answering questions. Such a request must be raised with the Title IX Coordinator at least five (5) business days prior to the hearing.

- A list of all those who will attend the hearing, along with an invitation to object to any decision-maker on the basis of demonstrated bias. This must be raised with the Title IX Coordinator at least two (2) business days prior to the hearing.

- Information on how the hearing will be recorded and on access to the recording for the parties after the hearing.

- A statement that if any party or witness does not appear at the scheduled hearing, the hearing may be held in their absence, and the party's or witness's testimony and any statements given prior to the

Exhibit 6 Page 31 of 38

hearing will not be considered by the decision-maker(s). For compelling reasons, the chair may reschedule the hearing.

- Notification that the parties may have the assistance of an advisor of their choosing at the hearing and will be required to have one present for any questions they may desire to ask. The party must notify the Title IX Coordinator if they do not have an advisor, and the college will appoint one. Each party must have an advisor present. There are no exceptions.

- A copy of all the materials provided to the decision-maker(s) about the matter, unless they have been provided already.[2]

- An invitation to each party to submit to the chair an impact statement pre-hearing that the decision-maker will review during any sanction determination.

- An invitation to contact the Title IX Coordinator to arrange any disability accommodations, language assistance, and/or interpretation services that may be needed at the hearing, at least seven (7) business days prior to the hearing.

- Whether parties can or cannot bring mobile phones/devices into the hearing.


Hearings for possible violations that occur near or after the end of an academic term (assuming the respondent is still subject to this policy) and are unable to be resolved prior to the end of term will typically be held immediately after the end of the term or during the summer, as needed, to meet the resolution timeline followed by the college and remain within the 60-90 business day goal for resolution.

In these cases, if the respondent is a graduating student, a hold may be placed on graduation and/or official transcripts until the matter is fully resolved (including any appeal). A student facing charges under this policy is not in good standing to graduate.

### (L) DECISION MAKER/HEARING PANEL

The college will designate a single decision-maker or a three-member panel at the discretion of the Title IX Coordinator. The single decision-maker will also chair the hearing. With a panel, one of the three members will be appointed as chair by the Title IX Coordinator.

The decision-maker(s) will not have had any previous involvement with the investigation.

Those who have served as investigators will be witnesses in the hearing and therefore may not serve as decision-makers. Those who are serving as advisors for any party may not serve as decision-makers in that matter.

The Title IX Coordinator may not serve as a decision-maker or chair in the matter but may serve as an administrative facilitator of the hearing if their previous role(s) in the matter do not create a conflict of interest. Otherwise, a designee may fulfill this role. The hearing will convene at a time determined by the chair or designee.

### (M) HEARING PROCEDURES

At the hearing the decision-maker(s) has the authority to hear and make determinations on all allegations of sexual harassment and/or retaliation and may also hear and make determinations on any

---

[2] The final investigation report may be shared using electronic means that preclude downloading, forwarding, or otherwise sharing.

Exhibit 6 Page 32 of 38

additional alleged policy violations that have occurred in concert with the sexual harassment and/or retaliation, even though those collateral allegations may not specifically fall within the policy.

Participants at the hearing will include the chair, any additional panelists, the investigator(s) who conducted the investigation, the parties (or three (3) organizational representatives when an organization is the respondent), advisors to the parties, any called witnesses, and anyone providing authorized accommodations or assistive services.

The chair will answer all questions of procedure. Anyone appearing at the hearing to provide information will respond to questions on their own behalf.

The chair will allow witnesses who have relevant information to appear at a portion of the hearing in order to respond to specific questions from the decision-maker(s) and the parties and will then be excused. [3]

### (N) RECORDING

Hearings (but not deliberations) are recorded by the college for purposes of review in the event of an appeal. The parties may not record the proceedings and no other unauthorized recordings are permitted.

The decision-maker(s), the parties, their advisors, and appropriate administrators of the college will be permitted to listen to the recording in a controlled environment determined by the Title IX Coordinator. No person will be given or be allowed to make a copy of the recording without permission of the Title IX Coordinator.

### (O) DELIBERATION, DECISION-MAKING AND STANDARD OF PROOF

The decision-maker(s) will deliberate in closed session to determine whether the respondent is responsible or not responsible for the policy violation(s) in question. If a panel is used, a simple majority vote is required to determine the finding. The preponderance of the evidence standard of proof is used.

When there is a finding of responsibility on one or more of the allegations, the decision-maker(s) may then consider the previously submitted party impact statements in determining appropriate sanction(s).

The chair will ensure that each of the parties has an opportunity to review any impact statement submitted by the other party(ies). The decision-maker(s) may – at their discretion – consider the statements, but they are not binding.

The decision-maker(s) will review the statements and any pertinent conduct history provided by the appropriate administrator, and will determine the appropriate sanction(s) in consultation with other appropriate administrators, as required.

The chair will then prepare a written deliberation statement and deliver it to the Title IX Coordinator, detailing the determination, rationale, the evidence used in support of its determination, the evidence not relied upon in its determination, credibility assessments, and any sanctions or recommendations.

---

[3] A copy of the order of the hearing proceedings is available upon request in the Title IX Coordinator's Office and will be provided to parties upon commencement of a formal investigation leading to a hearing.

Exhibit 6 Page 33 of 38

This report must be submitted to the Title IX Coordinator within two (2) business days of the end of deliberations, unless the Title IX Coordinator grants an extension. If an extension is granted, the Title IX Coordinator will notify the parties.

**(P)   NOTICE OF THE OUTCOME**

Using the deliberation statement, the Title IX Coordinator will work with the chair to prepare a Notice of Outcome. The Title IX Coordinator will then share the letter, including the final determination, rationale, and any applicable sanction(s) with the parties and their advisors within seven (7) business days of receiving the decision-maker(s)' deliberation statement.

The Notice of Outcome will be shared with the parties simultaneously. Notification will be made in writing and may be delivered by one or more of the following methods: in person, mailed to the local or permanent address of the parties as indicated in official college records, or emailed to the parties' college-issued email or otherwise approved account. Once mailed, emailed, and/or received in-person, notice will be presumptively delivered.

The Notice of Outcome will articulate the specific policy(ies) reported to have been violated, including the relevant policy section, and will contain a description of the procedural steps taken by the college from the receipt of the misconduct report to the determination, including any and all notifications to the parties, interviews with parties and witnesses, site visits, methods used to obtain evidence, and hearings held.

The Notice of Outcome will specify the finding on each alleged policy violation; the findings of fact that support the determination; conclusions regarding the application of the relevant policy to the facts at issue; a statement of, and rationale for, the result of each allegation to the extent the college is permitted to share such information under state or federal law; any sanctions issued which the college is permitted to share according to state or federal law; and any remedies provided to the complainant designed to ensure access to the college's educational or employment program or activity, to the extent the college is permitted to share such information under state or federal law (this detail is not typically shared with the respondent unless the remedy directly relates to the respondent).

The Notice of Outcome will also include information on when the results are considered by the college to be final, any changes that occur prior to finalization, and the relevant procedures and bases for any available appeal options.

**(Q) SANCTIONS**

Factors considered when determining a sanction/responsive action may include, but are not limited to:
- The nature, severity of, and circumstances surrounding the violation(s)
- The respondent's disciplinary history
- Previous allegations or allegations involving similar conduct
- The need for sanctions/responsive actions to bring an end to the sexual harassment and/or retaliation
- The need for sanctions/responsive actions to prevent the future recurrence of sexual harassment and/or retaliation
- The need to remedy the effects of the sexual harassment and/or retaliation on the complainant and the community
- The impact on the parties
- Any other information deemed relevant by the decision-maker(s)

Exhibit 6 Page 34 of 38

The sanctions will be implemented as soon as is feasible, either upon the outcome of any appeal or the expiration of the window to appeal without an appeal being requested.

The sanctions described in this policy are not exclusive of, and may be in addition to, other actions taken or sanctions imposed by external authorities.

## PART II. TITLE IX COLLEGE GRIEVANCE STANDARDS

**ALL CASES THAT ARE DISMISSED UNDER THE REGULATORY STANDARDS WILL BE ADDRESSED UNDER THE WHITMAN COLLEGE GRIEVANCE POLICY.**

### PART III    APPEALS

Any party may file a request for appeal ("Request for Appeal"), but it must be submitted in writing to the Title IX Coordinator within seven (7) days of the delivery of the Notice of Outcome.

A three-member appeal panel will be designated by the Title IX Coordinator OR a single appeal decision-maker will chair the appeal. No appeal panelists or decision-maker will have been involved in the process previously, including any dismissal appeal that may have been heard earlier in the process.

The request for appeal will be forwarded to the appeal chair for consideration to determine if the request meets the grounds for appeal (a "Review for Standing").

This review is not a review of the merits of the appeal, but solely a determination as to whether the request meets the grounds and is timely filed.

#### a. Grounds for Appeal

Appeals are limited to the following grounds:

1.  Procedural irregularity that affected the outcome of the matter;

2.  New evidence that was not reasonably available at the time the determination regarding responsibility or dismissal was made, that could affect the outcome of the matter; and

3.  The Title IX Coordinator, investigator(s), or decision-maker(s) had a conflict of interest or bias for or against complainants or respondents generally or the specific complainant or respondent that affected the outcome of the matter.

If any of the grounds in the request for appeal do not meet the grounds in this policy, that request will be denied by the appeal chair and the parties and their advisors will be notified in writing of the denial and the rationale.

If any of the grounds in the request for appeal meet the grounds in this policy, then the appeal chair will notify the other party(ies) and their advisors, the Title IX Coordinator, and, when appropriate, the investigators and/or the original decision-maker(s).

The other party(ies) and their advisors, the Title IX Coordinator, and, when appropriate, the investigators and/or the original decision-maker(s) will be mailed, emailed, and/or provided a hard copy of the request with the approved grounds and then be given seven (7) business days to submit a

Exhibit 6 Page 35 of 38

response to the portion of the appeal that was approved and involves them. All responses will be forwarded by the chair to all parties for review and comment.

The non-appealing party (if any) may also choose to raise a new ground for appeal at this time. If so, that will be reviewed to determine if it meets the grounds in this policy by the appeal chair and either denied or approved. If approved, it will be forwarded to the party who initially requested an appeal, the investigator(s) and/or original decision-maker(s), as necessary, who will submit their responses in seven (7) business days, which will be circulated for review and comment by all parties.

Neither party may submit any new requests for appeal after this time period. The appeal chair will collect any additional information needed and all documentation regarding the approved grounds and the subsequent responses will be shared with the appeal panel, or and the chair/panel will render a decision in no more than seven (7) business days, barring exigent circumstances. All decisions are by majority vote and apply the preponderance of the evidence standard.

A Notice of Appeal Outcome will be sent to all parties simultaneously including the decision on each approved ground and rationale for each decision. The Notice of Appeal Outcome will specify the finding on each ground for appeal, any specific instructions for remand or reconsideration, any sanctions that may result which the college is permitted to share according to state or federal law, and the rationale supporting the essential findings to the extent the college is permitted to share under state or federal law.

Notification will be made in writing and may be delivered by one or more of the following methods: in person, mailed to the local or permanent address of the parties as indicated in official institutional records, or emailed to the parties' college-issued email or otherwise approved account. Once mailed, emailed and/or received in-person, notice will be presumptively delivered.

Any sanctions imposed as a result of the hearing are stayed during the appeal process. Supportive measures may be reinstated, subject to the same supportive measure procedures above

**b.  Appeal Considerations**
   o  Decisions on appeal are to be deferential to the original decision, making changes to the finding only when there is clear error and to the sanction(s)/responsive action(s) only if there is a compelling justification to do so.

   o  Appeals are not intended to provide for a full re-hearing (de novo) of the allegation(s). In most cases, appeals are confined to a review of the written documentation or record of the original hearing and pertinent documentation regarding the specific grounds for appeal.

   o  An appeal is not an opportunity for appeal decision-makers to substitute their judgment for that of the original decision-maker(s) merely because they disagree with the finding and/or sanction(s).

   o  The appeal chair/decision-maker(s) may consult with the Title IX Coordinator on questions of procedure or rationale, for clarification, if needed. Documentation of all such consultation will be maintained.

   o  Appeals granted based on new evidence should normally be remanded to the original investigator(s) and/or decision-maker(s) for reconsideration. Other appeals may be remanded at the discretion of the Title IX Coordinator or, in limited circumstances, decided on appeal.

   o  Once an appeal is decided, the outcome is final, further appeals are not permitted, even if a

Exhibit 6 Page 36 of 38

decision or sanction is changed on remand (except in the case of a new hearing).

- o In rare cases where a procedural error cannot be cured by the original decision-maker(s) (as in cases of bias), the appeal may order a new hearing with a new decision-maker(s).

- o The results of a remand to a decision-maker(s) cannot be appealed. The results of a new hearing can be appealed, once, on any of the three available appeal grounds.

- o In cases in which the appeal results in reinstatement to the college or resumption of privileges, all reasonable attempts will be made to restore the respondent to their prior status, recognizing that some opportunities lost may be irreparable in the short term.

**(R)  FAILURE TO COMPLY WITH SANCTIONS**

All respondents are expected to comply with the assigned sanctions, responsive actions, and/or corrective actions within the timeframe specified by the final decision-maker(s) (including the appeal chair/panel).

Failure to abide by the sanction(s)/action(s) imposed by the date specified, whether by refusal, neglect, or any other reason, may result in additional sanction(s)/action(s), including suspension, expulsion, and/or termination from the college and may be noted on a student's official transcript.

A suspension will only be lifted when compliance is achieved to the satisfaction of the Title IX Coordinator.

**(S)  RECORDKEEPING**

The college will maintain for a period of at least seven years records of:

1. Each sexual harassment investigation including any determination regarding responsibility and any audio or audiovisual recording or transcript required under federal regulation;

2. Any disciplinary sanctions imposed on the respondent;

3. Any remedies provided to the complainant designed to restore or preserve equal access to the college's education program or activity;

4. Any appeal and the result therefrom;

5. Any informal resolution and the result therefrom;

6. All materials used to train Title IX Coordinators, investigators, decision-makers, and any person who facilitates an informal resolution process. The college will make these training materials publicly available on the college's website; and

7. Any actions, including any supportive measures, taken in response to a report or formal complaint of sexual harassment, including:

a. The basis for all conclusions that the response was not deliberately indifferent;

b. Any measures designed to restore or preserve equal access to the college's education program or activity; and

c. If no supportive measures were provided to the complainant, document the reasons why such a response was not clearly unreasonable in light of the known circumstances.

Exhibit 6 Page 37 of 38

The college will also maintain any and all records in accordance with state and federal laws.

### (T)  REVISION OF POLICY AND GRIEVANCE PROCESS

This policy and procedures supersede any previous policy(ies) addressing harassment, sexual misconduct and/or retaliation under Title IX and will be reviewed and updated annually by the Title IX Coordinator. The college reserves the right to make changes to this document as necessary, and once those changes are posted online, they are in effect.

During the resolution process, the Title IX Coordinator may make minor modifications to procedures that do not materially jeopardize the fairness owed to any party, such as to accommodate summer schedules. The Title IX Coordinator may also vary procedures materially with notice (on the institutional website, with the appropriate effective date identified) upon determining that changes to law or regulation require policy or procedural alterations not reflected in this policy and procedures.

If government laws or regulations change – or court decisions alter – the requirements in a way that impacts this document, this document will be construed to comply with the most recent government regulations or holdings.

This document does not create legally enforceable protections beyond the protection of the background state and federal laws which frame such policies and codes, generally.

This policy and procedures are effective [August 14, 2020].

Exhibit 6 Page 38 of 38

SUPERIOR COURT OF THE STATE OF WASHINGTON
IN THE COUNTY OF WALLA WALLA

JOHN DOE

        Plaintiff,

vs.

THE BOARD OF TRUSTEES OF WHITMAN
COLLEGE, a non-profit corporation.

Case No.: 23-2-00228-36

ORDER GRANTING MOTION FOR
TEMPORARY RESTRAINING ORDER

The Plaintiff's Motion for Temporary Restraining Order came before the Court with oral argument. The Court has considered the following pleadings and evidence:

1.      Plaintiff's Motion for Temporary Restraining Order; and

2.      Declaration of John Doe in Support of Motion for Temporary Restraining Order.

Being fully advised, the Court finds that Plaintiff has met the applicable burdens for a temporary restraining order under RCW 7.40.020.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREEED that Plaintiff's Motion for Temporary Restraining Order is GRANTED.

Defendant is hereby IMMEDIATELY RESTRAINED AND ENJOINED FROM expelling John Doe from Whitman College until a hearing on a motion for a preliminary injunction can be held.

ORDER GRANTING MOTION FOR TEMPORARY
RESTRAINING ORDER - 1

**Cedar Law PLLC**
113 Cherry Street, PMB 96563
Seattle, WA 98104-2205
lara@cedarlawpllc.com
Phone (206) 607-8277 • Fax (206) 237-9101

Dated this _____ of April, 2023.

_____
Judge/Court Commissioner

Presented by:


___s/Lara Hruska_____
LARA HRUSKA, WSBA #46531
Attorney for Plaintiff
Lara@CedarLawPLLC.com

ORDER GRANTING MOTION FOR TEMPORARY
RESTRAINING ORDER - 2

1
2
3
4
5
6

SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR WALLA WALLA COUNTY

7

JOHN DOE,

8
                    Plaintiff,

9
         v.

10

THE BOARD OF TRUSTEES OF
11   WHITMAN COLLEGE, a non-profit
     corporation,
12
                    Defendant.
13

No. 23-2-00228-36

ACCEPTANCE OF SERVICE

14          I, Michael Porter, hereby declare that on behalf of defendant THE BOARD OF

15   TRUSTEES OF WHITMAN COLLEGE ("Whitman College"), I am authorized to accept and I

16   do hereby accept service of the following documents:  (1) Civil Cover Sheet, (2) Summons to

17   The Board of Trustees of Whitman College, (3) Complaint for Injunctive Relief and Damages,

18   (4) Motion to Proceed Under a Pseudonym, (5) Motion for Temporary Restraining Order,

19   (6) Declaration of John Doe in Support of Motion for Temporary Restraining Order,

20   (7) Proposed Order Granting Motion for Temporary Restraining Order, (8) Proposed Order

21   Granting Motion to Proceed Under a Pseudonym, and (9) Note for Hearing.

22

23   /// /// ///

24   /// /// ///

25   /// /// ///

26   /// /// ///

ACCEPTANCE OF SERVICE - 1

**MILLER NASH LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON 98121

4878-0129-4173.1

1    This Acceptance of Service is without waiver of any and all objections and/or

2  defenses.

3    DATED: April 18, 2023.

4    By: _____
     Michael Porter, WSBA No. 37339

5

6    MILLER NASH LLP
     Pier 70, 2801 Alaskan Way Ste. 300

7    Seattle, WA  98121-1128
     Tel:  (206) 624-8300 / Fax:  (206) 340-9599

8    Email:  michael.porter@millernash.com

9    Attorneys for Defendant Board of Trustees of
     Whitman College

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ACCEPTANCE OF SERVICE - 2

**MILLER NASH LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

4878-0129-4173.1